**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>FRIMET ROTH and ARNOLD ROTH,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)<br>)</td><td>Civil Action No. 20-3838 (ABJ)</td></tr>
<tr><td>U.S. DEPARTMENT OF STATE,</td><td>)<br>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)<br>)</td><td></td></tr>
</table>

<u>**DECLARATION OF MARIELLE T. LABERGE**</u>

Pursuant to 28 U.S.C. § 1746, I, Marielle T. LaBerge, declare and state as follows:

1. I am an associate at the law firm Proskauer Rose LLP. I have personal knowledge of the facts contained in this Declaration based my work on the matter and my review of documents in the record. I submit this Declaration in Opposition to Defendant's Motion for Summary Judgment and in support of Plaintiffs' Cross-Motion for Summary Judgment.

2. Exhibit 1 is a true and correct copy of B-1942772 as it was produced to Plaintiffs on February 14, 2021. It is identified on the *Vaughn* index[1] as Document 1.

3. Exhibit 2 is a true and correct copy of B-1942773 as it was produced to Plaintiffs on February 14, 2021. It is identified on the *Vaughn* index as Document 2.

4. Exhibit 3 is a true and correct copy of B-1942775 as it was produced to Plaintiffs on February 14, 2022. It is identified on the *Vaughn* index as Document 3.

---

[1] The *Vaughn* index was filed by Defendant on October 28, 2024 (ECF No. 50-4).

5. Exhibit 4 is a true and correct copy of B-1942777 as it was produced to Plaintiffs on March 14, 2021. It is identified on the *Vaughn* index as Document 4.

6. Exhibit 5 is a true and correct copy B-1942780 as it was produced to Plaintiffs on February 14, 2021. It is identified on the *Vaughn* index as Document 5.

7. Exhibit 6 is a true and correct copy of B-2428519 as it was produced to Plaintiffs on April 14, 2023. It is identified on the *Vaughn* index as Document 6.

8. Exhibit 7 is a true and correct copy of B-2428530 as it was produced to Plaintiffs on May 12, 2023. It is identified on the *Vaughn* index as Document 7.

9. Exhibit 8 is a true and correct copy of B-2428523 as it was produced to Plaintiffs on April 14, 2023. It is identified on the *Vaughn* index as Document 8.

10. Exhibit 9 is a true and correct copy of B-2428550 as it was produced to Plaintiffs on April 14, 2023. It is identified on the *Vaughn* index as Document 9.

11. Exhibit 10 is a true and correct copy of B-2428554 as it was produced to Plaintiffs on April 14, 2023. It is identified on the *Vaughn* index as Document 10.

12. Exhibit 11 is true and correct copy of B-2428547 as it was produced to Plaintiffs on June 14, 2023. It is identified on the *Vaughn* index as Document 11.

13. Exhibit 12 is a true and correct copy of B-2428575 as it was produced to Plaintiffs on June 14, 2023. It is identified on the *Vaughn* index as Document 12.

14. Exhibit 13 is a true and correct copy of B-2528560 as it was produced to Plaintiffs on June 14, 2023. It is identified on the *Vaughn* index as Document 13.

15. Exhibit 14 is a true and correct copy of B-2528561 as it was produced to Plaintiffs on June 14, 2023. It is identified on the *Vaughn* index as Document 14.

16. Exhibit 15 is a true and correct copy of a document as it was produced to Plaintiffs on June 14, 2022. Though it does not have an identifying number, Plaintiffs believe it to be B-1942769, identified on the *Vaughn* index as Document 15, which has been withheld in full.

17. Exhibit 16 is a true and correct copy of A-329938 as it was produced to Plaintiffs on January 14, 2022. It is identified on the *Vaughn* index as Document 16.

18. Exhibit 17 is a slip sheet for A-329948, identified on the *Vaughn* index as Document 17, which has been withheld in full. Plaintiffs are unable to identify, with any degree of certainty, a document within the State Department's productions that corresponds to Document 17 on the *Vaughn* index.

19. Exhibit 18 is a slip sheet for A-329950, identified on the *Vaughn* index as Document 18, which has been withheld in full. Plaintiffs are unable to identify, with any degree of certainty, a document within the State Department's productions that corresponds to Document 18 on the *Vaughn* index.

20. Exhibit 19 is a true and correct copy of A-564207 as it was produced to Plaintiffs on March 14, 2023. It is identified on the *Vaughn* index as Document 19.

21. Exhibit 20 is a true and correct copy of A-564189 as it was produced to Plaintiffs on November 14, 2022. It is identified on the *Vaughn* index as Document 20.

22. Exhibit 21 is a true and correct copy of A-330457 as it was produced to Plaintiffs on April 14, 2022. It is identified on the *Vaughn* index as Document 21.

23. Exhibit 22 is a true and correct copy of A-445744 as it was produced to Plaintiffs on August 15, 2022. It is identified on the *Vaughn* index as Document 22.

24. Exhibit 23 is a true and correct copy of A-445756 as it was produced to Plaintiffs on August 15, 2022. It is identified on the *Vaughn* index as Document 23.

25. Exhibit 24 is a true and correct copy of A-564222 as it was produced to Plaintiffs on March 14, 2023. It is identified on the *Vaughn* index as Document 24.

26. Exhibit 25 is a true and correct copy of A-445749 as it was produced to Plaintiffs on August 15, 2022. It is identified on the *Vaughn* index as Document 25.

27. Exhibit 26 is a true and correct copy of A-445755 as it was produced to Plaintiffs on April 14, 2022. It is identified on the *Vaughn* index as Document 26.

28. Exhibit 27 is a slip sheet for A-445759, identified on the *Vaughn* index as Document 27. The State Department withheld Document 27 in part, but Plaintiffs are unable to identify, with any degree of certainty, a document within the State Department's productions that corresponds to Document 27 on the *Vaughn* index.

29. Exhibit 28 is a true and correct copy of A-459617 as it was produced to Plaintiffs on November 15, 2021. It is identified on the *Vaughn* index as Document 28.

30. Exhibit 29 is a slip sheet for A-445760, identified on the *Vaughn* index as Document 29, which has been withheld in full. Plaintiffs are unable to identify, with any degree of certainty, a document within the State Department's productions that corresponds to Document 29 on the *Vaughn* index.

31. Exhibit 30 is a true and correct copy of A-330393 as it was produced to Plaintiffs on May 14, 2021. It is not identified on the *Vaughn* index.

32. Exhibit 31 is a true and correct copy of A-330447 as it was produced to Plaintiffs on May 14, 2021. It is not identified on the *Vaughn* index.

33. Exhibit 32 is a true and correct copy of A-330289 as it was produced to Plaintiffs on June 11, 2021. It is not identified on the *Vaughn* index.

34. Exhibit 33 is a true and correct copy of B-1942770 as it was produced to Plaintiffs on May 16, 2022. It is not identified on the *Vaughn* index.

35. Exhibit 34 is a true and correct copy of A-330471 as it was produced to Plaintiffs on August 15, 2022. It is not identified on the *Vaughn* index.

36. Exhibit 35 is a true and correct copy of the Plaintiffs' August 7, 2020, FOIA request to the U.S. Department of State.

37. Exhibit 36 is a true and correct copy of the April 2, 2024 letter that Plaintiffs' attorneys sent to Assistant United States Attorney Stephen M. DeGenaro, regarding the deficiencies in the State Department's *Vaughn* index.

38. Exhibit 37 is a true and correct copy of the Department of Justice's criminal complaint against Ahlam Al-Tamimi filed on July 15, 2013. The criminal complaint was unsealed by the Department of Justice on March 14, 2017.  *See United States v. Ahmad Al-Tamimi*, No. 1-13:mj-00580-DAR (D.D.C. July 15, 2013).

39. Exhibit 38 is a true and correct copy of email correspondence between Plaintiffs' counsel and Assistant United States Attorney Stephen M. DeGenaro, on November 6, 2024, regarding discrepancies between the State Department's various productions of redacted documents to Plaintiffs and its *Vaughn* index.

40. Exhibit 39 is a true and correct copy of the Department of Justice's press release number 17-275, dated March 14, 2017, announcing the unsealing of the criminal complaint against Ahlam Al-Tamimi.

42. Exhibit 40 is a copy of the Congressional Record for the February 2, 2016, hearing before the House Oversight and Government Reform Committee's Subcommittee on National Security.  A transcript of Arnold Roth's oral statement begins on page 19 and his written statement

begins on page 22. *See* Seeking Justice for the Victims of Palestinian Terrorism in Israel: Hearing

Before the Subcomm. on National Security, 114 Cong. 19 (2016) (https://oversight.house.gov/wp-

content/uploads/2016/02/2016-2-2-Testimony-for-Arnold-Roth.pdf).

43. Exhibit 41 is a true and correct copy of A-329959 as it was produced to Plaintiffs on

June 10, 2021.  It is an English language version of the Jordanian Court of Cassation's decision to

deny the United States' extradition request for Ahlam Al-Tamimi.

I declare under the penalty of perjury that the foregoing is true and correct to the best of

my knowledge.

Executed this  _26_  day of November 2024, Boston, Massachusetts.

_____

Marielle T. LaBerge

# Exhibit 1

(b)(2)

**From:** (b)(6) FL-2021-00034    B-00001942772    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 13

**To:**

**Subject:** RE: Embassy of Jordan

**Date:** Tue, 7 Jan 2020 20:15:57 +0000

(b)(2)

(b)(2)

FL-2021-00034    B-00001942772    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 14

Here is my draft readout, sorry in advance because it is way too long. I highlighted key takeaways. Please let me know if you see anything egregious.

(b)(6);
(b)(7)(C)

**State-DOJ Meeting with Jordanian DCM** ☐ **to Discuss the Extradition of Ahlam Tamimi**
January 6, 2020 @ 1200 @ Jordanian Embassy

(b)(1); (b)(5);   (b)(7)(A)

(b)(2)

(b)(2)

FL-2021-00034    B-00001942772    "UNCLASSIFIED"    2/14/2022   FL-2021-00034 2-14-22 15

(b)(1); (b)(5);   (b)(7)(A)

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 12:58 PM
**To:** (b)(6)
**Cc:**
**Subject:** RE: Embassy of Jordan

Hi (b)(6)

No problem!

(b)(6)

U.S. Department of State
Jordan Desk Officer
Desk phone: (b)(6)
Cell phone/WhatsApp: (b)(6)

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 12:48 PM
**To:** (b)(6)
**Cc:**
**Subject:** FW: Embassy of Jordan

(b)(6);
(b)(7)(C)

Hope it is OK that I sent this directly. ⁓ called me earlier today and also emailed so I just replied.

(b)(2)    Best,

(b)(6)

(b)(2)

FL-2021-00034    B-00001942772    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 16

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 12:47 PM
**To:** (b)(7)(C)    (b)(6)
**Cc:** (b)(7)(C)    (b)(6)                                              Muniz, David
(b)(6)
**Subject:** RE: Embassy of Jordan

Hello

Thank you all very much for hosting our discussion yesterday. In response to your request yesterday and phone call earlier, I have attached both the Jordanian and U.S. instruments of ratification as well as the Protocol of Exchange of Instruments of Ratification. I hope this is helpful.

Best regards,

(b)(6)

Attorney-Adviser, L/LEI
OFFICE OF THE LEGAL ADVISER
U.S. Department of State
(b)(6)

**From:** 
**Sent:** Tuesday, January 7, 2020 10:41 AM
**To:** (b)(6)
**Cc:** 
**Subject:** Embassy of Jordan

Hi (b)(6)

Following up with our phone call and meeting yesterday.
Could you please send me a copy of the Jordanian and US letters of exchange (from both sides)?

Thank you very much for your cooperation.

Counselor
Embassy of the Hashemite Kingdom of Jordan in Washington DC
Desk: (b)(6)
Cell: ◄

(b)(2)

(b)(2)

FL-2021-00034    B-00001942772    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 17

Image removed by sender.

(b)(2)

(b)(2)

**Sender:**2021-00034   B-00001942772   "UNCLASSIFIED"   2/14/2022   FL-2021-00034 2-14-22 18

**Recipient:**

(b)(2)

# Exhibit 2

(b)(2)

(b)(1); (b)(5); (b)(7)(A)    FL-2021-00034    B-00001942773    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 10

(b)(2)

(b)(2)

FL-2021-00034    B-00001942773    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 11
(b)(1);    (b)(7)(A)

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 12:58 PM
**To:** (b)(6)
**Cc:**
**Subject:** RE: Embassy of Jordan

Hi (b)(6)

No problem!

(b)(6)

U.S. Department of State
Jordan Desk Officer
Desk phone: (b)(6)
Cell phone/WhatsApp: (b)(6)

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 12:48 PM
(b)(6);  **To:** (b)(6)
(b)(7)(C)  **Cc:**
**Subject:** FW: Embassy of Jordan

Hope it is OK that I sent this directly. [    ] called me earlier today and also emailed so I just replied.

Best,

(b)(6)

(b)(6);
(b)(7)(C)  **From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 12:47 PM
**To:**
(b)(6);  **Cc:**                              (b)(6)                              Muniz,
(b)(7)(C)  David (b)(6)
**Subject:** RE: Embassy of Jordan

Hello

Thank you all very much for hosting our discussion yesterday. In response to your request yesterday and phone call earlier, I have attached both the Jordanian and U.S. instruments of ratification as well as the Protocol of Exchange of Instruments of Ratification. I hope this is helpful.

Best regards,

(b)(6)

(b)(2)

# Exhibit 3

(b)(2)

FL-2021-00034     B-00001942775     "UNCLASSIFIED"     2/14/2022    FL-2021-00034 2-14-22 4

**From:** (b)(6)

(b)(6);
(b)(7)(C)

**To:**

**CC:**

**Subject:**   RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM [        ] (Tamimi)

**Date:**   Wed, 8 Jan 2020 20:12:54 +0000

(b)(2)

(b)(2)

FL-2021-00034    B-00001942775    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 5

Yes, could you please shorten it up a bit and let's wait until COB today (in case John weighs in) before sending to Nathan Thanks, (b)(6)

SENSITIVE BUT UNCLASSIFIED

From: (b)(6)
Sent: Wednesday, January 8, 2020 2:49 PM                                            (b)(6);
To: (b)(6)                                                                          (b)(7)(C)
Cc:
Subject: RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM          (Tamimi)

I think you are right since John wasn't in the meeting.  He may want to expand upon potential next steps at some point. am happy to shorten the readout and send it to Nathan if you'd like.

SENSITIVE BUT UNCLASSIFIED

From: (b)(6)
Sent: Wednesday, January 8, 2020 2:30 PM                                            (b)(6);
To: (b)(6)                                                                          (b)(7)(C)
Cc:
Subject: RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM          (Tamimi)

Thanks for this, (b)(6)  A process question – does John typically like reviewing such readouts before we pass to Nathan? have usually sent such readouts to Nathan directly and copied John, et al.  Thanks.

SENSITIVE BUT UNCLASSIFIED

From: (b)(6)
Sent: Tuesday, January 7, 2020 3:10 PM
To: Godfrey, John T (b)(6)                                                          (b)(6);
Cc: Muniz, David (b)(6)                                                             (b)(7)(C)
(b)(6)

Subject: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM          (Tamimi)

John,

(b)(5);   (b)(7)(A)

(b)(1);   (b)(7)(A)

(b)(2)

(b)(2)

FL-2021-00034    B-00001942775    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 6

Please let me know if you have any questions of if you'd like me to send this to Nathan. The below readout is too long so
highlighted key takeaways.

(b)(6)

(b)(6);
(b)(7)(C)

**State-DOJ Meeting with Jordanian DCM** ———— **to Discuss the Extradition of Ahlam Tamimi**
January 6, 2020 @ 1200 @ Jordanian Embassy

(b)(1);  (b)(7)(A)

(b)(2)

(b)(2)

FL-2021-00034    B-00001942775        "UNCLASSIFIED"        2/14/2022    FL-2021-00034 2-14-22 7

(b)(1);  (b)(7)(A)

SENSITIVE BUT UNCLASSIFIED

(b)(2)

(b)(2)

**Sender:** (b)(6)  2/14/00034    B-00001942775    "UNCLASSIFIED"    2/14/2022    FL-2021-00034 2-14-22 8

**Recipient:**

(b)(2)

# Exhibit 4

**From:** "Godfrey, John T" (b)(6)
**To:** (b)(6)
**CC:**
**Subject:** RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM (Tamimi)
**Date:** Thu, 9 Jan 2020 00:46:55 +0000

(b)(6);
(b)(7)(C)

Thanks for sending him the readout – good call.

SENSITIVE BUT UNCLASSIFIED  .

**From:** (b)(6)
**Sent:** Wednesday, January 8, 2020 6:06 PM
**To:** Godfrey, John T (b)(6)
**Cc:** (b)(6)
**Subject:** RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM (Tamimi)

(b)(6);
(b)(7)(C)

John --

I chatted with (b)(6) about this and I'm going to send an abbreviated version of the below readout to Nathan. The Desk shared that the King's visit to D.C. is not yet on the books but could be end of January/early February, if it happens.

(b)(6)

SENSITIVE BUT UNCLASSIFIED

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 3:10 PM
**To:** Godfrey, John T (b)(6)
**Cc:** Muniz, David (b)(6)
(b)(6)

(b)(6);
(b)(7)(C)

**Subject:** For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM (Tamimi)

John,

(b)(5);   (b)(7)(A)

(b)(1); (b)(7)(A)

Please let me know if you have any questions of if you'd like me to send this to Nathan.  The below readout is too long so I highlighted key takeaways.

(b)(6)

(b)(6);
(b)(7)(C)

**State-DOJ Meeting with Jordanian DCM** _____ **to Discuss the Extradition of Ahlam Tamimi**
January 6, 2020 @ 1200 @ Jordanian Embassy

(b)(1); (b)(7)(A)

(b)(1);   (b)(7)(A)

SENSITIVE BUT UNCLASSIFIED

**Sender:** "Godfrey, John T" (b)(6)

**Recipient:** (b)(6)

# Exhibit 5

FL-2021-00034    B-00001942780        "UNCLASSIFIED"        2/14/2022    FL-2021-00034 2-14-22 1

**From:** (b)(6)

**To:**                                                                    (b)(6);
                                                                           (b)(7)(C)

**Subject:** RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM (Tamimi)

**Date:** Tue, 7 Jan 2020 20:13:27 +0000

I love that this is what I am spending my time on this week of all weeks.

SENSITIVE BUT UNCLASSIFIED

**From:** (b)(6)                                                           (b)(6);
**Sent:** Tuesday, January 7, 2020 3:10 PM                                  (b)(7)(C)
**To:** (b)(6)
**Subject:** RE: For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM (Tamimi)

So tidy!

SENSITIVE BUT UNCLASSIFIED

**From:** (b)(6)
**Sent:** Tuesday, January 7, 2020 3:10 PM
**To:** Godfrey, John T (b)(6)
**Cc:** Muniz, David (b)(6)                                                 (b)(6);
(b)(6)                                                                      (b)(7)(C)

**Subject:** For JG: Readout: State-DOJ January 6 Meeting w/ Jordanian DCM (Tamimi)

John,

(b)(5);  (b)(7)(A)

(b)(1);  (b)(7)(A)

FL-2021-00034     B-00001942780          "UNCLASSIFIED"          2/14/2022     FL-2021-00034 2-14-22 2

Please let me know if you have any questions of if you'd like me to send this to Nathan. The below readout is too long so I highlighted key takeaways.

(b)(6)

(b)(6);
(b)(7)(C)

**State-DOJ Meeting with Jordanian DCM** _____ **to Discuss the Extradition of Ahlam Tamimi**
January 6, 2020 @ 1200 @ Jordanian Embassy

(b)(1);   (b)(7)(A)

FL-2021-00034    B-00001942780        "UNCLASSIFIED"        2/14/2022   FL-2021-00034 2-14-22 3

(b)(1);   (b)(7)(A)

SENSITIVE BUT UNCLASSIFIED

**Sender:** (b)(6)
**Recipient:**

# Exhibit 6

UNCLASSIFIED

SECRET//NOFORN

### (SBU) Background for Under Secretary Hale's (P) Call with Jordanian Ambassador Kawar

(b)(1)

**(U) October 29 Jordanian Holiday:**  Prime Minister Khasawneh decreed on October 22 that October 29 would be a non-working public holiday in Jordan to commemorate the Prophet Muhammad's birthday.

SECRET//NOFORN
Classified by:  CT Coordinator Nathan A. Sales
E.O. 13526, Reasons:  1.4 (b) and (d)
Declassify on:  October 21, 2045

# Exhibit 7

SECRET//NOFORN

**(SBU) Background for the Deputy Secretary's Call with
Jordanian Ambassador Dina Kawa**

(b)(1)

SECRET//NOFORN
Classified by: CT Coordinator Nathan A. Sales
E.O. 13526, Reasons: 1.4 (b) and (d)
Declassify on: October 16, 2045

# Exhibit 8

**CT Acting Deputy Coordinator David Muniz's Meeting with Jordanian DCM Ali Arabiyat 6 January 2020**

CT ADC David Muniz met with Jordanian DCM Ali Arabiyat on 6 January to discuss Ahlam al-Tamimi. ADC Muniz opened with the following points:

(b)(1)

DCM Arabiyat responded with the following points:

(b)(1)

After the meeting, CT agreed to draft a message to the Roth family noting recent engagements on the Tamimi issue.

# Exhibit 9

| From: | (b)(6)                                  @state.sgov.gov> |
|---|---|
| To: | Sasahara, Karen H (b)(6)          @state.sgov.gov>;<br>Hankey, Michael P (b)(6)       @state.sgov.gov>;<br>Amman-MSX-POL-DL <Amman-MSX-POL-DL@state.sgov.gov>;<br>Amman-MSX-ECON-DL <Amman-MSX-ECON-DL@state.sgov.gov>;<br>Amman EXEC <AmmanEXEC@state.sgov.gov>;<br>(b)(6)                              @state.sgov.gov>;<br>(b)(6)                                   >@state.sgov.gov>;<br>(b)(6)                      @state.sgov.gov>;<br>(b)(6)                            @state.sgov.gov> |
| CC: | (b)(6)                                    >@state.sgov.gov>;<br>Rayburn, Joel D (b)(6)       @state.sgov.gov>;<br>NEA-Jordan-DL <NEA-Jordan-DL@state.sgov.gov> |
| Subject: | Jordan Desk OI Jan 6 |
| Date: | Mon, 6 Jan 2020 16:47:09 -0500 |

Amman Colleagues,

**Jordan Desk OI – January 6, 2020**

(C) **CT Meeting with Jordan DCM on Tamimi:** Readout attached for CT Acting Deputy Coordinator Muniz's meeting with Jordanian DCM Ali Arabiyat. (b)(1)                                                                                                    CT agreed to draft a message for the Roth family noting recent engagements on the issue. The Desk will clear with post once we get it.

**(SBU)**

(b)(6)

Jordan Desk Officer

(b)(6)

**Official - Sensitive**

~~CONFIDENTIAL~~

Classified By: David Schenker - Assistant Secretary, Office:NEA, Agency:U.S. Department of State
Declassify On: 1/6/2045
Reasons: Derived Per DSCG.

| Sender: | (b)(6)                                  >@state.sgov.gov> |
|---|---|
| Recipient: | Sasahara, Karen H (b)(6)          I@state.sgov.gov>; |

Hankey, Michael P (b)(6) @state.sgov.gov>;
Amman-MSX-POL-DL <Amman-MSX-POL-DL@state.sgov.gov>;
Amman-MSX-ECON-DL <Amman-MSX-ECON-DL@state.sgov.gov>;
Amman EXEC <AmmanEXEC@state.sgov.gov>;
(b)(6) @state.sgov.gov>;
(b)(6) @state.sgov.gov>;
(b)(6) @state.sgov.gov>;
(b)(6) @state.sgov.gov>;
(b)(6) @state.sgov.gov>;
Rayburn, Joel D (b)(6) @state.sgov.gov>;
NEA-Jordan-DL <NEA-Jordan-DL@state.sgov.gov>

# Exhibit 10

| From: | "Sales, Nathan A" |
| --- | --- |
| To: | (b)(6) @state.sgov.gov> |
| CC: | CT_StaffAssistants <CT_StaffAssistants@state.sgov.gov>; Muniz, David (b)(6) @state.sgov.gov>; (b)(6) @state.sgov.gov>; Godfrey, John T (b)(6) @state.sgov.gov>; Romanowski, Alina L (b)(6) @state.sgov.gov> |
| Subject: | RE: Draft email to AAG Demers on Kawar meeting |
| Date: | Tue, 16 Jul 2019 19:52:58 +0000 |

Looks good, thanks.

**Official - Sensitive**
~~SECRET~~
Classified By: Nathan Sales - Coordinator, Office:CT, Agency:U.S. Department of State
Declassify On: 7/16/2029
Reasons: (Derived) Classification derived from previous message(s)

---

**From:** (b)(6)
**Sent:** Tuesday, July 16, 2019 3:35 PM
**To:** Sales, Nathan A
**Cc:** CT_StaffAssistants; Muniz, David; (b)(6) ; Godfrey, John T; Romanowski, Alina L
**Subject:** Draft email to AAG Demers on Kawar meeting

Sir—

A draft readout of the Kawar meeting for AAG Demers as requested.  (David reviewed.)

Regards,

(b)(6)

(b)(1)

(b)(1)

(b)(6)

Bureau of Counterterrorism (CT/SCAN)

(b)(6)

**Official - Sensitive**

~~SECRET~~

Classified By: Nathan Sales - Coordinator, Office:CT, Agency:U.S. Department of State
Declassify On: 7/16/2029
Reasons: Derived Per DSCG.

| | |
|---|---|
| **Sender:** | "Sales, Nathan A" |
| **Recipient:** | (b)(6) @state.sgov.gov>;<br>CT_StaffAssistants <CT_StaffAssistants@state.sgov.gov>;<br>Muniz, David (b)(6) @state.sgov.gov>;<br>(b)(6) @state.sgov.gov>;<br>Godfrey, John T (b)(6) @state.sgov.gov>;<br>Romanowski, Alina L (b)(6) @state.sgov.gov> |

# Exhibit 11

(b)(1)

**Background**

(b)(1)

**Official - Sensitive**

# Exhibit 12

| From: | (b)(6) @state.sgov.gov> |
|---|---|
| To: | Godfrey, John T (b)(6) @state.sgov.gov> |
| CC: | (b)(6) @state.sgov.gov>;<br>(b)(6) @state.sgov.gov>;<br>Pounds, Tim J (b)(6) @state.sgov.gov>;<br>(b)(6) @state.sgov.gov> |
| Subject: | Urgent for JTG: Draft Informal Note to D CoS Palladino on Tamimi |
| Date: | Wed, 30 Sep 2020 14:46:50 -0400 |

John,

Per your request. The below has been updated to reflect today's developments. (b)(5)

(b)(6) Will come back up to FO now in case you have Qs.

**(SBU) State of Play**

(b)(1)

(b)(1)

**(U) Background**

(b)(1)

Attachment:
  CT's January 17 Note to S on USG Tamimi Engagement

**Official - Sensitive**
~~SECRET//NOFORN~~

Classified By: Nathan A. Sales - Ambassador, Office:CT, Agency:U.S. Department of State
Declassify On: 9/30/2045
Reasons: Derived Per DSCG.

**From:** (b)(6)
**Sent:** Monday, September 28, 2020 5:22 PM
**To:** Godfrey, John T; Pounds, Tim J
**Cc:** (b)(6)
**Subject:** For JTG and TP: Draft Informal Note to S CoS Palladino on Tamimi

Dear PDC Godfrey and DC Pounds,

Per your request, please a draft informal note to S CoS Palladino regarding the Tamimi case below. (b)(6) and (b)(6) have reviewed.   Also attached is the Note to S we sent up back in January on this case.
 Please let me know if you have any questions. I should be around for another hour before I have to take off.

Regards,

(b)(6)
Bureau of Counterterrorism – Syria, Iraq, Jordan, Egypt
U.S. Department of State, HST 2250
(b)(6)


**(SBU) Current State of Play**

(b)(1);   (b)(6)

(b)(1)

**(U) Background**

(b)(1)

Attachment:

    CT's January 17 Note to S on USG Tamimi Engagement

**Official - Sensitive**

~~SECRET//NOFORN~~

Classified By: Nathan A. Sales - Ambassador, Office:CT, Agency:U.S. Department of State
Declassify On: 9/28/2045
Reasons: Derived Per DSCG.

| Sender: | (b)(6)        @state.sgov.gov> |
|---|---|
| Recipient: | Godfrey, John T (b)(6)   @state.sgov.gov>;<br>(b)(6)     @state.sgov.gov>;<br>(b)(6)     @state.sgov.gov>; |

Pounds, Tim J (b)(6) @state.sgov.gov>;
(b)(6) @state.sgov.gov>

# Exhibit 13

| | |
|---:|---|
| **From:** | "Palladino, Robert J" (b)(6) @state.sgov.gov> |
| **To:** | Godfrey, John T (b)(6) @state.sgov.gov> |
| **CC:** | (b)(6) @state.sgov.gov>; Pounds, Tim J (b)(6) @state.sgov.gov> |
| **Subject:** | RE: Overview/Update on Ahlam al-Tamimi Case |
| **Date:** | Wed, 30 Sep 2020 08:24:53 -0400 |

John, many thanks for this overview.  Perfect.

**Official - Sensitive**
~~SECRET//NOFORN~~
Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S. Department of State
Declassify On: 9/28/2070
Reasons: (Derived) Classification derived from previous message(s)

**From:** Godfrey, John T (b)(6) @state.sgov.gov>
**Sent:** Monday, September 28, 2020 7:14 PM
**To:** Palladino, Robert J (b)(6) @state.sgov.gov>
**Cc:** (b)(6) @state.sgov.gov>; Pounds, Tim J (b)(6) @state.sgov.gov>
**Subject:** Overview/Update on Ahlam al-Tamimi Case

Hi, Robert – it was good seeing you again this morning up in the D suite.  As discussed, please find below a brief overview/update on the case of Ahlam al-Tamimi.

**Background**

(b)(1)

(b)(1)

**Current State of Play**

(b)(1)

Attachment:

     CT's January 17 Note to S on USG Tamimi Engagement

I hope this is helpful for you and your team – please let us know if you need more on this.

Best,

John

**John T. Godfrey**
*Principal Deputy Assistant Secretary*
*Counterterrorism Bureau – U.S. Department of State*
*O:* (b)(6)

**Official - Sensitive**
~~SECRET//NOFORN~~
Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S. Department of State
Declassify On: 50X1-HUM
Reasons: Derived Per DSCG.

| | |
|---|---|
| **Sender:** | "Palladino, Robert J" (b)(6) @state.sgov.gov> |
| **Recipient:** | Godfrey, John T (b)(6) @state.sgov.gov>; (b)(6) @state.sgov.gov>; Pounds, Tim J (b)(6) @state.sgov.gov> |

# Exhibit 14

| From: | (b)(6)                                         @state.sgov.gov> |
|-------|----------------------------------------------------------------|
| To:   | (b)(6)                               @state.sgov.gov>;<br>Nelson, Kevin D (b)(6)        @state.sgov.gov>;<br>(b)(6)                               @state.sgov.gov> |
| CC:   | (b)(6)                               @state.sgov.gov>;<br>(b)(6)                          @state.sgov.gov>;<br>(b)(6)                                    @state.sgov.gov>;<br>(b)(6)                          @state.sgov.gov> |
| Subject: | RE: Update on Tamimi Case |
| Date: | Thu, 1 Oct 2020 15:19:07 -0400 |

Thanks (b)(6)

**Official - Sensitive**
~~SECRET//NOFORN~~
Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S. Department of State
Declassify On: 9/30/2045
Reasons: (Derived) Classification derived from previous message(s)

---

**From:** (b)(6)
**Sent:** Thursday, October 01, 2020 3:06 PM
**To:** (b)(6)          Nelson, Kevin D; (b)(6)
**Cc:** (b)(6)
**Subject:** FW: Update on Tamimi Case

FYI

**Official - Sensitive**
~~SECRET//NOFORN~~
Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S. Department of State
Declassify On: 9/30/2045
Reasons: (Derived) Classification derived from previous message(s)

---

**From:** Godfrey, John T
**Sent:** Thursday, October 01, 2020 3:03 PM
**To:** (b)(6)
**Cc:** Pounds, Tim J
**Subject:** FW: Update on Tamimi Case

**Official - Sensitive**

~~SECRET//NOFORN~~

Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S. Department of State
Declassify On: 9/30/2045
Reasons: (Derived) Classification derived from previous message(s)

---

**From:** Godfrey, John T
**Sent:** Thursday, October 01, 2020 1:35 PM
**To:** Waters, John R (Rick); (b)(6) Palladino, Robert J
**Cc:** Sales, Nathan A; Pounds, Tim J; Schenker, David K; Hood, Joey R; Hooke, Kathleen H; (b)(6) C; Hankey, Michael P; Wooster, Henry T; (b)(6) Nelson, Phillip R (Doha)
**Subject:** RE: Update on Tamimi Case

Circling back on this.

(b)(1)

(b)(1)

Thank you,

John

**Official - Sensitive**

~~SECRET//NOFORN~~

Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S.
Department of State
Declassify On: 9/30/2045
Reasons: (Derived) Classification derived from previous message(s)

**From:** Godfrey, John T
**Sent:** Wednesday, September 30, 2020 3:04 PM
**To:** Waters, John R (Rick); (b)(6) Palladino, Robert J; (b)(6)
**Cc:** Sales, Nathan A; Pounds, Tim J; Schenker, David K; Hood, Joey R; Hooke, Kathleen H; (b)(6)
C; Hankey, Michael P
**Subject:** Update on Tamimi Case
**Importance:** High

*There has been considerable churn on the Tamimi case today.  Flagging the latest below – pls let
us know if you have questions/concerns.*

*John*

**State of Play**

(b)(1)

(b)(1)

**Background**

(b)(1)

**Official - Sensitive**

~~SECRET//NOFORN~~

Classified By: John T. Godfrey - Deputy Coordinator, Office:Bureau of Counterterrorism, Agency:U.S. Department of State
Declassify On: 9/30/2045
Reasons: Derived Per DSCG.

| Sender: | (b)(6) | @state.sgov.gov> |
|---|---|---|
| **Recipient:** | (b)(6) | @state.sgov.gov>; |
| | Nelson, Kevin D (b)(6) | @state.sgov.gov>; |
| | (b)(6) | @state.sgov.gov>; |
| | (b)(6) | @state.sgov.gov>; |
| | (b)(6) | @state.sgov.gov>; |
| | (b)(6) | @state.sgov.gov>; |
| | (b)(6) | @state.sgov.gov> |

# Exhibit 15

Case 1:20-cv-03838-ABJ     Document 53-3     Filed 11/26/24     Page 63 of 270

Withheld pursuant to exemption

(b)(5)

Withheld pursuant to exemption

(b)(5)

Page 06

Withheld pursuant to exemption

(b)(5)

Withheld pursuant to exemption

(b)(5)

Case 1:20-cv-03838-ABJ     Document 53-3     Filed 11/26/24     Page 69 of 270

Withheld pursuant to exemption

(b)(5)

Withheld pursuant to exemption

(b)(5)

Withheld pursuant to exemption

(b)(5)

# Exhibit 16

| | |
|---|---|
| **From:** | (b)(6) |
| **To:** | |
| **CC:** | |
| **Subject:** | FW: Al-Tamimi - (b)(7)(A) |
| **Date:** | Tue, 23 Jul 2019 16:19:48 +0000 |

(b)(6)

(b)(7)(A)

(b)(7)(A)   Also, it might be worth saving the attached translations of the court decisions somewhere there as well.

Best,

(b)(6)

**Official - SBU**
**UNCLASSIFIED**

**From:** Olson, Jeffrey (CRM) (b)(6); (b)(7)(C) @usdoj.gov>
**Sent:** Monday, July 22, 2019 4:47 PM
**To:** (b)(6)
**Cc:** (b)(6); (b)(7)(C) (CRM) (b)(6); (b)(7)(C) @usdoj.gov>
**Subject:** RE: Al-Tamimi - (b)(7)(A)

Hi (b)(6)

(b)(5)

Let me know if you have questions.

Jeff

Jeffrey Olson
DOJ/OIA
Desk 202-(b)(6); (b)(7)(C)

**From:** (b)(6)
**Sent:** July 22, 2019 11:13 AM
**To:** Olson, Jeffrey (CRM) (b)(6); (b)(7)(C) @CRM.USDOJ.GOV>; (b)(6); (b)(7)(C) (CRM) (b)(6); (b)(7)(C) @CRM.USDOJ.GOV>
**Subject:** Al-Tamimi - (b)(7)(A)

Jeff and (b)(6); (b)(7)(C)

After the Jordanian Court of Cassation ruled against our request to extradite Tamimi, (b)(7)(A)

(b)(7)(A)

Best,

(b)(6)

Attorney-Adviser, L/LEI
OFFICE OF THE LEGAL ADVISER
U.S. Department of State

(b)(6)

CAUTION: Information contained in this message may be protected by the attorney/client, attorney work product, deliberative process or other privileges. Do not disseminate further without approval from the Office of the Legal Adviser.

**Official - SBU**
UNCLASSIFIED

| | | |
|---|---|---|
| **Sender:** | (b)(6) | |
| **Recipient:** | | |

# Exhibit 17

## Intentionally Left Blank - Exhibit Not Produced

# Exhibit 18

**Intentionally Left Blank - Exhibit Not Produced**

# Exhibit 19

| From: | (b)(6) |
|---|---|
| To: | |
| Subject: | FW: Tamimi letter |
| Date: | Wed, 13 Mar 2019 19:37:00 +0000 |

**Official – Privacy/PII**
**UNCLASSIFIED**

**From:** (b)(6);   (b)(7)(C)              @usdoj.gov>
**Sent:** Wednesday, February 08, 2017 10:39 AM
**To:** Olson, Jeffrey (b)(6);         @usdoj.gov>; (b)(6)
(b)(6)                                                              ;
**Cc:** Korkor, Samer (CRM) (b)(6);         @usdoj.gov>
**Subject:** RE: Tamimi letter

Hi all,

The package and copies are in the pouch. Attached here are the full package in PDF, and the dip note request in both PDF and Word.

Thanks,
(b)(6);

**From:** Olson, Jeffrey
**Sent:** Tuesday, February 7, 2017 6:02 PM
**To:** (b)(6)
(b)(6)
**Cc:** Korkor, Samer (CRM) (b)(6);         @CRM.USDOJ.GOV>(b)(6);   (b)(7)(C)
(b)(6);   (b)(7)(C)      USDOJ.GOV>
**Subject:** RE: Tamimi letter                                                .

(b)(5)

Jeffrey Olson
DOJ/OIA
Desk (b)(6);

**From:** (b)(6)
**Sent:** February 7, 2017 5:57 PM
**To:** Olson, Jeffrey (b)(6);   (b)(7)(C)   USDOJ.GOV>; (b)(6)
(b)(6)
**Cc:** Korkor, Samer (CRM)(b)(6);   (b)(7)(C)      USDOJ.GOV>(b)(6);   (b)(7)(C)

(b)(6);   (b)(7)(C)   USDOJ.GOV>
**Subject:** RE: Tamimi letter

Exciting.  Personally, I am always pleased to see an email chain that references my good looks.

(b)(5)

(b)(6)

SBU
This email is UNCLASSIFIED.

---

**From:** Olson, Jeffrey [mailto:(b)(6);   @usdoj.gov]
**Sent:** Tuesday, February 07, 2017 5:51 PM
**To:** (b)(6)
**Cc:** Korkor, Samer (CRM); (b)(6);   (b)(7)(C)
**Subject:** RE: Tamimi letter

All,

(b)(5)

Thanks
Jeff

Jeffrey Olson
DOJ/OIA
Desk (b)(6);

---

**From:** (b)(6)
**Sent:** June 23, 2016 9:29 AM
**To:** Olson, Jeffrey <(b)(6);   (b)(7)(C)   USDOJ.GOV>
**Cc:** (b)(6)                                          ; Korkor, Samer (CRM)
(b)(6);   (b)(7)(C)   USDOJ.GOV>; (b)(6);   (b)(7)(C)                          USDOJ.GOV>
**Subject:** RE: Tamimi letter

To be clear, it was mostly my good looks.

-----Original Message-----
From: Olson, Jeffrey [mailto:(b)(6);   @usdoj.gov]
Sent: Thursday, June 23, 2016 9:24 AM

To: (b)(6)
Cc: (b)(6)          Korkor, Samer (CRM): (b)(6);   (b)(7)(C)
Subject: Re: Tamimi letter

I knew you were hired for more than just your good looks and charm. Thanks for catching that (b)(5)
(b)(5)

(b)(5)

Thanks
Jeff

Jeffrey Olson
DOJ/OIA
Mobile (b)(6);

On Jun 23, 2016, at 9:20 AM, (b)(6)
<(b)(6)                                          > wrote:

(b)(5)

SBU
This email is UNCLASSIFIED.

From: Olson, Jeffrey [http:/(b)(6);   (b)(7)(C)                   @usdoj.gov]
Sent: Thursday, June 23, 2016 9:12 AM
To: (b)(6)
Cc: Korkor, Samer (CRM): (b)(6);   (b)(7)(C)
Subject: Tamimi letter
Importance: High

Hi (b)(6)

(b)(5)

Let me know if you have questions.

Thanks
Jeff

Jeffrey M. Olson
Associate Director for Asia|Pacific|Africa|Middle East Affairs U.S. Department of Justice, Office of International

Affairs • (b)(6):    (b)(7)(C) | • Email:
(b)(6):          @usdoj.gov• (b)(6):    (b)(7)(C)
(b)(6):          @usdoj.gov>
• Mob: + (b)(6):          | • After Hours Command Center: +1-202-514-5000


SBU
This email is UNCLASSIFIED.


| **Sender:** | (b)(6) | |
|---|---|---|
| **Recipient:** | | |

# Exhibit 20

| From: | (b)(6) @state.gov> |
|---|---|
| To: | Nepal, Rohit S (Amman) (b)(6) @state.gov>; NEA-Jordan-DL <NEA-Jordan-DL@state.gov> |
| CC: | (b)(6) @state.gov>; (b)(6) @state.gov> |
| Subject: | Re: FYSA ~ Timeline of U.S. engagement w/GoJ on Tamimi |
| Date: | Wed, 15 Mar 2017 08:56:59 -0400 |

(b)(5)

(Sent from my mobile device.)

---

**From:** Nepal, Rohit S (Amman) (b)(6) @state.gov>
**Date:** March 15, 2017 at 8:08:40 AM EDT
**To:** NEA-Jordan-DL <NEA-Jordan-DL@state.gov>
**Cc:** (b)(6) @state.gov>, (b)(6)
(b)(6) @state.gov>
**Subject:** Fw: FYSA ~ Timeline of U.S. engagement w/GoJ on Tamimi

Desk friends - FYI in case you need the details on our engagement re Tamimi.  We have provided to GoJ.
Rohit Nepal
Political Counselor
U.S. Embassy Amman
(b)(6)

**From:** Wooster, Henry T (Amman) (b)(6) @state.gov>
**Sent:** Wednesday, 15 March 2017 14:04
**To:** Amman PA All Americans
**Cc:** Amman Exec; Nepal, Rohit S (Amman); (b)(6) (Amman); Amman Legatt
**Subject:** FYSA ~ Timeline of U.S. engagement w/GoJ on Tamimi

*Slightly edited from version LEGATT sent me this afternoon.*

**Official**
UNCLASSIFIED

---

**From:** Wooster, Henry T (Amman)
**Sent:** Wednesday, March 15, 2017 2:04 PM
**To:** 'Fayiz Khouri'
**Cc:** Wells, Alice G (Amman)
**Subject:** Timeline of U.S. engagement w/GoJ on Tamimi

UNCLASSIFIED

*Dear Fayiz, per our earlier exchange, please find below a timeline of U.S. engagement with the GoJ on Tamimi.*

(b)(7)(A)

*Very kind regards,*

*Henry T. Wooster*
Deputy Chief of Mission
U.S. Embassy Amman
(b)(6)

Follow us online:

UNCLASSIFIED U.S. Department of State Case No. F-2021-00034 3

**Official**
UNCLASSIFIED

| | |
|---|---|
| **Sender:** | (b)(6) @state.gov> |
| **Recipient:** | Nepal, Rohit S (Amman) (b)(6) @state.gov>; |
| | NEA-Jordan-DL <NEA-Jordan-DL@state.gov>; |
| | (b)(6) @state.gov>; |
| | (b)(6) @state.gov> |

# Exhibit 21

| From: | (b)(6) |
|---|---|
| To: | (b)(6);  (b)(7)(C) |
| Subject: | Fw: Tamimi Extradition Case |
| Date: | Mon, 22 Jun 2020 17:05:24 +0000 |

(b)(5)

(b)(6)
(b)(6)

From: Olson, Jeffrey (CRM (b)(6);  (b)(7)(C)
Sent: Wednesday, May 29, 2019 2:26 PM
To: (b)(6)                                                                    ; Gillice, Thomas (USADC)     (b)(6)

Cc: Friedman, Michael (USADC)
(b)(6)

(b)(6)                                    NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-
Jordan-DL@state.gov>>; (b)(6);  (b)(7)(C)
(b)(6);  (b)(7)(C)
Subject: RE: Tamimi Extradition Case

H (b)(6)
(b)(5);  (b)(6);  (b)(7)(C)

I hope that's helpful.

Jeff

Jeffrey M. Olson
Associate Director for Asia|Pacific|Africa|Middle East Affairs U.S. Department of Justice, Office of International
Affairs • Tel: (b)(6);  (b)(7)(C)
• Mob: (b)(6);  (b)(7)(C)

(b)(6)

From: (b)(6)
Sent: May 28, 2019 4:28 PM
To: Olson, Jeffrey (CRM) (b)(6);  (b)(7)(C)
Gillice, Thomas (USADC)

Cc: Friedman, Michael (USADC) (b)(6)
(b)(6)

(b)(6)                                              >; NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-
Jordan-DL@state.gov>>
Subject: Tamimi Extradition Case

DOJ colleagues,

I hope all is well with you and you had a good long weekend.

I spoke earlier today with Malki Roth's father Arnold regarding some concerns he has with the Jordan Media
Institute and its potential relationship with Ahlam al-Tamimi.  During our conversation, Mr. Roth relayed his
understanding that there had been three extraditions made under the bilateral U.S.-Jordan extradition treaty.  Mr.
Roth subsequently sent me the below list of people he claimed had been extradited from Jordan to the United States:

Eyad Ismoil (aka Iyad Isama'il Al-Najim)
Citizenship: Jordanian
Charge: Being part of the plot to destroy the World Trade Center in 1993 Fled to Jordan, captured by Jordanian
police in August 1995, immediately extradited to US. Convicted in November 1997, sentenced in April 1998 to 240
years imprisonment in a maximum security penitentiary

Mohammad Zaki Amawi
Citizenship: Both US and Jordanian
Charge: "Plotting to kill American soldiers serving overseas" (The Toledo, OH plotters) Arrested in Jordan and
extradited to US in February 2006. Convicted in a US court in June 2008 - sentenced to 20 years Nader Saadeh
Citizenship: Both US and Jordanian
Charge: Tried to join ISIS by going to Jordan on May 5, 2015 Apprehended in Jordan, extradited to US in August
2015 Convicted April 30, 2018 Sentenced to 10 years in a federal prison and will also serve a lifetime of supervised
release.

(b)(5)

Thanks,

(b)(6)

Official
UNCLASSIFIED
**Official - SBU**

**UNCLASSIFIED**

| | |
|---|---|
| **Sender:** | (b)(6) |
| **Recipient:** | (b)(6);  (b)(7)(C) |

# Exhibit 22



**From:**

**To:** (b)(6) @usdoj.gov>;

Olson, Jeffrey (CRM) (b)(6) @usdoj.gov>;
(b)(6) usdoj.gov>;
(b)(6) @usdoj.gov>;

**CC:**

NEA-Jordan-DL <NEA-Jordan-DL@state.gov>;

(b)(6) @usdoj.gov>;
(b)(6) @usdoj.gov>

**Subject:** RE: Tamimi Extradition Case

**Date:** Wed, 24 Jul 2019 21:06:08 +0000

Perfect, thank you!



**Official – SBU**
**UNCLASSIFIED**

**From:**
**Sent:** Wednesday, July 24, 2019 5:05 PM
**To:** (b)(6) (b)(6) @usdoj.gov>;
**Cc:** Olson, Jeffrey (CRM) (b)(6) usdoj.gov>;
(b)(6) usdoj.gov>; (b)(6)
(b)(6) usdoj.gov>; ; NEA-Jordan-DL <NEA-Jordan-
DL@state.gov>; (b)(6)
(b)(6) @usdoj.gov>; (b)(6) (b)(6) @usdoj.gov>
**Subject:** RE: Tamimi Extradition Case

(b)(5)

(b)(6)



(b)(6)

Attorney-Adviser, L/LEI
OFFICE OF THE LEGAL ADVISER
U.S. Department of State

CAUTION: Information contained in this message may be protected by the attorney/client, attorney work product, deliberative process or other privileges. Do not disseminate further without approval from the Office of the Legal Adviser.

(b)(6)

**Official - SBU**
**UNCLASSIFIED**

(b)(6)
(b)(6)

**From:**

**Sent:** Wednesday, July 24, 2019 4:29 PM

(b)(6)

**To:** (b)(6) (b)(6) @usdoj.gov>

**Cc:** ; Olson, Jeffrey (CRM) <(b)(6) @usdoj.gov>;

(b)(6)
(b)(6) usdoj.gov>;(b)(6)

(b)(6) @usdoj.gov>; ; NEA-Jordan-DL <NEA-Jordan-DL@state.gov>; (b)(6)

(b)(6) usdoj.gov>(b)(6) (b)(6) @usdoj.gov>

**Subject:** RE: Tamimi Extradition Case

(+ [ ] in our bureau, as well)

(b)(6)

**Official - SBU**
**UNCLASSIFIED**

(b)(6)
(b)(6)

**From:**

**Sent:** Wednesday, July 24, 2019 4:23 PM

(b)(6)

**To:** (b)(6) (b)(6) @usdoj.gov>

**Cc:** Olson, Jeffrey (CRM) (b)(6) @usdoj.gov>;

(b)(6) usdoj.gov>;(b)(6)

; NEA-Jordan-DL <NEA-Jordan-DL@state.gov>(b)(6) (b)(6) @usdoj.gov>;(b)(6)

(b)(6) @usdoj.gov>

**Subject:** RE: Tamimi Extradition Case

L and DOJ colleagues—



(b)(5)

(b)(6)

Regards,

(b)(6)

Acting Near East Unit Chief
Bureau of Counterterrorism Affairs (CT/SCAN)
U.S. Department of State

(b)(6)

**Official - SBU**
UNCLASSIFIED

(b)(6) **From:**

**Sent:** Wednesday, July 24, 2019 9:47 AM

(b)(6) **To:** (b)(6)                                @usdoj.gov>

**Cc:**                                        Olson, Jeffrey (CRM) (b)(6)        @usdoj.gov>;

(b)(6)                                        usdoj.gov> (b)(6)

(b)(6) (b)(6)              @usdoj.gov>;

                                                        ; NEA-Jordan-DL <NEA-Jordan-

DL@state.gov> (b)(6)                        @usdoj.gov>; (b)(6)

(b)(6)              @usdoj.gov>;

**Subject:** RE: Tamimi Extradition Case

Hi (b)(

(b)(5)



(b)(5)

(b)(6)

Thanks for your help.

(b)(6)

-----Original Message-----
(b)(6) From: (b)(6) (b)(6) @usdoj.gov>
(b)(6) Sent: Tuesday, July 23, 2019 10:03 PM
(b)(6) To:
Cc: Olson, Jeffrey (CRM) (b)(6) @usdoj.gov>;

(b)(6) (b)(6) (b)(6)

; NEA-Jordan-DL <NEA-Jordan-DL@state.gov> (b)(6)

(b)(6) (b)(6) @usdoj.gov> (b)(6) (b)(6) @usdoj.gov>;

Subject: Re: Tamimi Extradition Case

(b)(5)

Thanks for reaching out.
(b)(6)
Sent from my iPhone

(b)(6)

(b)(6) On Jul 23, 2019, at 1:46 PM, > wrote:

Thanks,

(b)(5)

(b)(6)

Best,

(b)(6) Attorney-Adviser, L/LEI
OFFICE OF THE LEGAL ADVISER
U.S. Department of State

CAUTION: Information contained in this message may be protected by the attorney/client, attorney work product, deliberative process or other privileges. Do not disseminate further without approval from the Office of the Legal Adviser.

(b)(6)

Official - SBU
UNCLASSIFIED

From:
Sent: Tuesday, July 23, 2019 11:57 AM
To: (b)(6)                (b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>> (b)(6)        (b)(6)
(USADC) (b)(6)                                        @usdoj.gov>>;
(b)(6)        usdoj.gov<mailto:(b)(6)        usdoj.gov>>
Cc: (b)(6)                <(b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>;
(b)(6)

(b)(6)                                        >; NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>; (b)(6)        <(b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>;
(b)(6)        (b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>

Subject: RE: Tamimi Extradition Case

Thanks, (b)(6)

The call will be on Thursday afternoon.  Mr. Roth had indicated he would send questions in advance, but he has yet to do so.  The latest question he asked via email was: "Has the Hashemite Kingdom of Jordan 'notified' the US of its refusal to extradite?"

Thanks,

(b)(6)

From: Olson, Jeffrey (CRM) (b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>
Sent: Tuesday, July 23, 2019 11:49 AM
To: (b)(6)        <(b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>
(b)(6)        usdoj.gov<mailto:(b)(6)        usdoj.gov>>
Cc: (b)(6)                (b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>;
(b)(6)

(b)(6)        ; NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>; (b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>;
(b)(6)        (b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov>>
Subject: RE: Tamimi Extradition Case

(b)( et al,

(b)(5)

Thanks
(b)(

(b)(6)

Jeffrey Olson
DOJ/OIA
Desk: (b)(6)

From: (b)(6) [mailto:(b)(5) @usdoj.gov]  (b)(6)
Sent: May 29, 2019 2:40 PM
To: Olson, Jeffrey (CRM) (b)(5) USDOJ.GOV<mailto:(b)(5) USDOJ.GOV>>;  (b)(6)
(b)(6) ;  (b)(6)
(b)(6) usdoj.gov<mailto:(b)(6) usdoj.gov>>
Cc:(b)(6)  (b)(6) doj.gov<mailto:(b)(6) doj.gov>>  (b)(6)

NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>> (b)(6)
(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>; (b)(6)
(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>
Subject: RE: Tamimi Extradition Case

(b)(5)

From: Olson, Jeffrey (CRM) (b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>  (b)(6)
Sent: Wednesday, May 29, 2019 2:36 PM
To: (b)(6)  (b)(6)
(b)(6) doj.gov<mailto:(b)(6) doj.gov>>;
(b)(6) usdoj.gov<mailto:(b)(6) usdoj.gov>>
Cc:(b)(6)  (b)(6) doj.gov<mailto:(b)(6) doj.gov>>

NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>> (b)(6)
(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>;(b)(6)
(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>
Subject: RE: Tamimi Extradition Case

(b)(5)

Jeffrey Olson
DOJ/OIA
Desk: (b)(6)

From:  (b)(6)
Sent: May 29, 2019 2:32 PM
To: Olson, Jeffrey (CRM) <(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>;  (b)(6)
(b)(6) ) <(b)(6) doj.gov<mailto:(b)(6) doj.gov>>;
(b)(6) usdoj.gov<mailto:(b)(6) usdoj.gov>>
Cc:(b)(6)  (b)(6) doj.gov<mailto:(b)(6) doj.gov>>;  (b)(6)

; NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>; (b)(6)
(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>;(b)(6)

(b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>
Subject: RE: Tamimi Extradition Case

(b)(6)

Thank you very much – this is very helpful.

(b)(6) Can I ask if the below information you provided has been shared with Mr. Roth previously?

Thank you,

Official
UNCLASSIFIED

(b)(6) From: Olson, Jeffrey (CRM) (b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>> (b)(6)
Sent: Wednesday, May 29, 2019 2:26 PM
(b)(6) To: (b)(6)
(b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>>;
(b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>>
(b)(6) Cc:(b)(6) ;(b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>>;
(b)(6) NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>;(b)(6) ;(b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>>;
(b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>>
Subject: RE: Tamimi Extradition Case

Hi

(b)(5) ;   (b)(6);   (b)(7)(C)

I hope that's helpful.

Jeff

Jeffrey M. Olson
Associate Director for Asia|Pacific|Africa|Middle East Affairs U.S. Department of Justice, Office of International Affairs • Tel: +(b)(6) • Email: (b)(6) @usdoj.gov<mailto:(b)(6) @usdoj.gov>
• Mob: +(b)(6) • After Hours Command Center: +1-202-514-5000

From:
Sent: May 28, 2019 4:28 PM
To: Olson, Jeffrey (CRM) (b)(6) USDOJ.GOV<mailto:(b)(6) USDOJ.GOV>>;
(b)(6) (b)(6) doj.gov<mailto:(b)(6) doj.gov>>;
(b)(6) usdoj.gov<mailto:(b)(6) usdoj.gov>>
Cc: (b)(6) (b)(6) doj.gov<mailto:(b)(6) doj.gov>>;

; NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>
Subject: Tamimi Extradition Case

DOJ colleagues,

I hope all is well with you and you had a good long weekend.

I spoke earlier today with Malki Roth's father Arnold regarding some concerns he has with the Jordan Media Institute and its potential relationship with Ahlam al-Tamimi. During our conversation, Mr. Roth relayed his understanding that there had been three extraditions made under the bilateral U.S.-Jordan extradition treaty. Mr. Roth subsequently sent me the below list of people he claimed had been extradited from Jordan to the United States:

Eyad Ismoil (aka Iyad Isama'il Al-Najim)
Citizenship: Jordanian
Charge: Being part of the plot to destroy the World Trade Center in 1993 Fled to Jordan, captured by Jordanian police in August 1995, immediately extradited to US. Convicted in November 1997, sentenced in April 1998 to 240 years imprisonment in a maximum security penitentiary

Mohammad Zaki Amawi
Citizenship: Both US and Jordanian
Charge: "Plotting to kill American soldiers serving overseas" (The Toledo, OH plotters) Arrested in Jordan and extradited to US in February 2006. Convicted in a US court in June 2008 - sentenced to 20 years Nader Saadeh
Citizenship: Both US and Jordanian
Charge: Tried to join ISIS by going to Jordan on May 5, 2015 Apprehended in Jordan, extradited to US in August 2015 Convicted April 30, 2018 Sentenced to 10 years in a federal prison and will also serve a lifetime of supervised release.

Thanks,

(b)(6)

Official
UNCLASSIFIED

From: Olson, Jeffrey (CRM) <(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>
Sent: Wednesday, March 13, 2019 12:13 PM
To: (b)(6)  ; (b)(6)
<(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>; Gaudiosi, Eric V
(b)(6)  NEA-Jordan-DL <NEA-Jordan-
DL@state.gov<mailto:NEA-Jordan-DL@state.gov>> (b)(6)
(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>
Cc:(b)(6)  <(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>;
(b)(6)

Subject: RE: Tamimi RFJ

+ [box] from L/LEI

Jeffrey M. Olson
Associate Director for Asia|Pacific|Africa|Middle East Affairs U.S. Department of Justice, Office of International
Affairs • Tel: (b)(6)  • Email: (b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>
• Mob: (b)(6)  • After Hours Command Center: +1-202-514-5000

From: [box]
Sent: March 13, 2019 11:24 AM
To:(b)(6)  (b)(6)  doj.gov<mailto:(b)(6)  doj.gov>>; Gaudiosi, Eric V
(b)(6)  ; NEA-Jordan-DL <NEA-Jordan-
DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>; Olson, Jeffrey (CRM)
(b)(6)  USDOJ.GOV <mailto:(b)(6)  USDOJ.GOV>>; (b)(6)
(b)(6)  usdoj.gov<mailto:(b)(6)  usdoj.gov>>
Cc:(b)(6)  <(b)(6)  doj.gov<mailto:(b)(6)  doj.gov>>
Subject: RE: Tamimi RFJ

Thanks, (b)(  I will reach out to NSC to see if that time works for them and revert back.

(b)(6)

Official
UNCLASSIFIED

From:(b)(6)  <(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>
Sent: Wednesday, March 13, 2019 11:15 AM
To [box]  Gaudiosi, Eric V
(b)(6)  ; NEA-Jordan-DL <NEA-Jordan-
DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>; Olson, Jeffrey (CRM)
(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>;
(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>
Cc:(b)(6)  <(b)(6)  @usdoj.gov<mailto:(b)(6)  @usdoj.gov>>
Subject: RE: Tamimi RFJ

(b)(6)  and Eric-
Looping in Jeff Olson from DOJ  OIA and (b)(6)  Let's have a
conference call to discuss further.  If, as you suggested, someone from NSC can be on the phone call, that might
help provide clarity on what the precise questions are and help us to focus our response.  We are all available at 4



pm if that would work for you. We can use the dial –in below.

Thanks.

Passcode

From:
Sent: Wednesday, March 13, 2019 8:49 AM
To: Gaudiosi, Eric V
<                 doj.gov<mailto:             doj.gov>>; NEA-Jordan-DL <NEA-Jordan-
DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>
Subject: RE: Tamimi RFJ

could you call Eric at 10 and I will join him in his office?

-----Original Message-----
From: Gaudiosi, Eric V
Sent: Wednesday, March 13, 2019 8:40 AM
To:                                                      >; NEA-Jordan-
DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>
Subject: RE: Tamimi RFJ

We'd very much look forward to a call. If a broader conference call would take too long to organize perhaps we
could have an initial conversation this morning.

10:00 would work for me.

Many thanks, EVG

Eric V. Gaudiosi
Acting DAS
Bureau of Near Eastern Affairs

-----Original Message-----
From:                    <           @usdoj.gov<mailto:            @usdoj.gov>>
Sent: Wednesday, March 13, 2019 8:36 AM
To:
Cc:                                               >;

>;

>;
               @usdoj.gov<mailto:           @usdoj.gov>>; NEA-Jordan-DL <NEA-Jordan-
DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>
Subject: Re: Tamimi RFJ

Perhaps a phone call would help me better understand the context of these questions. Would 10 am work for a call ?

(b)(6)

On Mar 12, 2019, at 7:49 PM, (b)(6)

wrote:

(b)(5)

_____

(b)(6)
(b)(6)
(b)(6);
(b)(6);
(b)(7)(C)

From: (b)(6)
<(b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov><mailto:(b)(6)        @usdoj.gov>>
Date: March 12, 2019 at 7:40:24 PM EDT
To: (b)(6)

(b)(6)

Cc:

(b)(6)

(USADC) <(b)(6)        @usdoj.gov<mailto:(b)(6)        @usdoj.gov><mailto:(b)(6)        @usdoj.gov>>,
(b)(5); (b)(7)(C)

(b)(6)

(b)(5)        @usdoj.gov<mailto:(b)(5)        @usdoj.gov><mailto:(b)(5)        @usdoj.gov>>,
NEA-Jordan-DL <NEA-Jordan-DL@state.gov<mailto:NEA-Jordan-DL@state.gov><mailto:NEA-Jordan-DL@state.gov>>
Subject: Re: Tamimi RFJ

(b)(5)

I can be reached on my cell if concerns or questions remain. (b)(5)
Take care.
(b)(6)

Sent from my iPhone

On Mar 12, 2019, at 6:44 PM

wrote:

Thanks,

(b)(5)

Thanks,

[(b)(6)]

Acting Deputy Director for Jordan and Lebanon Bureau of Near Eastern Affairs/Office of Levant Affairs U.S. Department of State
Office:
Mobile:

Official
UNCLASSIFIED

(b)(6);
(b)(6);
(b)(7)(C)

From: (b)(6)
(b)(5) @usdoj.gov<mailto (b)(5) @usdoj.gov><mailto (b)(5) @usdoj.gov><mailto (b)(
(b)(5) @usdoj.gov>>
Sent: Tuesday, March 12, 2019 5:31 PM
To:

(b)(6)

(b)(6);   (b)(7)(C);   (b)(7)(E)

[(b)(6)]

(b)(6)
(b)(6) @usdoj.gov<mailto (b)(6) @usdoj.gov><mailto (b)(6) @usdoj.gov><mailto (b)(
(b)(6) @usdoj.gov>>: (b)(6);   (b)(7)(C);   (b)(7)(E) >>:

[(b)(6)]

(b)(6)
(b)(6) @usdoj.gov<mailto (b)(6) @usdoj.gov><mailto (b)(6) @usdoj.gov><m
ailto: (b)(6) @usdoj.gov>>

(b)(6);
(b)(6);
(b)(7)(C)

Subject: RE: Tamimi RFJ

(b)(6)
(b)(6)

Of course.  Fire when ready.          Adding (b)(6)          of my office, who is also working on the case.

From:

Sent: Tuesday, March 12, 2019 5:28 PM
To:

(b)(6)
(b)(6) doj.gov<mailto (b)(6) doj.gov><mailto: (b)(6) doj.gov><mailto: (b)(6) doj.g
ov>>

(b)(6);   (b)(7)(C);   (b)(7)(E)                                              >: (b)(6)

[(b)(6)]

(b)(6)
(b)(6) doj.gov<mailto (b)(6) doj.gov><mailto: (b)(6) doj.gov><mailto: (b)(6) doj.g
(b)(6);   (b)(7)(C);   (b)(7)(E)                                              >:

Subject: RE: Tamimi RFJ
Importance: High

(b)(6)

Good afternoon, (b)( RFJ received an inquiry from our regional bureau at State and had some very specific legal questions regarding the al-Tamimi case and extradition.

(b)(6)

I wanted to introduce you to [          ] who had additional questions.

(b)(6);
(b)(7)(C)

If you could reply to [        ] DS would appreciate it.

Best,

(b)(6);
(b)(7)(C)

[      ]

(b)(6);
(b)(7)(C)

(b)(6);
(b)(7)(C)

[            ] Foreign Affairs Officer U.S. Department of State Bureau of Diplomatic Security Threat Investigations and Analysis (TIA) Rewards for Justice Program (RFJ)



www.rewardsforjustice.net<http://www.rewardsforjustice.net><http://www.rewardsforjustice.net/>>


Official
UNCLASSIFIED


<http://www.rewardsforjustice.net/%3chttp:/www.rewardsforjustice.net%3chttp:/www.rewardsforjustice.net/>
Official
<http://www.rewardsforjustice.net/%3chttp:/www.rewardsforjustice.net%3chttp:/www.rewardsforjustice.net/>
UNCLASSIFIED<http://www.rewardsforjustice.net/%3chttp:/www.rewardsforjustice.net%3chttp:/www.rewardsfor justice.net/>

(b)(6)

**Official - SBU**
UNCLASSIFIED

(b)(6)

| | |
|---|---|
| **Sender:** | [                          ] |
| | (b)(6) [                          ]@usdoj.gov>; |
| | [                          ] |
| | Olson, Jeffrey (CRM) <(b)(6) [        ]@usdoj.gov>; |
| | (b)(6) [                          ]usdoj.gov>; |
| | (b)(6) [              ] <(b)(6) [        ]@usdoj.gov>; |
| **Recipient:** | |
| | NEA-Jordan-DL <NEA-Jordan-DL@state.gov>; |
| | (b)(6) [          ] <(b)(6) [        ]@usdoj.gov>; |
| | (b)(6) [              ] <(b)(6) [        ]@usdoj.gov> |

# Exhibit 23

(b)(6)

| From: | (b)(6) @usdoj.gov> |
| To: | (b)(6) (b)(6) @usdoj.gov> |
| Subject: | RE: Informal Discussion During Nov 2019 Mtg w (b)(6) |
| Date: | Mon, 22 Jun 2020 18:42:16 +0000 |

(b)(5); (b)(6); (b)(7)(C)

---
(b)(6)
Trial Attorney
USDOJ/CRM/OIA
(b)(6) desk
cell
(b)(6) @usdoj.gov

**From:**
**Sent:** Monday, June 22, 2020 2:40 PM
**To:** (b)(6) (b)(6) USDOJ.GOV>; (b)(6)
(b)(6) USDOJ.GOV>
**Subject:** Re: Informal Discussion During Nov 2019 Mtg w (b)(6)

Also, just FYI--just got invited to the SVTC for tomorrow.

**From:**
**Sent:** Monday, June 22, 2020 2:37 PM
**To:** (b)(6) (b)(6)
**Subject:** Re: Informal Discussion During Nov 2019 Mtg w (b)(6)

Thanks, (b)(6) This is helpful.

(b)(5)

(b)(6)

Best,

(b)(6)

**From:** (b)(6)    (b)(6)    @usdoj.gov>
**Sent:** Monday, June 22, 2020 1:24 PM
(b)(6)

**To:** [                    ] (b)(6)    (b)(6)    @usdoj.gov>
**Subject:** RE: Informal Discussion During Nov 2019 Mtg w (b)(6)

Hey [        ]

(b)(5);    (b)(6);    (b)(7)(C)

Thanks!

(b)(6)

(b)(6)

Trial Attorney
USDOJ/CRM/OIA
[            ]    desk
[            ]    cell
(b)(6)    @usdoj.gov

**From:** [                    ]
**Sent:** Monday, June 22, 2020 12:08 PM
**To:** (b)(6)    (b)(6)    USDOJ.GOV>
**Cc:** (b)(6)    (b)(6)    USDOJ.GOV>
**Subject:** Re: Informal Discussion During Nov 2019 Mtg w (b)(6)

(b)(6)

(b)(5)

(b)(6)

(b)(6)

(b)(6)

(b)(6)

**From:** (b)(6)
**Sent:** Monday, June 22, 2020 11:41 AM
**To:**
**Cc:** (b)(6)
**Subject:** Informal Discussion During Nov 2019 Mtg w (b)(6)

(b)(5)

(b)(6)
**Trial Attorney**
**Office of International Affairs**
**U.S. Department of Justice, Criminal Division**
**1301 New York Avenue N.W., Suite 447**
**Washington, D.C. 20530**
Phone: (b)(6)
Email: (b)(6)    @usdoj.gov

(b)(6)

| **Sender:** | (b)(6) | '  <(b)(6)    @usdoj.gov> |
| **Recipient:** | | |
| | (b)(6) | <(b)(6)    @usdoj.gov> |

# Exhibit 24

| From: | "Korkor, Samer (CRM)" (b)(6): @usdoj.gov> |
|---|---|
| To: | (b)(6) |
| CC: | (b)(6)<br>Olson, Jeffrey (CRM) (b)(6): @usdoj.gov> |
| Subject: | Re: Two further questions |
| Date: | Wed, 20 Sep 2017 22:31:33 +0000 |

Thank you (b)(6)

Sent from my iPhone

On Sep 20, 2017, at 5:30 PM, (b)(6) wrote:

Samer –

(b)(5); (b)(5)

(b)(6)

**From:** Korkor, Samer (CRM) [mailto:(b)(6): @usdoj.gov]
**Sent:** Wednesday, September 20, 2017 10:54 AM
**To:** (b)(6)
**Cc:** Olson, Jeffrey (CRM)
**Subject:** RE: Two further questions

(b)(6) Any thoughts ton this?

-- Samer B. Korkor
+(b)(6):

**From:** Korkor, Samer (CRM)
**Sent:** Friday, September 15, 2017 11:59 AM
**To:** (b)(6)
**Cc:** Olson, Jeffrey (CRM) (b)(6): (b)(7)(C) USDOJ.GOV>
**Subject:** Re: Two further questions

(b)(6) please take a look at query below and let us know your thoughts. Hate to pester you but the sooner the better!

Sent from my iPhone

On Sep 15, 2017, at 11:57 AM, Teresinski, Jerome (NSD) <(b)(6); usdoj.gov> wrote:

(b)(5)

---

**From:** Korkor, Samer (CRM)
**Sent:** Friday, September 15, 2017 11:41 AM
**To:** Gillice, Thomas (USADC) <(b)(6); @usdoj.gov>
**Cc:** Teresinski, Jerome (NSD) <(b)(6); usdoj.gov>
**Subject:** Re: Two further questions

(b)(5)

Sent from my iPhone

On Sep 15, 2017, at 11:39 AM, Gillice, Thomas (USADC) <(b)(6); @usdoj.gov> wrote:

Samer- please see the email below from Arnold Roth, the father of a victim of the attack in which we have charged Tamimi.

(b)(5)

Hope you've been well.
Tom

Sent from my iPhone

Begin forwarded message:

**From:** Arnold Roth <(b)(6) @gmail.com>
**Date:** September 15, 2017 at 10:05:37 AM EDT
**To:** "Gillice, Thomas (USADC)" <(b)(6); @usdoj.gov>
**Cc:** Frimet Roth <(b)(6) @gmail.com>
**Subject: Two further questions**

Dear Mr Gillice,

Thank you again for sharing the information you did in our call this past Wednesday. We are grateful for your unfailing courtesy and that of your colleagues.

The following two questions have just arisen in the context of an article that is shortly to appear in the media. My wife and I would very much appreciate the DoJ's input.

**First**, though I have raised this with you already and you answered on March 24, 2017, there is a quote which is doing the rounds and which conflicts with the statement you kindly provided to us

a few weeks back about the 1995 treaty having been lawfully **ratified** by the Jordanians but not **"endorsed"** (which is evidently the word used in its January 25, 1997 decision by Jordan's Court of Cassation.

Here is the quote on which I would ask for your input:
"*A judicial source told Jordan News Agency, PETRA, that the Kingdom and the United States signed an extradition treaty on March 28, 1995, but was not approved by the Jordanian parliament.*" Source https://english.palinfo.com/24708

My question: In the view of the United States, was the 1995 treaty **ratified** by the Jordanian government? Assuming yes as you have already said, can you offer a suggestion as to what the Jordanians and Palestinian Arabs mean when they speak of it having not been **approved**?

**Second:** Was the United States represented in the two Tamimi hearings - one in September 2016 and one in March 2017 when two separate appeals courts found in favor of Tamimi's claims? Whether yes or no, does the US have, and will it share with us, the terms of the courts' decisions? In each of the two cases, does the US know the identity of the respondent, given that the two hearings were said to be appeals?

Sincerely,
Arnold Roth


--

Arnold Roth PO Box 23637 Jerusalem 9123601 Israel • Office +972-2-586-4323 • Mobile +972-54-560-1002 • Fax +972-77-470-1103 • From the United States: 1-201-256-1516 to reach me in Israel

<Katwan Declaration on Jordan Treaty.pdf>

| | |
|---|---|
| **Sender:** | "Korkor, Samer (CRM)" (b)(6) @usdoj.gov> |
| **Recipient:** | (b)(6)<br>Olson, Jeffrey (CRM) (b)(6) @usdoj.gov> |

# Exhibit 25

| | |
|---|---|
| **From:** | (b)(6);  (b)(7)(C) |
| | (b)(6) |
| | Olson, Jeffrey (b)(6)       @usdoj.gov>; |
| | (b)(6)           (b)(6)        @usdoj.gov>; |
| **To:** | (b)(6);  (b)(7)(C);  (b)(7)(E) |
| **CC:** | |
| **Subject:** | RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80) |
| **Date:** | Tue, 18 Apr 2017 08:41:56 -0400 |

(b)(6)

All,

(b)(7)(A)                                              (b)(6)      - I attached
both Extradition request Dip Note and GOJ response)

(b)(5);  (b)(6);  (b)(7)(C)

Best regards,

(b)(6);
(b)(7)(C)

*Legat Amman*

(b)(6);  (b)(7)(C);  (b)(7)(E)

**Official**
**UNCLASSIFIED**

**From:** (b)(6);  (b)(7)(C)
**Sent:** Thursday, February 23, 2017 1:50 PM
**To:** 'Korkor, Samer (CRM)'; Olson, Jeffrey; (b)(6)        (CRM)

**Cc:**
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6) attached is a copy of the Dip Note.

(b)(5); (b)(6); (b)(7)(C)

(b)(6);
(b)(7)(C)

We'll keep you posted.

**Official**
**UNCLASSIFIED**

(b)(6);
(b)(7)(C)

**From:** Korkor, Samer (CRM) [mailto:(b)(6)@usdoj.gov]
**Sent:** Wednesday, February 22, 2017 5:24 PM
**To:** (b)(6) Amman); Olson, Jeffrey; (b)(6) ; (b)(6) (CRM); (Amman)
**Cc:** (b)(6); (b)(7)(C)
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

-- Samer B. Korkor
Counsel to the Assistant Attorney General

**From:**
**Sent:** Wednesday, February 22, 2017 9:57 AM
**To:** Olson, Jeffrey (b)(6) USDOJ.GOV>; (b)(6)
Korkor, Samer (CRM) (b)(6) USDOJ.GOV>; (b)(6)
(b)(6) USDOJ.GOV>; (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

Thanks again,

(b)(6);
(b)(7)(C)

**Official**
UNCLASSIFIED

(b)(6);
(b)(6);
(b)(6);
(b)(7)(C)

(b)(6);
(b)(7)(C)

**From:** Olson, Jeffrey [mailto: (b)(6)   @usdoj.gov]
**Sent:** Wednesday, February 22, 2017 4:47 PM
**To:** (b)(6)   Amman); Korkor, Samer (CRM); (b)(6)   (CRM);
(Amman)
**Cc:**
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6)

(b)(5)

Jeffrey Olson
DOJ/OIA
Desk

(b)(6)

(b)(6)

(b)(6);
(b)(7)(C)

**From:**
**Sent:** February 22, 2017 9:46 AM
**To:**   Olson, Jeffrey
(b)(6)   USDOJ.GOV>; Korkor, Samer (CRM) (b)(6)   USDOJ.GOV> (b)(6)
(b)(6)   < (b)(6)   USDOJ.GOV>;
(b)(6);   (b)(7)(C);   (b)(7)(E)

**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

All—

(b)(5)

(b)(6)

(b)(6);
(b)(7)(C)

**Official**
UNCLASSIFIED

(b)(6);
(b)(7)(C)

(b)(6);
(b)(6)

**From:**
**Sent:** Wednesday, February 22, 2017 9:21 AM
**To:** Olson, Jeffrey; Korkor, Samer (CRM); (b)(6)   (CRM);
**Cc:**
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

(b)(6);
(b)(7)(C)

Best regards,

*Legat Amman*

(b)(6);   (b)(7)(C);   (b)(7)(E)

**Official**
**UNCLASSIFIED**

(b)(6);
(b)(6);
(b)(7)(C)

(b)(6);
(b)(6)

**From:** Olson, Jeffrey [mailto: (b)(6) @usdoj.gov]
**Sent:** Wednesday, February 22, 2017 4:05 PM
**To:** (Amman); Korkor, Samer (CRM); (b)(6) (CRM); (Amman)
**Cc:** ; 
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6)

(b)(5)

(b)(6)

Jeffrey Olson
DOJ/OIA

(b)(6);
(b)(7)(C)

Desk 

**From:** 
**Sent:** February 22, 2017 8:15 AM
**To:** Olson, Jeffrey (b)(6) USDOJ.GOV>; Korkor, Samer (CRM)
(b)(6) USDOJ.GOV>; (b)(6) (b)(6) USDOJ.GOV>;

(b)(6);   (b)(7)(C);   (b)(7)(E)

**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)
**Importance:** High

All,

(b)(5)

(b)(6);
(b)(7)(C)

Thanks,

**Official**
**UNCLASSIFIED**

(b)(6);
(b)(6);
(b)(7)(C)

(b)(6);
(b)(7)(C)

**From:** Olson, Jeffrey [mailto (b)(6) @usdoj.gov]
**Sent:** Friday, February 17, 2017 4:17 PM
**To:** Korkor, Samer (CRM); (Amman) (b)(6) ; (Amman)
**Cc:**

(b)(6);
(b)(7)(C)

**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

(b)(6)

Jeff

Jeffrey Olson
DOJ/OIA
Desk

(b)(6)

(b)(6);
(b)(7)(C)

**From:** Korkor, Samer (CRM)
**Sent:** February 17, 2017 9:13 AM
**To:** (b)(6)
(b)(6) USDOJ.GOV>;
**Cc:** Olson, Jeffrey < (b)(6) USDOJ.GOV>;
(b)(6); (b)(7)(C); (b)(7)(E)

(b)(6);
(b)(7)(C)

(b)(6);
(b)(7)(C)

(b)(6);
(b)(7)(C)

**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

Hi

(b)(5)

(b)(6)

-- Samer B. Korkor
Counsel to the Assistant Attorney General
(b)(6);
(b)(7)(C)

**From:**
**Sent:** Thursday, February 16, 2017 10:10 AM
**To:** (b)(6)    <(b)(6)    USDOJ.GOV>; Korkor, Samer (CRM)
(b)(6)    USDOJ.GOV>;
**Cc:** Olson, Jeffrey (b)(6)    USDOJ.GOV>; (b)(6), (b)(7)(C), (b)(7)(E)
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

Hi (b)(6)

(b)(5)                                                    Do you by any chance have the Arabic translation in a word format?

Thanks,

(b)(6);
(b)(7)(C)

**Official**
**UNCLASSIFIED**

**From:** (b)(6)    [mailto:(b)(6)    @usdoj.gov]
**Sent:** Thursday, February 16, 2017 4:15 PM
**To:** Korkor, Samer (CRM);
**Cc:** (Amman); (b)(6)
**Subject:** RE: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

Best,
(b)(6)

**From:** Korkor, Samer (CRM)
**Sent:** Thursday, February 16, 2017 8:48 AM
**To:** (b)(6); (b)(7)(C); (b)(7)(E)
**Cc:** ; Olson, Jeffrey (b)(6) USDOJ.GOV>;
(b)(6) (b)(6) USDOJ.GOV>

(b)(6); (b)(7)(C)

**Subject:** Re: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

(b)(6); (b)(7)(C)

Sent from my iPhone

On Feb 16, 2017, at 8:33 AM, [                              ] wrote:

Morning (b)(6)
Please see below cable that we received from state. Do you concur with the language used in paragraph 2?
(b)(5)                                                                            If so, please email
us a copy (English and Arabic version) so we can pass it to (b)(6)

(b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)

**Official - Privacy/PII**
**UNCLASSIFIED**

**From:** [              ] (Amman)
**Sent:** Thursday, February 16, 2017 1:14 PM
**To:** [            ] (Amman)
**Subject:** FW: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6); (b)(7)(C)

I know (b)(7)(A) has been involved with this issue previously, so are you guys taking lead on this?

(b)(6); (b)(7)(C)

Assistant Regional Security Officer – Investigator
U.S. Embassy Amman

(b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)
(b)(6);
(b)(6)

**Official - Privacy/PII**
**UNCLASSIFIED**

**From:** [            ] (Amman)
**Sent:** Thursday, February 16, 2017 9:09 AM
**To:** [          ] (Amman)
**Cc:** [                          ] (Amman)
**Subject:** FW: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6);
(b)(7)(C)

Who does this, POL? Or us?

(b)(6);
(b)(7)(C)

Office Management Specialist – Regional Security Office
U.S. Embassy Amman, Jordan

(b)(6)

**Official**
**UNCLASSIFIED**

(b)(6);
(b)(7)(C)

**From:** [redacted] (Amman)
**Sent:** Thursday, February 16, 2017 9:09 AM
**To:** [redacted] (Amman)
**Subject:** FW: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6)

U.S. Embassy Amman
Political Office OMS

This email is UNCLASSIFIED.

(b)(6);
(b)(7)(C)

**From:** SMART Core
**Sent:** Wednesday, February 15, 2017 4:51 PM

**Subject:** EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

<div align="center">

**UNCLASSIFIED**
Privacy/PII

</div>

<image001.gif>

| | |
|---|---|
| **Action Office:** | ECON, CONS, POL, ORA, RSO, DCM, HR, CONGEN, AMB |
| **Info Office:** | EAC, AMB_INFO, DAO_INFO |

| | |
|---|---|
| **MRN:** | 17 STATE 14560 |
| **Date/DTG:** | Feb 15, 2017 / 151450Z FEB 17 |
| **From:** | SECSTATE WASHDC |
| **Action:** | AMMAN, AMEMBASSY *ROUTINE* |
| **For Addressee(s) Only** | |
| **E.O.:** | 13526 |
| **TAGS:** | CVIS, CJAN, JO, KCRM, PTER |
| **Captions:** | SENSITIVE |
| **Subject:** | EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80) |

SENSITIVE BUT UNCLASSIFIED. LAW ENFORCEMENT SENSITIVE. PLEASE PROTECT
ACCORDINGLY.

(b)(5)

Case 1:20-cv-03838-ABJ    Document 53-3    Filed 11/26/24    Page 125 of 270

Withheld pursuant to exemption

(b)(5)

(b)(5)

(b)(6)
(b)(6)
(b)(6)

**Signature:**         Tillerson

(b)(6)

**Drafted By:**      L_LEI
**Cleared By:**     L/AN

(b)(6)
(b)(6)

                  NEA/LEV
                  DOJ/OIA:Olson, Jeffrey (SUBS)

**Approved By:**   L/LEI:
**Released By:**   L_LEI:

(b)(6)

**Info:**            DEPT OF JUSTICE WASHINGTON DC *ROUTINE*; FBI WASHINGTON
                  DC *ROUTINE*;

FL-2021-00020 A-00000445749 "UNCLASSIFIED" 8-15-22 29

| | |
|---|---|
| **Action Post:** | AMEMBASSY AMMAN |
| **Dissemination Rule:** | EAC, ECON, CONS_ACTION, POL, ORA, RSO, DCM, HR, CONGEN, AMB_Action, AMB_INFO, DAO_INFO |

<div align="center">

**UNCLASSIFIED**
Privacy/PII

</div>

(b)(6); (b)(7)(C)

&lt;image001.gif&gt;

| | |
|---|---|
| **Sender:** | |
| **Recipient:** | Korkor, Samer (CRM) (b)(6) @usdoj.gov&gt;; <br> Olson, Jeffrey (b)(6) @usdoj.gov&gt;; <br> (b)(6) (CRM) (b)(6) @usdoj.gov&gt;; <br> (b)(6);  (b)(7)(C);  (b)(7)(E) |

No. 328

 

 

The Embassy of the United States of America presents its compliments to the Ministry of Foreign Affairs and Expatriates of the Hashemite Kingdom of Jordan and has the honor to kindly request the Ministry's assistance in addressing the appropriate authorities in the Hashemite Kingdom of Jordan for the extradition of Ahlam Aref Ahmad AL-TAMIMI, alias Khalti, alias Halati, to the United States, pursuant to the Extradition Treaty between the United States and the Hashemite Kingdom of Jordan, signed at Washington on March 28, 1995 ("the Treaty"). In the alternative, the United States requests the removal of AL-TAMIMI to the United States by way of deportation, expulsion, or other means available under the laws of Jordan. The offense with which the fugitive is charged is among those defined by Articles 1 and 2 of the International Convention for the Suppression of Terrorist Bombings of December 15, 1997 (the "Convention"). In accordance with Articles 6, 7, 8, 9, and 10, the

Convention may be used to establish jurisdiction to prosecute someone within the State of which the national is a citizen or surrender or extradite the fugitive for prosecution in another State. AL-TAMIMI is believed to be located in Amman, Jordan.

Pursuant to Article 15 of the Treaty, Embassy also requests the seizure of all articles, instruments, objects of value, or documents in the possession of the fugitive at the time of arrest, which may be required as evidence, for surrender with the fugitive if extradition to the United States is granted.

AL-TAMIMI is wanted to stand trial in the United States for a terrorism offense. On July 15, 2013, a Criminal Complaint, in case number 13-MJ-580, was filed in the United States District Court for the District of Columbia, charging AL-TAMIMI with the following offense:

Conspiring to Use and Using a Weapon of Mass Destruction Against a United States National Outside the United States Resulting in Death and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18,

United States Code, Sections 2332a(a)(1) and 2. The maximum penalty for a violation of the offense charged is life imprisonment or death.

Based on the charge in the Criminal Complaint, on July 15, 2013, the United States District Court for the District of Columbia issued a warrant for the arrest of AL-TAMIMI. This warrant remains valid and executable.

The facts of the case are as follows:

AL-TAMIMI conspired to carry out a terrorist attack on behalf of the military wing of Hamas, a terrorist organization designated by the United States Department of State, in which United States nationals were killed. In July 2001, AL-TAMIMI placed an explosive device that was hidden inside a beer can in a supermarket; the device detonated but did not result in any casualties. Later in July or August 2001, AL-TAMIMI offered her assistance to a co-conspirator planning to conduct a suicide attack in Jerusalem. On or about August 9, 2001, AL-TAMIMI provided that assistance by meeting the suicide bomber in Ramallah, traveling with him to Jerusalem, leading him to a crowded area, and instructing him to detonate

the explosive device somewhere nearby. Later that day, after AL-TAMIMI had left the scene, the suicide bomber exploded the device in a nearby Sbarro pizza restaurant, killing himself and 15 civilians. Two of those civilians were United States nationals. The blast injured over one hundred others, including four United States nationals.

The offense with which the fugitive is charged is punishable under United States law by imprisonment of more than one year of by a more severe penalty and covered by Article 2 of the Treaty. Conspiracy to commit an extraditable offense is covered by Article 2(2) of the Treaty. A more detailed explanation of the applicable crimes and punishments is provided in the extradition documents. In addition, the applicable U.S. statute of limitations does not bar prosecution of AL-TAMIMI for the offense for which extradition is sought.

AL-TAMIMI is a citizen of Jordan. She was born on January 20 or October 20, 1980. She has brown hair and brown eyes. Her Jordanian passports numbers are G-052933 and 6052933. A photograph of AL-TAMIMI is enclosed with the supporting documents.

(b)(6);   (b)(7)(C)

The Embassy of the United States of America would like to take this

opportunity to renew to Ministry of Foreign Affairs and Expatriates the

assurances of its highest consideration.

Enclosure:  Original Affidavit with attachments and translation

Embassy of the United States of America,

Amman, 23 February, 2017.

(b)(6)

# Exhibit 26

(b)(6)

| | |
|---|---|
| **From:** | "Olson, Jeffrey (CRM)" |
| **To:** | (b)(6) |
| **Subject:** | extradition treaty |
| **Date:** | Wed, 18 Apr 2018 14:50:43 +0000 |

(b)(6)

(b)(5)

(b)(5)

(b)(6)

Jeffrey M. Olson
Associate Director for Asia|Pacific|Africa|Middle East Affairs
U.S. Department of Justice, Office of International Affairs
☎ Tel:                    ✉ Email:
☎ Mob                    | ☎ After Hours Command Center: +1-202-514-5000

(b)(6)

(b)(5)

| Sender: | "Olson, Jeffrey (CRM)" |
| Recipient: | (b)(6) |

# Exhibit 27

**Intentionally Left Blank - Exhibit Not Produced**

# Exhibit 28

**NEA Press Guidance**
**March 15, 2017**

### Jordan: TAMIMI CHARGES

**(IF ASKED ONLY)**

- We can confirm that on March 14, the U.S. Department of Justice announced that a criminal complaint was unsealed charging Ahlam Aref Ahmad Al-Tamimi with conspiring to use a weapon of mass destruction against U.S. nationals outside the U.S., resulting in death. The charge is related to the defendant's participation in an Aug. 9, 2001, suicide bomb attack at a restaurant in Jerusalem that killed 15 people, including two U.S. nationals. Four other U.S. nationals were among the approximately 122 people injured in the attack.

- For further details we refer to you the Department of Justice.

*Has the U.S. government / the U.S. Embassy in Amman asked the GOJ to extradite Tamimi?*
- We do not comment on extradition requests, including whether or not one has been made.

*What has the GOJ said in response?*
- We would refer you to the Government of Jordan to address that question.

*Why was the order unsealed now / why was it put under seal in the first place / further legal questions?*
- We would refer you to the Department of Justice to address that/those questions.

*Is this case going to harm the bilateral relationship if Jordan refuses to extradite Tamimi?*
- The United States and Jordan have an enduring partnership, and we continue to work together to address a range of issues.

(b)(5)

(b)(5)

r

**DOJ PRESS RELEASE**

<div align="center">

**Department of Justice**
Office of Public Affairs

</div>

---

FOR IMMEDIATE RELEASE
Tuesday, March 14, 2017

<div align="center">

**Individual Charged in Connection With 2001 Terrorist Attack in Jerusalem That Resulted in Death of Americans**

</div>

A criminal complaint was unsealed today charging Ahlam Aref Ahmad Al-Tamimi, also known as "Khalti" and "Halati," a Jordanian national in her mid-30s, with conspiring to use a weapon of mass destruction against U.S. nationals outside the U.S., resulting in death. The charge is related to the defendant's participation in an Aug. 9, 2001, suicide bomb attack at a pizza restaurant in Jerusalem that killed 15 people, including two U.S. nationals. Four other U.S. nationals were among the approximately 122 others injured in the attack. Also unsealed today was a warrant for Al-Tamimi's arrest and an affidavit in support of the criminal complaint and arrest warrant. The criminal charge had been under seal since July 15, 2013.

Acting Assistant Attorney General for National Security Mary B. McCord, U.S. Attorney Channing D. Phillips for the District of Columbia and Assistant Director in Charge Andrew Vale of the FBI's Washington Field Office made the announcement.

"Al-Tamimi is an unrepentant terrorist who admitted to her role in a deadly terrorist bombing that injured and killed numerous innocent victims. Two Americans were killed and four injured. The charges unsealed today serve as a reminder that when terrorists target Americans anywhere in the world, we will never forget – and we will continue to seek to ensure that they are held accountable," said Acting Assistant Attorney General McCord. "I want to thank the many dedicated agents and prosecutors who have worked on this investigation."

"We have never forgotten the American and non-American victims of this awful terrorist attack," said U.S. Attorney Phillips. "We will continue to remain vigilant until Ahlam Aref Ahmad Al-Tamimi is brought to justice."

"Al-Tamimi is a terrorist who participated in an attack that killed United States citizens," said Assistant Director in Charge Vale. "The bombing that she planned and assisted in carrying out on innocent people, including children, furthered the mission of a designated terrorist organization. The FBI continues to work with our international partners to combat terrorists like Al-Tamimi and hold them accountable."

According to the affidavit in support of the criminal complaint and arrest warrant, Al-Tamimi was living in the West Bank in the summer of 2001, while attending school and working as a journalist for a television station. Al-Tamimi agreed that summer to carry out attacks on behalf of the military wing of Hamas (the Izz al-Din al-Qassam Brigades), a Palestinian organization designated by the U.S. as a terrorist organization.

The affidavit states that on Aug. 9, 2001, Al-Tamimi met with the suicide bomber in Ramallah, in the West Bank, and traveled with the suicide bomber by car to Jerusalem. The suicide bomber was in possession of an explosive device concealed within a guitar. Al-Tamimi led the suicide bomber to a crowded area in downtown Jerusalem and instructed the suicide bomber to detonate the explosive device in the area, or somewhere nearby if an opportunity arose to cause more casualties. According to the affidavit, the suicide bomber entered a Sbarro pizza restaurant and detonated the explosive device, causing extensive damage, bodily injury and death. Seven of the dead were children, including one U.S. national.

The affidavit states that Al-Tamimi pleaded guilty in an Israeli court in 2003 to multiple counts of murder arising from the Sbarro suicide bomb attack and was sentenced to 16 life terms of incarceration. The defendant served only eight years of the sentence before being released on or about Oct. 28, 2011, as part of a prisoner exchange between the government of Israel and Hamas.

Al-Tamimi was returned to Jordan upon her release from incarceration. Jordan's courts, however, have ruled that their constitution forbids the extradition of Jordanian nationals. The U.S. has worked and will continue to work with its foreign partners to obtain custody of Al-Tamimi so she can be held accountable for her role in the terrorist bombing. The FBI also announced today that Al-Tamimi has been placed on its list of Most Wanted Terrorists. Charges contained in a criminal complaint are merely allegations, and every defendant is presumed innocent unless and until proven guilty beyond a reasonable doubt.

The maximum penalty for a person convicted of this charge is a lifetime term of incarceration or death. The maximum statutory sentence is prescribed by Congress and is provided here for

informational purposes. If convicted of any offense, the sentencing of the defendant will be determined by the court based on the advisory Sentencing Guidelines and other statutory factors.

The investigation into this matter was conducted by the FBI's Washington Field Office. The Office of International Affairs of the Department of Justice's Criminal Division provided significant assistance. The case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the National Security Division's Counterterrorism Section.

Victims and their families can contact the Department of Justice via e-mail at USADC.SbarroCaseIsrael@USDOJ.gov

# Exhibit 29

**Intentionally Left Blank - Exhibit Not Produced**

# Exhibit 30

FL-2021-00034    A-00000330393    "UNCLASSIFIED"    5/14/2021    FL-2021-00034 5-14-21 9

| From: | (b)(6) |
|---|---|
| To: | (b)(6) |
| Subject: | Al-Tamimi - (b)(7)(A) |
| Date: | Wed, 24 Jun 2020 15:43:44 +0000 |

(b)(6)

Per my comment in the margins in the document, attached is (b)(7)(A)
(b)(7)(A)                         as well as the three court decisions and their translations.
Best,
(b)(6)

| Sender: | (b)(6) |
|---|---|
| Recipient: | (b)(6) |

# Exhibit 31

FL-2021-00034    A-00000330447    "UNCLASSIFIED"    5/14/2021    FL-2021-00034 5-14-21 6

| From: | (b)(6) |
|---|---|
| To: | |
| CC: | |
| Subject: | FW: MP asks about Jordanian citizen in U.S. prison |
| Date: | Mon, 15 Apr 2019 14:51:27 +0000 |

FYI

**Official**
**UNCLASSIFIED**

**From:** (b)(6)
**Sent:** Monday, April 15, 2019 5:44 PM
**To:** Sasahara, Karen H (Amman) (b)(6) Kowalski, John M (Amman) (b)(6)
**Cc:** Amman Exec <AmmanExec@state.gov>; (b)(6)
(b)(6)

**Subject:** FYI: MP asks about Jordanian citizen in U.S. prison

FYI -- an MP (Saleh al-Armouti) formally requested information from the Government about Iyad Mahmoud Ismail Nejem, the only Jordanian to be extradited to the United States under the 1995 Extradition Treaty. Nejem (referred to as Eyad Ismoil in U.S. court documents) was extradited in 1995 for his role in the 1993 World Trade Center bombing, convicted in 1998, and currently is serving a 240-year sentence at a federal prison in Colorado. Armouti represents East Amman (Amman 3rd District), is part of the IAF-affiliated Reform Bloc, (b)(5)
(b)(5)

(b)(5)

Here is a quick informal translation of Armouti's memo:

In accordance with the provisions of article 96 of the Constitution and article 125 of the Rules of procedure of the Chamber of Deputies, I request the following question to be addressed to the Prime Minister:

Content:

1. Has the Government followed up on the case of Jordanian citizen Iyad Mahmoud Ismail Nejem, detained in American prisons in Florence, Colorado, and sentenced to 240 years in solitary confinement from the moment of his arrest until the end of his trial?

FL-2021-00034    A-00000330447    "UNCLASSIFIED"    5/14/2021    FL-2021-00034 5-14-21 7

2. Has the Jordanian embassy in Washington paid a visit to Iyad Nejem and has been satisfied with his health, detention conditions and needs, and has provided him with all the rights he must enjoy in prison? and if so, how many visits? and has the Ministry of Foreign Affairs communicated with his family in Jerash?

3. Has the situation of Jordanian prisoner Iyad Nejem been investigated and his fear of torture contrary to universal human rights covenants, which has been held in solitary confinement since 1995 in his narrow cell without a window nor sun light?

4. Did the Foreign Minister know that Iyad was on food strike in protest of his detention conditions several times and was prevented from reading, sports and going out to the field under the sun.

5. Does the Government have the intention of preparing a report and conducting a detailed and prompt investigation into the situation of the prisoner and what he is going through?

6. Does the government know that Iyad Nejem was arrested on Sunday evening, 30 June 1995, and was referred to the Amman Magistrate's Court regarding his extradition to the United States?

7. Does the Government know that Iyad has been extradited to the United States without trial in contravention of the provisions of the Constitution and the Extradition Act of 1927?

8. Does the Government know that the extradition Convention with the United States is null and void for violating the provisions of the Constitution in support of article 33, which requires the approval of this Treaty by the National Assembly by decision No. 762/1996 of the Court of Cassation, dated 25/6/1996,. Noting that no citizen has been extradited after this case, despite the great demand of the United States, but the Jordanian judiciary refused to extradite any citizen.

9. Does the ministry know that the arrest and extradition of the citizen Iyad has not been accompanied by a royal decree  based on article 9 (2) and (3) of the Extradition Act 1927, which requires the consent of the king?

10. Does the Government know that extradition procedures are also illegal because there wasn't a definitive judgement against the citizen, but rather was arrested and handed over to the United States in two days only, even though the arrest warrant was issued for a timeframe of 60-day, and the law authorizes his trial in Jordan.

11. Does the Government have an intention to pursue the case by taking all legal, diplomatic and political measures to end his imprisonment after he has spent nearly a quarter of a century in prison, and have a re-trial to prove and declare his innocence--especially since the court has been pressured by the Americans to convict him, despite his pleading not guilty of his charge.

Please accept my highest respect
MP attorney Saleh Abdul Karim al-Armouti

| Sender: | (b)(6) | |
|---|---|---|
| Recipient: | | |

FL-2021-00034      A-00000330447         "UNCLASSIFIED"         5/14/2021      FL-2021-00034 5-14-21 8

# Exhibit 32

| From: | (b)(6) |
|---|---|
| **To:** | Amman Political Americans <Amman-Political-Americans@state.gov> |
| **Subject:** | Did this ever go out? FW: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80) |
| **Date:** | Wed, 15 Mar 2017 09:36:41 -0400 |

Did this request ever go out?

I saw the article below on the issue which says the Jordanian courts "have said their constitution does not allow for the extradition of Jordanian nationals."

http://www.aljazeera.com/news/2017/03/ahlam-aref-ahmad-al-tamimi-fbi-wanted-list-170314223916414.html

**Official - SBU**
**UNCLASSIFIED**

**From:** (b)(6) (Amman)
**Sent:** Wednesday, February 15, 2017 4:56 PM
**To:** Amman Political Americans
**Subject:** FW: EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(6) – can you get the dip note machine cranking on this one? Thx.

**Official**
**UNCLASSIFIED**

**From:** SMART Core
**Sent:** Wednesday, February 15, 2017 4:51 PM

(b)(6)

(b)(6)

**Subject:** EXTRADITION: JORDAN: AHLAM AREF AHMAD AL-TAMIMI (POB: Palestine, DOB: 20 JAN 80 or 20 OCT 80)

(b)(5)

Case 1:20-cv-03809-AJN Document 53-3 Filed 11/26/21 Page 152 of 270

(b)(5)

(b)(5);  (b)(6)

(b)(5);  (b)(6)

| | |
|---|---|
| **Sender:** | (b)(6) |
| **Recipient:** | Amman Political Americans <Amman-Political-Americans@state.gov> |

# Exhibit 33

| From: | (b)(6) |
|---|---|
| To: | Schenker, David K (b)(6) |
| CC: | Rayburn, Joel D (b)(6) |
| | (b)(6) |
| | NEA-Staff-Assistants-DL <NEA-Staff-Assistants-DL@state.sgov.gov> |
| Subject: | [For A/S Schenker] IM from L: Jordan Extradition Treaty |
| Date: | Tue, 4 Aug 2020 15:59:27 -0400 |

A/S Schenker,

Attached is an IM from L on U.S.-Jordan Extradition Treaty

(b)(5)

(b)(1)

Sincerely,

(b)(6)  NEA/LEV
Senior Jordan Desk Officer

**Official - Sensitive**
This message is **SECRET//NOFORN** when separated from **UNCLASSIFIED** attachment(s)
Classified By: (b)(6) Senior Jordan Desk Officer, Office:NEA/LEV, Agency:U.S. Department of State
Declassify On: 8/4/2045
Reasons: Derived Per DSCG.



| Sender: | (b)(6) |
|---|---|
| Recipient: | Schenker, David K (b)(6) |
| | Rayburn, Joel D (b)(6) |
| | (b)(6) |
| | NEA-Staff-Assistants-DL <NEA-Staff-Assistants-DL@state.sgov.gov> |

# Exhibit 34

| | |
|---|---|
| **From:** | (b)(6) |
| **To:** | |
| **Subject:** | Fwd: Tamimi Extradition Case |
| **Date:** | Tue, 28 May 2019 20:33:48 +0000 |

FYI, Roth spoke to the desk. Roth has received offers from bounty hunters. (b)(5) Desk reiterated Roth still not happy with our delayed response and our tepid letter. Jeff

---

**From:** (b)(6)

**Date:** May 28, 2019 at 4:27:39 PM EDT

**To:** Olson, Jeffrey (CRM) (b)(6) @usdoj.gov>, (b)(6) (b)(6) @usdoj.gov>, (b)(6) i@usdoj.gov>

**Cc:** (b)(6) <(b)(6) @usdoj.gov>, (b)(6) (b)(6)

(b)(6) NEA-Jordan-DL <NEA-Jordan-DL@state.gov>

**Subject:** Tamimi Extradition Case

DOJ colleagues,

I hope all is well with you and you had a good long weekend.

I spoke earlier today with Malki Roth's father Arnold regarding some concerns he has with the Jordan Media Institute and its potential relationship with Ahlam al-Tamimi. During our conversation, Mr. Roth relayed his understanding that there had been three extraditions made under the bilateral U.S.-Jordan extradition treaty. Mr. Roth subsequently sent me the below list of people he claimed had been extradited from Jordan to the United States:

**Eyad Ismoil (aka Iyad Isama'il Al-Najim)**
Citizenship: Jordanian
Charge: Being part of the plot to destroy the World Trade Center in 1993
Fled to Jordan, captured by Jordanian police in August 1995, immediately extradited to US. Convicted in November 1997, sentenced in April 1998 to 240 years imprisonment in a maximum security penitentiary

**Mohammad Zaki Amawi**
Citizenship: Both US and Jordanian
Charge: "Plotting to kill American soldiers serving overseas" (The Toledo, OH plotters)
Arrested in Jordan and extradited to US in February 2006. Convicted in a US court in June 2008 - sentenced to 20 years

**Nader Saadeh**
Citizenship: Both US and Jordanian
Charge: Tried to join ISIS by going to Jordan on May 5, 2015
Apprehended in Jordan, extradited to US in August 2015
Convicted April 30, 2018
Sentenced to 10 years in a federal prison and will also serve a lifetime of supervised release.

(b)(5)

Thanks,

(b)(6)

**Official**
UNCLASSIFIED

**From:** Olson, Jeffrey (CRM) (b)(6) @usdoj.gov>                                    (b)(6)
**Sent:** Wednesday, March 13, 2019 12:13 PM
**To:** (b)(6)                                    (b)(6)                (b)(6)          @usdoj.gov>;
Gaudiosi, Eric V (b)(6)                    NEA-Jordan-DL <NEA-Jordan-DL@state.gov>;
(b)(6)                                @usdoj.gov>
**Cc:** (b)(6)                    (b)(6)              @usdoj.gov> (b)(6)
(b)(6)
**Subject:** RE: Tamimi RFJ

+(b)(6)                from L/LEI

Jeffrey M. Olson
Associate Director for Asia|Pacific|Africa|Middle East Affairs
U.S. Department of Justice, Office of International Affairs
☎ Tel: (b)(6)                | ✉ Email: (b)(6)        @usdoj.gov
☎ Mob: +(b)(6)              | ☎ After Hours Command Center: +1-202-514-5000

**From:** (b)(6)
**Sent:** March 13, 2019 11:24 AM
**To:** (b)(6)                    (b)(6)          doj.gov>; Gaudiosi, Eric V (b)(6)                        ; NEA-
Jordan-DL <NEA-Jordan-DL@state.gov>; Olson, Jeffrey (CRM) <(b)(6)              USDOJ.GOV>;
(b)(6)                                usdoj.gov>
**Cc:** (b)(6)                    (b)(6)          doj.gov>
**Subject:** RE: Tamimi RFJ

Thanks (b)(6)  I will reach out to NSC to see if that time works for them and revert back.

UNCLASSIFIED

(b)(6)

**Official**
**UNCLASSIFIED**

**From:** (b)(6) <(b)(6) @usdoj.gov>
**Sent:** Wednesday, March 13, 2019 11:15 AM
**To:** (b)(6) Gaudiosi, Eric V <(b)(6) NEA-Jordan-DL <NEA-Jordan-DL@state.gov>; Olson, Jeffrey (CRM) <(b)(6) @usdoj.gov>; (b)(6) (b)(6) @usdoj.gov>
**Cc:** (b)(6) ) <(b)(6) @usdoj.gov>
**Subject:** RE: Tamimi RFJ

(b)(6) and Eric-
Looping in Jeff Olson from DOJ OIA and (b)(6) Let's have a conference call to discuss further. If, as you suggested, someone from NSC can be on the phone call, that might help provide clarity on what the precise questions are and help us to focus our response. We are all available at 4 pm if that would work for you. We can use the dial –in below.
Thanks.

(b)(6)

Passcode
(b)(7)(E)

**From:** (b)(6)
**Sent:** Wednesday, March 13, 2019 8:49 AM
**To:** Gaudiosi, Eric V <(b)(6) (b)(6) <(b)(6) doj.gov>; NEA-Jordan-DL <NEA-Jordan-DL@state.gov>
**Subject:** RE: Tamimi RFJ

(b)(6) could you call Eric at 10 and I will join him in his office?

(b)(6)

-----Original Message-----
From: Gaudiosi, Eric V <(b)(6)
Sent: Wednesday, March 13, 2019 8:40 AM
To: (b)(6) <(b)(6) @usdoj.gov>; NEA-Jordan-DL <NEA-Jordan-DL@state.gov>
Subject: RE: Tamimi RFJ

We'd very much look forward to a call. If a broader conference call would take too long to organize perhaps we could have an initial conversation this morning.

10:00 would work for me.

Many thanks, EVG

Eric V. Gaudiosi
Acting DAS
Bureau of Near Eastern Affairs
(b)(6)

-----Original Message-----
From: (b)(6) <(b)(6) @usdoj.gov>
Sent: Wednesday, March 13, 2019 8:36 AM
To: (b)(6)
Cc: (b)(6)  (b)(6);  (b)(7)(C);  (b)(7)(E)  (b)(6)
(USADC)  ; (b)(6)
(b)(6)
(b)(6)  NEA-Jordan-DL <NEA-Jordan-DL@state.gov>
Subject: Re: Tamimi RFJ

Perhaps a phone call would help me better understand the context of these questions. Would 10 am work for a call ?

On Mar 12, 2019, at 7:49 PM, (b)(6)
wrote:

(b)(5)



_____

From: (b)(6) <(b)(6) @usdoj.gov<mailto: (b)(6) @usdoj.gov>>
Date: March 12, 2019 at 7:40:24 PM EDT
To: (b)(6)  >
Cc: (b)(6);  (b)(7)(C)  (b)(6);  (b)(7)(C);  (b)(7)(E)
(b)(6)
(b)(6);  (b)(7)(C);  (b)(7)(E)  ; (b)(6)
(b)(6)
(b)(6)
(b)(6)  (b)(6)
(b)(6)  @usdoj.gov<mailto: (b)(6) @usdoj.gov>>, NEA-Jordan-DL <NEA-Jordan-
DL@state.gov<mailto:NEA-Jordan-DL@state.gov>>
Subject: Re: Tamimi RFJ

(b)(6)
(b)(5)
(b)(6)



I can be reached on my cell if concerns or questions remain. (b)(6)
Take care.
(b)(6)

Sent from my iPhone

On Mar 12, 2019, at 6:44 PM (b)(6)

(b)(6) wrote:

Thanks, (b)(

(b)(5)

Thanks,

(b)(6)

Acting Deputy Director for Jordan and Lebanon Bureau of Near Eastern Affairs/Office of Levant Affairs U.S. Department of State

(b)(6)

Official
UNCLASSIFIED

(b)(6);
(b)(7)(C)

From: (b)(6)

(b)(6) @usdoj.gov< (b)(6) @usdoj.gov><mailto: (b)(6) @usdoj.gov>>

Sent: Tuesday, March 12, 2019 5:31 PM

To:

(b)(6)

(b)(6)

Cc: (b)(6); (b)(7)(C); (b)(7)(F) >;

(b)(6)

(b)(6) @usdoj.gov<mailto: (b)(6) @usdoj.gov><mailto: (b)(6) @usdoj.gov>>;

(b)(6); (b)(7)(C) >; (b)(6)

(b)(6)

(b)(6) >; (b)(6)

(b)(6) @usdoj.gov<mailto: (b)(6) @usdoj.gov><mailto: (b)(6) @usdoj.gov>>

Subject: RE: Tamimi RFJ

Of course. Fire when ready (b)(6) Adding (b)(6) of my office, who is also working on the case.

From: (b)(6)

Sent: Tuesday, March 12, 2019 5:28 PM

To: (b)(6)

(b)(6) > (b)(6)

(USADC) (b)(6) doj.gov<mailto: (b)(6) doj.gov><mailto: (b)(6) doj.gov>>

Cc:

(b)(6)

(b)(6) doj.gov<mailto: (b)(6) doj.gov><mailto: (b)(6) doj.gov>>;

(b)(6); (b)(7)(C) > (b)(6)

(b)(6)

Subject: RE: Tamimi RFJ

Importance: High

Good afternoon, (b)( RFJ received an inquiry from our regional bureau at State and had some very specific legal questions regarding the al-Tamimi case and extradition.

I wanted to introduce you to (b)(6) who had additional questions.

(b)(6);
(b)(7)(C)

If you could reply to (b)(6) DS would appreciate it.

Best,

(b)(6);
(b)(7)(C)

Foreign Affairs Officer U.S. Department of State Bureau of Diplomatic Security Threat Investigations and Analysis (TIA) Rewards for Justice Program (RFJ) (b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)

www.rewardsforjustice.net<http://www.rewardsforjustice.net/>>

Official
UNCLASSIFIED

**Official**
**UNCLASSIFIED**

| Sender: | (b)(6); (b)(7)(C) |
| --- | --- |
| Recipient: | (b)(6) |

# Exhibit 35



Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

August 7, 2020

Gregg M. Mashberg
Member of the Firm
d +1.212.969.3450
f 212.969.2900
gmashberg@proskauer.com
www.proskauer.com

***Via First Class Mail***
***Via Facsimile (202) 485-1669***
***Via Facsimile (202) 261-8579***

U. S. Department of State
Office of Information Programs and Services
A/GIS/IPS/RL
2201 C Street N.W., Suite B266
Washington, D.C. 20520-0000

U.S. Department of State
Office of Information Programs and Services
State Annex 2 (SA-2)
515 22nd Street, N.W.
Washington, DC 20522-8100

Re: <u>FOIA Request re: Extradition of Ahlam al-Tamimi from Jordan</u>

Dear Sir or Madam:

This firm is counsel to Arnold and Frimet Roth (the "<u>Roths</u>").  Pursuant to the Freedom of Information Act, 5 U.S.C. 552, as amended, and 22 C.F.R  Part 171 ("<u>FOIA</u>"), the Roths respectfully request that the Department of State  ("<u>DOS</u>") produce the "records"[1] identified below pursuant to and within the time frames set forth in FOIA.

<u>Background and Definitions</u>

The Roths' fifteen year old daughter, Malki Roth, a U.S. national, was murdered in the August 9, 2001 terrorist bombing of the Sbarro Pizzeria in Jerusalem (the "<u>Sbarro Attack</u>"). Since 2011, the Hashemite Kingdom of Jordan ("<u>Jordan</u>") has been harboring the terrorist responsible for the Sbarro Attack, Ahlam Aref Ahmad al-Tamimi ("<u>Tamimi</u>").

In 2013, the U.S. Department of Justice ("<u>DOJ</u>") filed a criminal complaint (the "<u>Complaint</u>") against Tamimi for violation of 18 U.S.C. §§ 2332a(a)(l) and (2), arising out of Tamimi's role in the Sbarro Attack and issued a warrant for her arrest.  Case 1:13-mj-580 (D.D.C., July 15, 2013).[2]  DOJ unsealed the Complaint on March 14, 2017 and included her on the list of FBI Most Wanted Terrorists.

---

[1] As defined in 22 C.F.R. 171.1(b).

[2] https://www.investigativeproject.org/documents/case_docs/3258.pdf

**Proskauer》**

U. S. Department of State
Office of Information Programs and Services
August 7, 2020
Page 2

Pursuant to the terms of the extradition treaty between the U.S. and Jordan, executed on or about March 28, 1995, and entered into force on or about July 29, 1995 (the "Treaty"), the U.S. has requested that Jordan extradite Tamimi to the U.S. to stand trial for the murder of Malki Roth and another U.S. national in the Sbarro Attack (the "Extradition Request"). Jordan, however, has refused to comply with the Extradition Request, claiming that the Treaty is not effective (the "Treaty Rejection"). DOS[3], however, deems the Treaty to be in force and valid, listing it as such in the DOS publication, "Treaties in Force."

Records Requested

1. All records or other documents or communications constituting or relating to the exchange of Instruments of Ratification[4] between the U.S. and Jordan relating to the Treaty.
2. All records or other documents or communications constituting or relating to any proposed or actual presidential proclamation and/or Executive Order declaring the Treaty to be in force.
3. All records or other documents or communications constituting or relating to any diplomatic notes or other communications from Jordan with respect to Jordan's internal procedures with respect to bringing the Treaty into force.
4. All records or other documents or communications constituting or relating to the Extradition Request, including intra-U.S. government communications as well as communications between the U.S. government and Jordan with respect thereto.
5. All records or other documents or communications constituting or relating to Jordan's refusal to comply with the Extradition Request, including intra-U.S. government communications as well as communications between the U.S. government and Jordan with respect thereto.
6. All records or other documents or communications relating to (a) Jordan's Court of Cassation's decision, on or about March 20, 2017, that the Treaty is invalid under Jordanian constitutional law, including intra-U.S. government communications as well as communications between the U.S. government and Jordan; and (b) any prior ruling by a Jordanian court (including without limitation in 1996) regarding the validity or effectiveness of the Treaty.

_____

[3] References herein to DOS include the U.S. Mission in Amman.

[4] Instruments of ratification refer to the exchange of instruments by the parties to the treaty whereby each country gives notice to the other that it has completed its domestic constitutional processes for approval and entry into force of the agreement. *See generally* https://www.justice.gov/file/23646/download

**Proskauer** »

U. S. Department of State
Office of Information Programs and Services
August 7, 2020
Page 3

7. All records or other documents or communications relating to any statement by or communication from Jordan regarding whether the Treaty is in force, including intra-U.S. government communications as well as communications between the U.S. government and Jordan.

8. All records or other documents or communications relating to (a) the inclusion of the Treaty in Treaties in Force, and (b) the statement in DOS's "Country Reports on Terrorism 2019: Jordan"[5] that, in the context of noting the Extradition Refusal, "The United States regards the extradition treaty with Jordan as valid and in force."

9. All records or other documents or communications relating to any instances where the Treaty has (a) been applied or utilized or (b) not applied or utilized with respect to the extradition, transfer or rendition of persons from Jordan to the U.S., other than Tamimi, including but not limited to Eyad Ismoil (a/k/a Iyad Isama'il Al-Najim)[6]; Mohammad Zaki Amawi[7]; and Nader Saadeh[8].

To the extent DOS objects to any of the above requests, in whole or in part, the Roths respectfully request that DOS produce all records to which it has no objection and otherwise explain the bases for any objections

The Roths acknowledge will agree to pay a fee in excess of $25.00, subject to prior notice of the amount of such excess and the Roths' agreement to pay such excess fee.

Thank you for your cooperation.

Sincerely,

Gregg M. Mashberg

Cc: Arnold and Frimet Roth

---

[5] https://www.state.gov/reports/country-reports-on-terrorism-2019/jordan/

[6] https://www.cambridge.org/core/journals/american-journal-of-international-law/article/contemporary-practice-of-the-united-states-relating-to-international-law/1A53A8ED43F7094469D422264D4CE174

[7] https://www.jpost.com/International/US-Alleged-terrorist-tries-to-annul-extradition

[8] https://www.alaraby.co.uk/english/news/2015/8/11/jordanian-american-appears-in-new-york-court-on-is-charges

# Exhibit 36



Proskauer Rose LLP    Eleven Times Square    New York, NY 10036-8299

Russell T. Gorkin
d 212.969.3496
f 212.969.2900
rgorkin@proskauer.com
www.proskauer.com

April 2, 2024

<u>By Email</u>

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Email: Stephen.DeGenaro@usdoj.gov

Re:    *Frimet Roth and Arnold Roth v. U.S. Dep't of State* (D.D.C. Case No. 20-3838-ABJ):
       <u>Department of State Draft Vaughn Index</u>

Dear Stephen:

I write with respect to the documents and the Department of State Draft Vaughn Index produced in connection with the above-captioned case.  The Draft Vaughn Index does not provide a sufficient basis for the redactions identified in Appendix A to this letter.  As a result, the identified documents must be reproduced without those redactions.[1]  Please confirm that the State Department will reproduce those documents without the redactions identified by April 30, 2024.  I am also available to meet-and-confer to discuss these issues further should you wish to do so.

By this letter, my clients do not intend to waive, and in fact do not waive, any rights, claims, or remedies, all of which are hereby expressly reserved.

Yours sincerely,

*/s/ Russell. T. Gorkin*

cc:    All counsel of record

---

[1] Where another basis has been asserted in the Draft Vaughn Index to withhold the information redacted, the document should be reproduced without the assertion of the improper basis identified in Appendix A.

Mr. Stephen DeGenaro, AUSA
April 2, 2024
Page 2

## APPENDIX A

1. <u>Document Nos. 1–5</u>

    a. B-1942772
    b. B-1942773
    c. B-1942775
    d. B-1942777
    e. B-1942780

Potions of these documents were redacted pursuant to Freedom of Information Act ("FOIA") Exemption 1, which allows an agency to withhold information "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C § 552(b)(7)(A).  Specifically, the State Department relies on Executive Order 13526, which allows information related to foreign government information or foreign relations or foreign activities of the United States to be designated as "Confidential" if its disclosure "reasonably could be expected to cause damage to the national security."  To the extent any portions of these documents were redacted on this basis without being at least designated "Confidential" pursuant to Executive Order 13526, the redactions are improper.

Portions of these documents also were redacted pursuant to FOIA Exemption 5, which allows an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C § 552(b)(7)(A).

Specifically, certain portions were redacted pursuant to the deliberative process privilege.  The State Department speculates that disclosure of the information withheld on that basis "*could* reasonably be expected to chill the open and frank expression of ideas, recommendations, [etc.]," and "*may* cause international confusion about the United States' stance on these issues."  (Emphasis added).  That is an insufficient basis on which to invoke the deliberative process privilege, which requires a concrete explanation as to how disclosure "would"—not could—adversely impair internal deliberations.

Portions of these documents were also redacted pursuant to FOIA Exemption 7(A), which allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C § 552(b)(7)(A).

The United States indicted Ahlam Aref Ahmad al-Tamimi "Tamimi") under seal in 2013, made the charges public in 2017, and at the same time formally sought her extradition

Mr. Stephen DeGenaro, AUSA
April 2, 2024
Page 3

under the 1995 bilateral treaty between the United States and the Hashemite Kingdom of Jordan ("Jordan").

The State Department contends that certain information redacted pursuant to FOIA Exemption 7(A) "was generated for the purpose of informing DOJ's efforts to extradite Tamimi from Jordan to the United States," and that disclosure of the information redacted "could . . . reasonably be expected to compromise the United States' ability to continue to work cooperatively with the Jordanian government to extradite Tamimi."  Jordan did not deny the United States's extradition request on a defendant-specific basis, however, but rather based on its claim that it never ratified the treaty.  Generally seeking to hold a foreign country to its treaty obligations is not a law enforcement matter.

The State Department also contends that the premature release of information redacted pursuant to FOIA Exemption 7(A) "could reasonably be expected to interfere with DOJ's ongoing criminal investigation."  This assertion seems dubious without further information to substantiate it given that (1) Tamimi engaged in the criminal acts at issue more than twenty years ago, (2) Tamimi was indicted more than ten years ago, and (3) the charges were made public and her extradition was sought more than seven years ago.  Additionally, Tamimi is a public figure whose whereabouts are known to or can easily be ascertained by the Jordanian government.  It is therefore difficult to see how any information withheld would hinder the DOJ's criminal investigation.

2.  <u>Documents Nos. 6–7</u>

     a.  B-2428519
     b.  B-2428530

Portions of these documents were redacted pursuant to FOIA Exemption 1, pursuant to the national security exemption.  For the reasons discussed above, to the extent any portions of these documents were redacted on this basis without being at least designated "Confidential" pursuant to Executive Order 13526, the redactions are improper.

3.  <u>Documents No. 8</u>

     a.  B-2428523

Portions of this document were redacted pursuant to FOIA Exemption 1, pursuant to the national security exemption.  For the reasons discussed above, to the extent any portions of these documents were redacted on this basis without being at least designated "Confidential" pursuant to Executive Order 13526, the redactions are improper.

4.  <u>Documents Nos. 9–10</u>

     a.  B-2428550
     b.  B-2428554

Mr. Stephen DeGenaro, AUSA
April 2, 2024
Page 4

Portions of this document were redacted pursuant to FOIA Exemption 1, pursuant to the national security exemption. For the reasons discussed above, to the extent any portions of these documents were redacted on this basis without being at least designated "Confidential" pursuant to Executive Order 13526, the redactions are improper.

5. <u>Documents Nos. 11–14</u>

    a. B-2428547
    b. B-2428575
    c. B-2528560
    d. B-2428561

Portions of these documents were redacted pursuant to FOIA Exemption 1, pursuant to the national security exemption. For the reasons discussed above, to the extent any portions of these documents were redacted on this basis without being at least designated "Confidential" pursuant to Executive Order 13526, the redactions are improper.

6. <u>Document No. 15</u>

    a. B-1942769

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

7. <u>Document No. 16</u>

    a. A-329938

Portions of this document were redacted pursuant to FOIA Exemption 7(A) for the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Portions of this document also were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Portions of this document also were redacted pursuant to FOIA Exemption 5 pursuant to the attorney work-product doctrine based on the contention that they "reflect the mental impressions, conclusions, opinions, or legal theories of State Department and DOJ attorneys regarding the U.S.-Jordan Extradition Treaty and the pending request for the extradition of Tamimi prepared in anticipation of litigation of the Tamimi case." However, any mental impressions, opinions, or legal theories that pertain to Tamimi's

Mr. Stephen DeGenaro, AUSA
April 2, 2024
Page 5

extradition, rather than to proving the crimes alleged against her in the indictment, are not
"in anticipation of litigation of the Tamimi case," but relate to an ancillary issue
regarding treaty enforcement that is unlikely to ever be litigated against Jordan.

8.  <u>Document Nos. 17 through 18</u>

    a.  A-329948
    b.  A-329950

Portions of these documents were redacted pursuant to FOIA Exemption 7(A) for
substantially the same reasons the State Department stated with respect to Document
Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in
connection with those documents.

The State Department also contends that FOIA Exemption 7(A) applies because the
documents "were compiled as a direct result of the United States' request for Tamimi's
extradition from Jordan to the United States," and "generated as a result of the case
brought by DOJ against Tamimi."  The fact that the documents were generated *as a result*
of the case brought by DOJ against Tamimi—*i.e.*, after the indictment was made—
undermines the suggestion that they were compiled for law enforcement purposes.  Nor
does the fact that the documents were compiled as a result of the United States'
extradition request or generated because the DOJ indicted Tamimi establish that
disclosing the information contained in those documents "could reasonably be expected
to interfere with enforcement proceedings."  FOIA Exemption 7(A) is inapplicable for
this reason, as well.

9.  <u>Document No. 19</u>

    a.  A-564207

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the
deliberative process privilege for substantially the same reasons the State Department
stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the
same reasons discussed above in connection with those documents.

Portions of this document also were redacted pursuant to FOIA Exemption 5 pursuant to
the attorney-work product doctrine for substantially the same reasons the State
Department stated with respect to Document No. 16, and those redactions are
inappropriate for the same reasons discussed above in connection with that document.

In addition to redacting portions of the email chain, the State Department also redacted
the entirety of the attachments to that chain pursuant to FOIA Exemption(s) 5, 6, or 7(C).
The State Department did not address the basis for redacting the attachments or of
invoking Exemptions 6 and/or 7 in the Draft Vaughn Index, so those redactions are
currently without any basis.

Mr. Stephen DeGenaro, AUSA
April 2, 2024
Page 6

10. <u>Document Nos. 21–24</u>

    a.  A-330457
    b.  A-445744
    c.  A-445756
    d.  A-564222

Portions of these documents were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for substantially the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Additionally, the State Department seeks to invoke FOIA Exemption 5 because "the written contents of the emails predate any final determination about how the agencies would respond to the questions posed to them [by the plaintiffs in this action] concerning the U.S.-Jordan Extradition Treaty and the pending request for the extradition of Tamimi." The United States and its agencies do not maintain an official policy as to how to respond to questions posed by the plaintiffs in this action, so the deliberative process privilege is not properly invoked with respect to these documents for this reason, as well.

Portions of these documents also were redacted pursuant to FOIA Exemption 5 pursuant to the attorney-work product doctrine for substantially the same reasons the State Department stated with respect to Document No. 16, and those redactions are inappropriate for the same reasons discussed above in connection with that document.

11. <u>Document Nos. 25</u>

    a.  A-445749

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for substantially the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Portions of this document also were redacted pursuant to FOIA Exemption 5 pursuant to the attorney-work product doctrine for substantially the same reasons the State Department stated with respect to Document No. 16, and those redactions are inappropriate for the same reasons discussed above in connection with that document.

Portions of this document also were redacted pursuant to FOIA Exemption 7(A) for substantially the same reasons the State Department stated with respect to Document Nos. 1–5 and 17–18, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Mr. Stephen DeGenaro, AUSA
April 2, 2024
Page 7

12. <u>Document Nos. 26</u>

    a.  A-445755

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for substantially the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Portions of this document also were redacted pursuant to FOIA Exemption 5 pursuant to the attorney-work product doctrine for substantially the same reasons the State Department stated with respect to Document No. 16, and those redactions are inappropriate for the same reasons discussed above in connection with that document.

13. <u>Document Nos. 27</u>

    a.  A-445759

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for substantially the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

14. <u>Document Nos. 28</u>

    a.  A-459617

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for substantially the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

Additionally, the United States and its agencies do not maintain an official policy as to how to respond to press inquiries regarding the U.S.-Jordan extradition treaty, so the deliberative process privilege is not properly invoked with respect to this document for this reason, as well.

15. <u>Document Nos. 29</u>

    a.  A-445760

Portions of this document were redacted pursuant to FOIA Exemption 5 pursuant to the deliberative process privilege for substantially the same reasons the State Department stated with respect to Document Nos. 1–5, and those redactions are inappropriate for the same reasons discussed above in connection with those documents.

# Exhibit 37

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| **A**HLAM AREF AHMAD AL-TAMIMI, | ) | |
| a/k/a KHALTI | ) | |
| a/k/a HALATI | ) | |

_____
_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of August 9, 2001, in the State of Israel and, therefore, outside of the jurisdiction of any
particular state or district of the United States, but within the extraterritorial jurisdiction of the United States and,
pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the
District of Columbia, the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. §§ 2332a(a)(1) and 2 | - Conspiring to Use and Using a Weapon of Mass Destruction Against a United States National Outside the United States Resulting in Death and Aiding and Abetting and Causing an Act to be Done. |

This criminal complaint is based on these facts:

See attached Affidavit in Support of a Criminal Complaint and Arrest Warrant

☐ Continued on the attached sheet.

_____
_Complainant's signature_

Special Agent Laura S. Walter
_____
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  July 15, 2013
_____
_Judge's signature_

City and state:  Washington, D.C.

Magistrate Judge Deborah A. Robinson
_____
_Printed name and title_

**AFFIDAVIT IN SUPPORT OF A**

**CRIMINAL COMPLAINT AND ARREST WARRANT**

      This affidavit is submitted by the affiant, Special Agent Laura S. Walter, in support of a criminal complaint and an application for an arrest warrant relating to:

> **AHLAM AREF AHMAD AL-TAMIMI, also known as Khalti, also known as Halati** (hereinafter, "TAMIMI"), a Jordanian national currently residing in Jordan.

      I respectfully submit that there is probable cause to believe that the above identified individual has committed the following criminal offense in violation of United States law:

> Conspiring to Use and Using a Weapon of Mass Destruction Against a United States National Outside the United States Resulting in Death and Aiding and Abetting and Causing an Act to be Done, in violation of 18 U.S.C. §§ 2332a(a)(1) and 2.

**AFFIANT'S BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 1, 2003.  I have been working international investigations at the Washington Field Office since January 2008.

2. As a Special Agent, I have participated in over 50 international investigations involving violations of U.S. criminal and terrorism laws.  I have employed investigative tools in furtherance of these investigations, and worked with numerous other agencies, both foreign and domestic.  I have also received specialized training in international counterterrorism investigations.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein.  I have also received information from other federal and foreign law enforcement officials relating to this investigation.  The statements contained in this affidavit are based on my own observations, witness interviews, document reviews and reliable information provided to me by other federal and foreign law enforcement officials.  Because this affidavit is submitted for the purpose of seeking the issuance of a criminal complaint and arrest warrant, it does not include every fact known to me concerning the investigation.

**FACTS SUPPORTING PROBABLE CAUSE**

**Background**

4. In June 2001, TAMIMI was a Jordanian national residing in Ramallah, West Bank.  She attended school at Bir Zeit University while working as a journalist for Istiklal Television.

5. The Izz al-Din al-Qassam Brigades is the military wing of Hamas, a designated foreign terrorist organization whose goals include the replacement of the State of Israel and the Palestinian Territories with an Islamic Palestinian state.

1

6. In or about June 2001, TAMIMI met with Conspirator A, and Conspirator A invited TAMIMI to join, and carry out terrorist attacks on behalf of, the Izz al-Din al-Qassam Brigades. TAMIMI agreed to join the Izz al-Din al-Qassam Brigades and expressed her willingness to carry out terrorist attacks on its behalf.

**Attacks on Behalf of Izz al-Din al-Qassam Brigades**

7. In or about July 2001, Conspirator A contacted TAMIMI and asked her to detonate an explosive device, concealed in a beer can, somewhere in Jerusalem. TAMIMI agreed to do so.

8. On or about July 27, 2001, TAMIMI travelled to Jaffa Street in downtown Jerusalem to scout a location for detonating the explosive device. When she surveilled the street in person, she decided it would be a good location to carry out an attack because it was centrally located and had a high volume of Jewish pedestrians. Ultimately, TAMIMI picked a Super Co-op supermarket on King George Street, near its intersection with Jaffa Street, for the attack because she believed that placing the beer can explosive device on a shelf in the supermarket would not cause suspicion.

9. On or about July 30, 2001, Conspirator A delivered an explosive device concealed in a beer can to TAMIMI. TAMIMI travelled to Jerusalem and, at approximately 11:15 a.m., placed the beer can containing the explosive device on a shelf at the Super Co-op supermarket located on King George Street in Jerusalem.

10. On or about July 30, 2001, the explosive device placed by TAMIMI detonated, causing substantial property damage to the Super Co-op, but no human casualties.

11. In or about late July or early August 2001, TAMIMI offered her assistance to Conspirator A in carrying out a suicide bombing operation in Jerusalem. Conspirator A instructed TAMIMI to assist the suicide bomber in transporting an explosive device into Jerusalem, and to aid him in finding an appropriate target for the suicide bombing. TAMIMI agreed to do so.

12. During this conversation, Conspirator A indicated to TAMIMI Conspirator A's intent to conceal the explosive device within an Oud, which is a traditional Arab musical instrument. TAMIMI refused to assist in the attack if the explosive device was to be concealed in an Oud, explaining that because an Oud was an Arab musical instrument, it might raise suspicion among the Israelis. TAMIMI suggested that the explosive device instead be concealed inside a Western guitar. Conspirator A agreed.

13. On or about August 9, 2001, at approximately 12:00 noon, Conspirator A called TAMIMI and requested that she come to Ramallah to carry out the planned attack. In Ramallah, she met the suicide bomber, Conspirator B, who was in possession of the

explosive device, which was concealed within a guitar. TAMIMI and Conspirator B travelled together via taxi to Jerusalem.

14. On or about August 9, 2001, TAMIMI led Conspirator B, who was carrying the explosive device in a guitar case on his back, to the intersection of King George Street and Jaffa Street in downtown Jerusalem, a crowded area with substantial pedestrian traffic. TAMIMI instructed Conspirator B to detonate the explosive device somewhere in the area, and indicated to Conspirator B that he could also choose another location on King George Street if the opportunity arose to cause more casualties. TAMIMI then left Conspirator B and returned to Ramallah.

15. On or about August 9, 2001, at approximately 1:55 p.m., Conspirator B entered the Sbarro pizza restaurant on Jaffa Road, near the intersection of Jaffa Road and King George Street. Conspirator B detonated the explosive device, killing himself along with 15 civilians, including seven children and two United States nationals, Judith Lillian Greenbaum and 15-year-old M.R. It left at least 122 injured, including four United States nationals : David Danzig, Matthew Gordon, Joanne Nachenberg, and two-year-old S.N.

## Evidence of Tamimi's Involvement

16. TAMIMI was detained by Israeli law enforcement in September 2001, and made several statements in which she the implicated herself and described her role in the attacks consistent with factual statements above. Physical and forensic evidence recovered at the scene of the Sbarro bombing by Israeli law enforcement corroborates TAMIMI's account that a suicide bomber detonated an explosive device inside the Sbarro, and that the device was concealed inside of a guitar. On or about June 22, 2003, TAMIMI pled guilty in an Israeli court to an indictment charging her with multiple counts of murder arising from the Sbarro bombing. At her sentencing hearing on or about October 23, 2003, at which she was represented by counsel, TAMIMI gave a statement in which she admitted her involvement in the bombing, expressed satisfaction at its results, and expressed no remorse for those who were killed or injured. The Israeli court sentenced her to 16 life terms. She served only eight years of her sentence, during which she gave several voluntary interviews to various media outlets describing her role in the Sbarro bombing and, again, expressed satisfaction at the results. On or about October 28, 2011, she was released as part of a prisoner exchange between Israel and Hamas and returned to Jordan. Upon her return, she again made statements to the media describing her role in the attack.

**Statutory Provisions**

17. Title 18, United States Code, Section 2332a(a)(1) makes it unlawful for a person without lawful authority to use, threaten, attempt, or conspire to use a weapon of mass destruction against a national of the United States while such national is outside the United States. Title 18, United States Code, Section 2332a(c)(2), defines a "weapon of mass destruction" to include any "destructive device," as defined in 18 U.S.C. § 921. Title 18, United States Code, Section 921(a)(4) defines "destructive device" to include "any explosive, incendiary, or poison gas (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the proceeding clauses." In addition, a "destructive device" includes "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled."

18. Based on my education, experience, and information I obtained from U.S. and foreign law enforcement officials and other experts involved in this investigation, I submit that the explosive device used in the Sbarro attack on August 9, 2001, meets the definition for a destructive device under 18 U.S.C. § 921(a)(4). As such, the explosive device also meets the statutory definition for a "weapon of mass destruction" under 18 U.S.C. § 2332a(c)(2).

## CONCLUSION

Based on the facts set forth herein, and on my experience and training in investigating cases involving violations of federal law, and on the information provided by other experienced agents with whom I have consulted, I submit that there is probable cause to believe that **AHLAM AREF AHMAD AL-TAMIMI, also known as Khalti, also known as Halati,** has committed the following offenses: Conspiring to Use and Using a Weapon of Mass Destruction Against a National of the United States Outside the United States Resulting in Death and Aiding and Abetting and Causing an Act to be Done, in violation of 18 U.S.C. §§ 2332a(a)(1) and 2.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Laura S. Walter
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed before me on this _____ day of July 2013.

_____
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA

# Exhibit 38

| | |
|---|---|
| **From:** | DeGenaro, Stephen (USADC) |
| **To:** | Dale, Margaret A. |
| **Cc:** | Carneiro, Henrique N.; LaBerge, Marielle T. |
| **Subject:** | RE: Status Report |
| **Date:** | Wednesday, November 6, 2024 12:56:41 PM |

**This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.**

Hi Margaret, I've received this list and am checking with State.

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

**From:** Dale, Margaret A. <mdale@proskauer.com>
**Sent:** Wednesday, November 6, 2024 12:24 PM
**To:** DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
**Cc:** Carneiro, Henrique N. <HCarneiro@proskauer.com>; LaBerge, Marielle T.
<MLaBerge@proskauer.com>; Dale, Margaret A. <mdale@proskauer.com>
**Subject:** [EXTERNAL] RE: Status Report

Hello Stephen,

We hope you are doing well. We are writing to you because as we have some questions regarding
the Vaughn Index and the Government's production of documents.

First, we have identified two documents on the Vaughn Index that are classified as having been
released in part, however, we are unable to locate in them in the previous productions. These
documents are listed on the Vaugh index as documents 16 and 27 and are identified as Documents
Nos. A-329938 and A-4457259, respectively.   Can you let me know when these documents were
produced by the Government?  And, if these documents have not been produced, could you please
advise us as to why they are being withheld?

Second, we have identified some documents in the Government's production that have redactions
but are not listed on the Vaughn Index. These documents are identified by Documents Nos. A-
3300447, A-330393, B-1942770, A-330289, and A-330471. Could you please advise where these
documents are identified on the Vaughn Index if we are mistaken or, alternatively, why they are
redacted but not included on the Vaughn Index (and supplement the Index)?

Last, we have a document that was produced to us on June 14, 2022, without an identifying number.
The accompanying letter states that the document was withheld in full, and the document is

completely redacted, but we are unable to identify which document on the Vaughn Index it is.  Could you please advise?

Thank you,
Margaret Dale


**Margaret A. Dale**
Partner
(she/her/hers)

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315
c 917.975.8748
f  212.969.2900
mdale@proskauer.com

**Visit our Commercial Litigation blog:**
**Minding Your Business Litigation**
**www.mindingyourbusinesslitigation.com**

greenspaces
Please consider the environment before printing this email.

---

**From:** DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
**Sent:** Wednesday, August 28, 2024 11:16 AM
**To:** Dale, Margaret A. <mdale@proskauer.com>
**Cc:** Carneiro, Henrique N. <HCarneiro@proskauer.com>; LaBerge, Marielle T. <MLaBerge@proskauer.com>
**Subject:** RE: Status Report

*This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.*

---

Hi Margaret,

Thanks for the follow up—I had some other deadlines before I could get back to you.

I have seen the briefing schedule done any number of ways, but the most common one is indeed Defendant moving first and State does not object to moving first.

Due to the number of withholdings at issue, State informs me that it would be ready to get the declaration completed in time to file by October 28, 2024.  If you'd prefer to have State going first—which we do not object to—we'd propose that as the start for the briefing schedule like thus:

- Defendant MSJ: October 28, 2024

- P oppo/cross: November 27, 2024
- Defendant oppo/reply: December 27, 2024
- P reply (if necessary): January 27, 2025

If Plaintiff prefers briefing to wrap earlier, then we'd be amenable to filing second, provided that our first brief is due no sooner than October 28, 2024.

Thanks,
Stephen

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

---

**From:** Dale, Margaret A. <mdale@proskauer.com>
**Sent:** Wednesday, August 28, 2024 10:35 AM
**To:** DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
**Cc:** Carneiro, Henrique N. <HCarneiro@proskauer.com>; LaBerge, Marielle T. <MLaBerge@proskauer.com>
**Subject:** [EXTERNAL] RE: Status Report

Stephen,
We've looked through a number of dockets and it appears in these FOIA cases the defendant usually moves first (which makes sense given the burden). We assume that will be the case here. Please let us know if you want to set a time to discuss the schedule or if you will send us your proposed schedule. We will reserve the right to cross-move. Our status report with agreed-upon schedule is Friday, Sept 6.
Thanks.
Margaret

**Margaret A. Dale**
Partner
(she/her/hers)

**Proskauer**
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315
c 917.975.8748
f  212.969.2900
mdale@proskauer.com

**Visit our Commercial Litigation blog:**
**Minding Your Business Litigation**
**www.mindingyourbusinesslitigation.com**

greenspaces
Please consider the environment before printing this email.

---

**From:** Dale, Margaret A.
**Sent:** Monday, August 26, 2024 4:59 PM
**To:** 'DeGenaro, Stephen (USADC)' <Stephen.DeGenaro@usdoj.gov>
**Cc:** Carneiro, Henrique N. <HCarneiro@proskauer.com>; LaBerge, Marielle T.
<MLaBerge@proskauer.com>
**Subject:** RE: Status Report

Hi Stephen,

Hope you're enjoying these summer days.

I wanted to touch base in advance of next week's filing of the schedule for summary
judgment.
Two issues:

1. In your experience, do the parties move at the same time, with simultaneous oppositions
   and then simultaneous replies? Or do Plaintiffs go first, State opposes/cross-moves?
2. Tom Blakely is leaving the Firm.  Henrique Carneiro and Marielle LaBerge are joining
   the team.  I've copied them here.

Thanks.
Margaret


**Margaret A. Dale**
Partner
(she/her/hers)

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315
c 917.975.8748
f  212.969.2900
mdale@proskauer.com

**Visit our Commercial Litigation blog:**
**Minding Your Business Litigation**
**www.mindingyourbusinesslitigation.com**

greenspaces

Please consider the environment before printing this email.

**From:** DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
**Sent:** Thursday, August 8, 2024 10:02 AM
**To:** Dale, Margaret A. <mdale@proskauer.com>; Blakely, Thomas R. <TBlakely@proskauer.com>
**Subject:** RE: Status Report

*This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.*

Margaret,

See attached State's insert.

Thanks,

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

**From:** Dale, Margaret A. <mdale@proskauer.com>
**Sent:** Wednesday, August 7, 2024 5:03 PM
**To:** DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>; Blakely, Thomas R.
<TBlakely@proskauer.com>
**Cc:** Dale, Margaret A. <mdale@proskauer.com>
**Subject:** [EXTERNAL] RE: Status Report

Dear Stephen,
Thank youi for the call.
Here is the revised draft – starting in paragraph 8.  If you would pls include your client's
position and send it back to us, we will review it.  We can also file it once we are agreed.
Thanks.
Margaret

**Margaret A. Dale**
Partner
(she/her/hers)

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315

c 917.975.8748
f 212.969.2900
mdale@proskauer.com

**Visit our Commercial Litigation blog:**
**Minding Your Business Litigation**
**www.mindingyourbusinesslitigation.com**

green spaces
Please consider the environment before printing this email.

---

**From:** DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
**Sent:** Wednesday, August 7, 2024 2:14 PM
**To:** Blakely, Thomas R. <TBlakely@proskauer.com>
**Cc:** Dale, Margaret A. <mdale@proskauer.com>
**Subject:** RE: Status Report

*This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.*

---

Thomas,

If there are withholdings that your clients intend to challenge, then the proper course would be for your client to confirm which specific challenges they intend to challenge, and then we will just inform the Court of a schedule for briefing summary judgment—no status or scheduling conference necessary. Happy to confer with you about a reasonable schedule, but once I know the full scope of the challenges, I can check with the Department about how much time it needs to prepare a declaration in support of our motion.

Also, I think I mentioned this on the call previously, but two attorneys ago, Gregg mentioned that your client was only interested in the justifications for Exemptions 1 (with specific subsets there), 5, and 7A. I believe the Vaughn has largely conformed itself to that list, but I think Russell's letter referenced complaints outside that list.

Thanks,
Stephen

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

---

**From:** Blakely, Thomas R. <TBlakely@proskauer.com>

**Sent:** Wednesday, August 7, 2024 2:01 PM
**To:** DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
**Cc:** Dale, Margaret A. <mdale@proskauer.com>
**Subject:** [EXTERNAL] RE: Status Report

Hi Stephen,

In advance of tomorrow's deadline for the filing of a new Joint Status Report, please see the attached proposed JSR. Please let us know if you have any comments or are signed off.

Thanks,
Tom

**Thomas R. Blakely**
Associate

Proskauer
One International Place
Boston, MA 02110-2600
d 617.526.9866
f  617.526.9899
TBlakely@proskauer.com

greenspaces
Please consider the environment before printing this email.

**From:** DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
**Sent:** Friday, July 26, 2024 1:05 PM
**To:** Dale, Margaret A. <mdale@proskauer.com>
**Cc:** Blakely, Thomas R. <TBlakely@proskauer.com>
**Subject:** RE: Status Report

*This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.*

Margaret and Tom, see attached.

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

**From:** Dale, Margaret A. <mdale@proskauer.com>

**Sent:** Tuesday, July 2, 2024 4:11 PM
**To:** DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
**Cc:** Blakely, Thomas R. <TBlakely@proskauer.com>
**Subject:** [EXTERNAL] RE: Status Report

How about 7/24 at 11 am?  if so, we can send an invite.

**Margaret A. Dale**
Partner
(she/her/hers)

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315
c 917.975.8748
f  212.969.2900
mdale@proskauer.com

**Visit our Commercial Litigation blog:**
**Minding Your Business Litigation**
**www.mindingyourbusinesslitigation.com**

greenspaces
Please consider the environment before printing this email.

---

**From:** DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
**Sent:** Tuesday, July 2, 2024 12:53 PM
**To:** Dale, Margaret A. <mdale@proskauer.com>
**Cc:** Blakely, Thomas R. <TBlakely@proskauer.com>
**Subject:** RE: Status Report

*This email sent by **stephen.degenaro@usdoj.gov** originated from outside the Firm.*

I am generally wide open that day before 330.

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

---

**From:** Dale, Margaret A. <mdale@proskauer.com>

**Sent:** Tuesday, July 2, 2024 12:34 PM
**To:** DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
**Cc:** Blakely, Thomas R. <TBlakely@proskauer.com>
**Subject:** [EXTERNAL] RE: Status Report

Hi.  Yes, the week of July 22 should work.  How about we put something on for July 24th?
I am copying Tom Blakely, who is going to join me on this matter going forward.
Thanks.

**Margaret A. Dale**
Partner
(she/her/hers)

**Proskauer**
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315
c 917.975.8748
f  212.969.2900
mdale@proskauer.com

**Visit our Commercial Litigation blog:**
**Minding Your Business Litigation**
**www.mindingyourbusinesslitigation.com**

**green**spaces
Please consider the environment before printing this email.

---

**From:** DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
**Sent:** Tuesday, July 2, 2024 11:46 AM
**To:** Dale, Margaret A. <mdale@proskauer.com>
**Subject:** RE: Status Report

This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.

Hi Margaret,

Pleased to meet you.

I am unfortunately out next week, and then am booked the week of the 15th. Would you like to set some time to speak on the week of the 22nd?

Thanks,

Stephen M. DeGenaro
Assistant United States Attorney

United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov


-----Original Message-----
From: Dale, Margaret A. <mdale@proskauer.com>
Sent: Tuesday, July 2, 2024 11:44 AM
To: DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
Subject: [EXTERNAL] RE: Status Report

Hello Stephen.
Nice to meet you virtually.
Perhaps we can have a conversation next week on where things stand?
Please let me know your availability.
Thanks.
Margaret

Margaret A. Dale
Partner
(she/her/hers)

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3315
c 917.975.8748
f  212.969.2900
mdale@proskauer.com
Visit our Commercial Litigation blog:
Minding Your Business Litigation
https://protect2.fireeye.com/v1/url?k=1230e7a8-4dacc544-1237c34d-000babff85fc-
8a7be15d59b82c07&q=1&e=2866fb90-7222-4d62-9961-
8d239eb27c8f&u=http%3A%2F%2Fwww.mindingyourbusinesslitigation.com%2F


greenspaces
Please consider the environment before printing this email.


-----Original Message-----
From: Gorkin, Russell T. <RGorkin@proskauer.com>
Sent: Friday, June 21, 2024 10:01 AM
To: DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>

Cc: Brenner, Guy <gbrenner@proskauer.com>; Dale, Margaret A. <mdale@proskauer.com>
Subject: RE: Status Report

Stephen -- I hope all is well.

I wanted to let you know that today is my last day at Proskauer and to introduce you by way of this email to Margaret Dale (cc'd), who will be taking over day-to-day responsibility for this case.

Best wishes,
Russell



Russell T. Gorkin
Attorney at Law

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3496
c 516.398.8598
f  212.969.2900
rgorkin@proskauer.com
greenspaces
Please consider the environment before printing this email.

-----Original Message-----
From: DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
Sent: Friday, June 7, 2024 12:22 PM
To: Gorkin, Russell T. <RGorkin@proskauer.com>
Cc: Brenner, Guy <gbrenner@proskauer.com>
Subject: RE: Status Report

This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.

Russell,

Edits are fine. Please file at your convenience.

Thanks,

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia

601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

-----Original Message-----
From: Gorkin, Russell T. <RGorkin@proskauer.com>
Sent: Friday, June 7, 2024 10:36 AM
To: DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
Cc: Brenner, Guy <gbrenner@proskauer.com>
Subject: [EXTERNAL] RE: Status Report

Stephen,

State is now proposing to do by August 6 what it previously represented it would do by today.
Proposed edits reflecting that fact and requesting a conference with the Court as soon as it can
make itself available following the filing of the next status report in the attached.

Thanks,
Russell


Russell T. Gorkin
Attorney at Law

Proskauer
Eleven Times Square
New York, NY 10036-8299
d 212.969.3496
c 516.398.8598
f  212.969.2900
rgorkin@proskauer.com
greenspaces
Please consider the environment before printing this email.

-----Original Message-----
From: DeGenaro, Stephen (USADC) <Stephen.DeGenaro@usdoj.gov>
Sent: Friday, June 7, 2024 9:29 AM
To: Gorkin, Russell T. <RGorkin@proskauer.com>
Subject: RE: Status Report

This email sent by stephen.degenaro@usdoj.gov originated from outside the Firm.

Russell,

See attached. State is going to evaluate the need to supply some additional detail to see whether that narrows the issues in dispute.

Thanks,

Stephen M. DeGenaro
Assistant United States Attorney
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7229
Email: Stephen.DeGenaro@usdoj.gov

-----Original Message-----
From: Gorkin, Russell T. <RGorkin@proskauer.com>
Sent: Friday, June 7, 2024 7:49 AM
To: DeGenaro, Stephen (USADC) <SDeGenaro@usa.doj.gov>
Subject: [EXTERNAL] Status Report

Stephen,

The joint status report is due today. Have you heard from State? Do you have a proposed report?

Thanks,
Russell


****************************************************************************************
****************************************************************************

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
****************************************************************************************
****************************************************************************

# Exhibit 39


**Office of Public Affairs**
U.S. Department of Justice



**PRESS RELEASE**

# Individual Charged in Connection With 2001 Terrorist Attack in Jerusalem That Resulted in Death of Americans

Tuesday, March 14, 2017

> **For Immediate Release**
>
> Office of Public Affairs

A criminal complaint was unsealed today charging Ahlam Aref Ahmad Al-Tamimi, also known as "Khalti" and "Halati," a Jordanian national in her mid-30s, with conspiring to use a weapon of mass destruction against U.S. nationals outside the U.S., resulting in death. The charge is related to the defendant's participation in an Aug. 9, 2001, suicide bomb attack at a pizza restaurant in Jerusalem that killed 15 people, including two U.S. nationals. Four other U.S. nationals were among the approximately 122 others injured in the attack. Also unsealed today was a warrant for Al-Tamimi's arrest and an affidavit in support of the criminal complaint and arrest warrant. The criminal charge had been under seal since July 15, 2013.

Acting Assistant Attorney General for National Security Mary B. McCord, U.S. Attorney Channing D. Phillips for the District of Columbia and Assistant Director in Charge Andrew Vale of the FBI's Washington Field Office made the announcement.

"Al-Tamimi is an unrepentant terrorist who admitted to her role in a deadly terrorist bombing that injured and killed numerous innocent victims. Two Americans were killed and four injured. The charges unsealed today serve as a reminder that when terrorists target Americans anywhere in the world, we will never forget – and we will continue to seek to ensure that they are held accountable," said Acting Assistant Attorney General McCord. "I want to thank the many dedicated agents and prosecutors who have worked on this investigation."

"We have never forgotten the American and non-American victims of this awful terrorist attack," said U.S. Attorney Phillips. "We will continue to remain vigilant until Ahlam Aref Ahmad Al-Tamimi is brought to justice."

"Al-Tamimi is a terrorist who participated in an attack that killed United States citizens," said Assistant Director in Charge Vale. "The bombing that she planned and assisted in carrying out on innocent people, including children, furthered the mission of a designated terrorist organization. The FBI continues to work with our international partners to combat terrorists like Al-Tamimi and hold them accountable."

According to the affidavit in support of the criminal complaint and arrest warrant, Al-Tamimi was living in the West Bank in the summer of 2001, while attending school and working as a journalist for a television station. Al-Tamimi agreed that summer to carry out attacks on behalf of the military wing of Hamas (the Izz al-Din al-Qassam Brigades), a Palestinian organization designated by the U.S. as a terrorist organization.

The affidavit states that on Aug. 9, 2001, Al-Tamimi met with the suicide bomber in Ramallah, in the West Bank, and traveled with the suicide bomber by car to Jerusalem. The suicide bomber was in possession of an explosive device concealed within a guitar. Al-Tamimi led the suicide bomber to a crowded area in downtown Jerusalem and instructed the suicide bomber to detonate the explosive device in the area, or somewhere nearby if an opportunity arose to cause more casualties. According to the affidavit, the suicide bomber entered a Sbarro pizza restaurant and detonated the explosive device, causing extensive damage, bodily injury and death. Seven of the dead were children, including one U.S. national.

The affidavit states that Al-Tamimi pleaded guilty in an Israeli court in 2003 to multiple counts of murder arising from the Sbarro suicide bomb attack and was sentenced to 16 life terms of incarceration. The defendant served only eight years of the sentence before being released on or about Oct. 28, 2011, as part of a prisoner exchange between the government of Israel and Hamas.

Al-Tamimi was returned to Jordan upon her release from incarceration. Jordan's courts, however, have ruled that their constitution forbids the extradition of Jordanian nationals. The U.S. has worked and will continue to work with its foreign partners to obtain custody of Al-Tamimi so she can be held accountable for her role in the terrorist bombing. The FBI also announced today that Al-Tamimi has been placed on its list of Most Wanted Terrorists.

Charges contained in a criminal complaint are merely allegations, and every defendant is presumed innocent unless and until proven guilty beyond a reasonable doubt.

The maximum penalty for a person convicted of this charge is a lifetime term of incarceration or death. The maximum statutory sentence is prescribed by Congress and is provided here for informational purposes. If convicted of any offense, the sentencing of the defendant will be

determined by the court based on the advisory Sentencing Guidelines and other statutory factors.

The investigation into this matter was conducted by the FBI's Washington Field Office. The Office of International Affairs of the Department of Justice's Criminal Division provided significant assistance. The case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the National Security Division's Counterterrorism Section.

Victims and their families can contact the Department of Justice via e-mail at USADC.SbarroCaseIsrael@USDOJ.gov.

*Updated March 14, 2017*

---

**Topic**

COUNTERTERRORISM

**Components**

National Security Division (NSD)  |  USAO - District of Columbia

Press Release Number: 17-275

# Related Content

PRESS RELEASE

## Dual U.S. and Albanian Citizen Arrested for Attempting to Provide Material Support to ISIS and Distributing Instructions Regarding Homemade Explosives

A former New York man and dual citizen of the United States and Albania was arrested yesterday in New York on criminal charges related to his alleged involvement in attempting...

November 22, 2024

**PRESS RELEASE**

## U.S. Army Soldier Sentenced to 14 Years in Prison For Attempting to Assist ISIS to Conduct Deadly Ambush on U.S. Troops

Cole Bridges, also known as Cole Gonzales, 24, of Stow, Ohio, was sentenced to 168 months in prison followed by 10 years of supervised release for attempting to provide material...

October 11, 2024

**PRESS RELEASE**

## Pakistani National with Ties to Iran Charged in Connection with Foiled Plot to Assassinate a Politician or U.S. Government Official

Asif Merchant, also known as Asif Raza Merchant, was indicted yesterday with attempting to commit an act of terrorism transcending national boundaries and murder-for-hire as part of a scheme to...

September 11, 2024

 **Office of Public Affairs**

U.S. Department of Justice

# Exhibit 40

# SEEKING JUSTICE FOR VICTIMS OF PALESTINIAN TERRORISM IN ISRAEL

## HEARING

BEFORE THE

## SUBCOMMITTEE ON NATIONAL SECURITY

OF THE

## COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM HOUSE OF REPRESENTATIVES

ONE HUNDRED FOURTEENTH CONGRESS

SECOND SESSION

FEBRUARY 2, 2016

### Serial No. 114–64

Printed for the use of the Committee on Oversight and Government Reform

Available via the World Wide Web: http://www.fdsys.gov
http://www.house.gov/reform

U.S. GOVERNMENT PUBLISHING OFFICE

20–555 PDF                    WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104  Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

JASON CHAFFETZ, Utah, *Chairman*

JOHN L. MICA, Florida
MICHAEL R. TURNER, Ohio
JOHN J. DUNCAN, Jr., Tennessee
JIM JORDAN, Ohio
TIM WALBERG, Michigan
JUSTIN AMASH, Michigan
PAUL A. GOSAR, Arizona
SCOTT DesJARLAIS, Tennessee
TREY GOWDY, South Carolina
BLAKE FARENTHOLD, Texas
CYNTHIA M. LUMMIS, Wyoming
THOMAS MASSIE, Kentucky
MARK MEADOWS, North Carolina
RON DeSANTIS, Florida
MICK MULVANEY, South Carolina
KEN BUCK, Colorado
MARK WALKER, North Carolina
ROD BLUM, Iowa
JODY B. HICE, Georgia
STEVE RUSSELL, Oklahoma
EARL L. "BUDDY" CARTER, Georgia
GLENN GROTHMAN, Wisconsin
WILL HURD, Texas
GARY J. PALMER, Alabama

ELIJAH E. CUMMINGS, Maryland, *Ranking Minority Member*
CAROLYN B. MALONEY, New York
ELEANOR HOLMES NORTON, District of Columbia
WM. LACY CLAY, Missouri
STEPHEN F. LYNCH, Massachusetts
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
MATT CARTWRIGHT, Pennsylvania
TAMMY DUCKWORTH, Illinois
ROBIN L. KELLY, Illinois
BRENDA L. LAWRENCE, Michigan
TED LIEU, California
BONNIE WATSON COLEMAN, New Jersey
STACEY E. PLASKETT, Virgin Islands
MARK DeSAULNIER, California
BRENDAN F. BOYLE, Pennsylvania
PETER WELCH, Vermont
MICHELLE LUJAN GRISHAM, New Mexico

JENNIFER HEMINGWAY, *Staff Director*
DAVID RAPALLO, *Minority Staff Director*
ART ARTHUR, *Staff Director, Subcommittee on National Security*
MIKE HOWELL, *Counsel*
WILLIE MARX, *Clerk*

(II)

SUBCOMMITTEE ON NATIONAL SECURITY

RON DESANTIS, Florida, *Chairman*

JOHN L. MICA, Florida
JOHN J. DUNCAN, JR., Tennessee
JODY B. HICE, Georgia
STEVE RUSSELL, Oklahoma, *Vice Chair*
WILL HURD, Texas

STEPHEN F. LYNCH, Massachusetts,
*Ranking Member*
ROBIN KELLY, Illinois
BRENDA L. LAWRENCE, Michigan
TED LIEU, California

(III)

# C O N T E N T S

———————

Page

Hearing held on February 2, 2016...............................................................................1

## WITNESSES

Mr. Brad Wiegmann, Deputy Assistant Attorney General, National Security
  Division, U.S. Department of Justice
    Oral Statement.............................................................................................5
Ms. Sarri Singer, Founder and Director, Strength to Strength
    Oral Statement.............................................................................................7
    Written Statement .......................................................................................10
Mr. Peter Schwartz, Uncle of a Victim of Terrorism
    Oral Statement.............................................................................................14
    Written Statement .......................................................................................16
Mr. Arnold Roth, Father of a Victim of Terrorism
    Oral Statement.............................................................................................19
    Written Statement .......................................................................................22

## APPENDIX

Submission to the Subcommittee on National Security of the Committee
  on Oversight and Government Reform, From Sherri Mandel, Mother of
  Koby Mandell..................................................................................................48
Submission From Alan Bauer, A Victim and Father of a Victim of Palestinian
  Terrorism........................................................................................................49
Statement From Mark Sokolow, A Victim of Palestinian Terrorism .........................53
Statement of Farley Weiss, President of the National Council of Young Israel     55

# SEEKING JUSTICE FOR VICTIMS OF PALESTINIAN TERRORISM IN ISRAEL

————

**Tuesday, February 2, 2016**

House of Representatives,
Subcommittee on National Security,
Committee on Oversight and Government Reform,
*Washington, D.C.*

The subcommittee met, pursuant to call, at 2:04 p.m., in Room 2154, Rayburn House Office Building, Hon. Ron DeSantis [chairman of the subcommittee] presiding.

Present: Representatives DeSantis, Mica, Lynch, Lieu, and Kelly. Also Present: Representative Meadows.

Mr. DeSantis. The Subcommittee on National Security will come to order. Without objection, the chair is authorized to declare a recess at any time. And we do have floor votes pending. It's just one 15-minute vote. I'm going to give my opening statement, and if the vote has not been called, then we'll go with the opening statements of the witnesses. Once the vote's called, my plan is to just recess the hearing, allow members to vote, and then come back and reconvene.

Since the signing of the Oslo Accords in 1993, more than 64 Americans, including two unborn children, have been murdered by Palestinian terrorists in Israel and the disputed territories. Some of them were tourists, some were students, some were living and working in Israel. Many were Jewish, but some were not. The stories of these American victims are heart wrenching. In 1996, Matthew Eisenfeld was a young graduate of Yale University who was studying abroad in Israel. He and his girlfriend, Sara Duker from New Jersey, had the misfortune to ride the number 18 bus that was blown up by Palestinian terrorists. Matthew's mother, Vicki, later bemoaned the quote, "lack of justice. It makes me feel like my son's blood is less American," unquote.

In 2002, Americans Dina Carter, Benjamin Blutstein, Marla Bennett, Janis Coulter, and David Gritz were studying at Hebrew University in Jerusalem. They were eating in the school cafeteria when Palestinian terrorists detonated a bomb inside the cafeteria, killing them all.

Malki Roth was a beautiful and talented 15-year-old girl, who was eating at the Sbarro Pizza Restaurant on Jaffa Road in Jerusalem on August 9th, 2001, when a Palestinian suicide bomber blew himself up. He took 15 civilians with him, including Malki and another American, Judith Greenbaum, who was pregnant at the time. The person responsible for planning and executing this dastardly attack, Ahlam Tamimi, has boasted about this many

2

times on video, yet, she resides in Jordan and hosts a television show for Hamas. We are honored to have Mr. Arnold Roth with us at today's hearing. He has traveled from Jerusalem, and we are looking forward to hearing his testimony.

So thank you for joining us, sir.

In 2001, Koby Mandell was a 13-year-old American boy who went on a hike with an Israeli friend, Yosef Ishran. They didn't come home, and their parents were worried. Their bodies were later found in a cave. They were so brutally bludgeoned that dental records were needed to positively identify the bodies. More than 10 years ago, the memories of American victims of terrorism, such as Koby and others, provide an inspiration for a bill bearing Koby's name, which became the legislative source for the opening of the Office of Justice for Victims of Overseas Terrorism within the Department of Justice.

The American people overwhelmingly believe that terrorists who kill Americans abroad must face justice. To this end, the office was designed with a purpose of ensuring, quote, "that the investigation and prosecution of terrorist deaths of American citizens overseas are a high priority within the Department of Justice."

The families of the victims of terrorism and their advocates celebrated the creation of the office in the hope that justice would be sought and achieved for the victims of terrorist attacks. Indeed, when commemorating the establishment of the new office, then-Attorney General Alberto Gonzalez remarked that it would guarantee, quote, "A voice for the victims and their families in the investigation and prosecution of terrorists who prey on American overseas," end quote.

Yet, DOJ has not been able to cite one example for this committee of even a single terrorist that has been prosecuted in the United States for any of the 64 attacks against Americans in Israel. Indeed, many of these terrorists roam free as a result of prisoner exchanges or evasions. This is not what Congress intended. This is not what the American people want. And this does not provide the justice to the victims' families that has been so tragically elusive.

In fact, the mother of Koby Mandell called the office, quote, "an affront to her son's name." The case of Ahlam Tamimi is a good example of the DOJ's failure. She is a terrorist who helped orchestrate the bombing that killed Malki Roth and Judith Greenbaum. She was released from an Israeli prison in 2011 as part of a prisoner exchange with the Palestine authority, but she's bragged about her conduct and has maintained a consistent presence on a Hamas television station, and, yet, this malignant woman continues to roam free, sowing the seeds of hate.

When the committee questioned the DOJ about this case, the Department declined to comment. If, in fact, bringing to justice the perpetrators of terrorism against Americans in Israel is a high priority for the DOJ, then, surely, people of this nature should be prosecuted for their crimes.

This afternoon, we will hear from those who might have been harmed in terrorist attacks or have lost loved ones. I thank them for their courage to speak out on this important issue. I also ask unanimous consent to insert into the record statements from indi-

3

viduals who have been impacted by terrorism. We have received testimony from Sherri Mandell, mother of Koby Mandell; Alan Bauer, a victim and father of a victim; and Mark Sokolow, whose family was in a terrorist attack in 2002, as well as the National Council of Young Israel. Israel is a magnet for terrorist attacks because it is a pro-Western Democratic nation of biblical significance. When Americans are the victims of terrorist attacks in Israel, they are, in a sense, being attacked for the shared values that bind our two nations, values that drive the jihadists to consume themselves in a culture of hate. We cannot allow the lives of our own American citizens to be devalued as merely pawns on a diplomatic chessboard. This effectively excuses the terrorist, invites more attacks, and leaves lasting scars on our own citizens due to justice being denied.

I look forward to today's testimony and eagerly await progress on bringing justice to the American victims of terrorism in Israel.

And with that, I am going to recess the hearing for 5 minutes. We have 12 minutes left on the clock. I'm going to go vote. Once we have some other members come back, we will reconvene. So I thank you for your patience, and I look forward to reconvene the hearing in about 15 minutes.

The hearing is in recess.

[Recess.]

Mr. DeSantis. The hearing will come to order. We are reconvened. Sorry about the delay, but we should be able to finish the hearing without having any more breaks for votes.

I now recognize the ranking member of the Subcommittee on National Security, Mr. Lynch, for his opening statement.

Mr. Lynch. Thank you very much, Mr. Chairman. You obviously run a little faster than I do from the last series of votes, but I would like to thank you for holding this hearing to examine the assistance to U.S. victims of terrorism abroad. And I also would like to thank our witnesses here today for your willingness to help this committee with its work.

Ms. Singer, Mr. Schwartz, and Mr. Roth, I would like to extend our deepest appreciation on both sides of the aisle for your testimony here today. And as always, our thoughts and prayers remain with you and your families for the unimaginable pain and the loss that you have endured. We also commend you for your dedication and continued work on behalf of U.S. victims of overseas terrorism.

In the wake of 9/11, a succession of horrific terrorist attacks targeting, or affecting U.S. citizens abroad, occurred around the world. These included devastating bombings and other violence in Israel that injured and killed Americans, as well as terrorist attacks in Bali, Saudi Arabia, India, Pakistan, and the Philippines. In light of this threat of terrorism against U.S. citizens abroad, Congress established the Office of Justice for Victims of Overseas Terrorism in December of 2004 to, quote, "Ensure that the investigation and prosecution of deaths of American citizens overseas are a high priority within the Department of Justice."

Pursuant to the implementing memorandum issued by U.S. Attorney Alberto Gonzalez in May of 2005, the Office of Justice for Victims of Overseas Terrorism, or OVT—I'll try not to use that acronym—is responsible for monitoring investigations and prosecu-

4

tions relating to terrorist attacks against Americans abroad. The Office of Justice for Victims of Overseas Terrorism also works with the FBI, United States Attorney General's offices, and other components within the Department of Justice, to safeguard the rights of U.S. citizens, victims, and their families. As noted by then-Attorney Gonzalez, the FBI is the leading U.S. agency for terrorism investigation involving U.S. citizens. Department of Justice criminal division, and its 93 U.S. attorneys are primarily in charge of terrorism-related prosecutions, along with the National Security Division's effort to combat terrorism.

As evidenced by recent events, the mission of the OVT remains critical in the face of relentless terrorism plots and attacks perpetrated by the Islamic State, Hamas, Al Qaeda, Jabhat al-Nusra, and other terrorist organizations worldwide. Just last week, I arrived in Istanbul, Turkey, on an oversight delegation only 4 days after a suicide bombing occurred in the city's Sultanahmet Square, an area heavily frequented by international tourists. I had been there previously with my family, my wife and daughter. And I also traveled to Beirut, Lebanon, a site of a double suicide bombing in November of 2005 that killed two American citizens and a permanent U.S. resident.

The U.S. Department of Homeland Security-sponsored national consortium for the study of terrorism reports that over 100 Americans were killed by terrorists' violence worldwide between September 11, 2001, and 2014. In addition, the State Department recently estimated that approximately 7.6 million Americans are living abroad, more than 70 million Americans travel internationally every year.

We must make every effort to ensure that U.S. victims of overseas terrorism and their families are afforded the justice they deserve. To the this end, it's imperative that we conduct meaningful oversight of the Department of Justice victims' assistance process in order to identify additional steps that we could take to facilitate this important mission.

I would note that Congress recently enacted a bipartisan omnibus appropriations bill that establishes a new United States victim of State-sponsored terrorism fund. This fund may be authorized up to $20 million to certain U.S. victims in the aftermath of a terrorist attack. Again, we very much appreciate the opportunity to hear from Ms. Singer, Mr. Schwartz, and Mr. Roth on your experiences with this process. I will also look forward to discussing with all of our witnesses how we can address existing challenges to assisting U.S. victims of terrorism abroad and their families.

I thank you, Mr. Chairman, and I yield back the balance of my time.

Mr. DeSantis. I thank the gentleman.

I will hold the record open for 5 legislative days for any members who would like to submit a written statement. We will now recognize our panel of witnesses.

I am pleased to welcome Mr. Brad Wiegmann, Deputy Assistant Attorney General, National Security Division, U.S. Department of Justice; Ms. Sarri Singer, founder and director of Strength to Strength, and a victim of terrorism herself; Mr. Peter Schwartz,

5

uncle to a victim of terrorism; and Mr. Arnold Roth, father to a victim of terrorism. Welcome to you, all.

Pursuant to committee rules, all witnesses will be sworn in before they testify. Please rise and raise your right hands.

Do you solemnly swear that the testimony that you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

Mr. DESANTIS. All witnesses answer in the affirmative; thank you and please be seated.

In order to allow time for discussion, please limit your testimony to 5 minutes, or if I talk with some of the witnesses, please do the best you can. Your entire written statement will be made part of the record.

Mr. Wiegmann, you are recognized for 5 minutes.

**WITNESS STATEMENTS**

**STATEMENT OF BRAD WIEGMANN**

Mr. WIEGMANN. Good afternoon, Chairman DeSantis, Ranking Member Lynch, distinguished members of the committee. I'm very pleased to be here today to talk about the Department of Justice's efforts to seek justice for U.S. victims of Palestinian terrorism in Israel. Protecting Americans from acts of terrorism, and ensuring that those who commit such acts are brought to justice, is the Department's highest priority. DOJ's agents, analysts and prosecutors use every available resource and appropriate tool to disrupt the terrorist plots and to investigate and prosecute terrorists. As we perform our mission, the American victims of terrorism are always foremost in our thoughts. Our hearts are with them and their families, relatives, and friends who have endured so much pain and suffering because of horrific attacks. We will leave no stone unturned in our efforts to ensure that those responsible for those attacks are held accountable, no matter where the attack occurred and no matter how long it takes.

This past year, we brought charges in scores of international terrorism-related cases reflecting the serious and diverse terrorist threats that we face today from Al Qaeda and its affiliates, to ISIL, to home-grown violent extremists, who are inspired by such groups. For more than 10 years, we've had an Office of Justice for Victims of Overseas Terrorism. The mission of OVT is to ensure that where Americans are killed or injured in terrorist attacks overseas, investigation and prosecution remain a high priority, and the rights of victims and their families are honored and respected.

OVT's operational assistance is focused principally on supporting American victims when cases are tried in foreign criminal justice systems, as is ordinarily the case in overseas attacks. Its work complements that of FBI's office for victim assistance, and the victim witness coordinators and U.S. Attorney's Offices, which have a more domestic focus. There are a number of different services OVT provides to victims, and I would be happy to talk about those in greater detail today. Now I know this committee is particularly interested in how we support American victims of Palestinian terrorism in Israel. Terrorist attacks, unfortunately, are all too common in Israel. Many Americans have been injured or killed in these

6

attacks, along with Israeli nationals and others. Seeking to ensure that justice is done in each and every case in which an American is harmed is our top priority, whether the attacks occurred in the United States, in Israel, or anywhere else around the world. The nationality of the terrorists or the group with which he or she may be affiliated is not relevant to our interest in the case.

Over the years, the Department of Justice has brought some cases against individuals affiliated with Palestinian terrorist groups. For example, we have prosecuted more than a dozen individuals associated with Hamas or Palestinian Islamic jihad for financing or otherwise facilitating terrorist activities or committing related offenses. We have also prosecuted Palestine terrorists who engaged in attacks that killed or injured Americans outside of Israel. Now to be sure, these cases do not involve any of the recent attacks within Israel, but they do evidence the Department's commitment to investigating and prosecuting terrorist activities by Palestinian terror groups where possible.

The Department of Justice also has a number of open investigations regarding overseas terrorist attacks committed in Israel and in other countries that have harmed Americans.

While I cannot discuss these investigations today or the facts of specific cases, it's important to note that the absence of public charges associated with a particular overseas attack does not mean that there are no charges or that no such charges will be brought.

A successful U.S. prosecution can occur and has occurred many years after an attack, and after an individual is released from a foreign prison. Of course, a U.S. prosecution is not the only way a terrorist can be brought to justice, nor is it the only means by which to protect our national security. Often, a foreign prosecution is the best or only available option. And if so, we work with foreign authorities to support such prosecutions as necessary.

Israeli authorities have successfully investigated and prosecuted many individuals in connection with terrorist attacks that have harmed Americans. Some of these terrorists have been sentenced to multiple life sentences or extensive jail time in Israeli prisons. Sometimes Israeli authorities have pursued a military response, rather than, or in addition to, a prosecution, and the terrorists have been killed. It is to be expected that Israel will ordinarily take the lead in investigating and prosecuting terrorist attacks against its nationals that occur on its territory, just as we do here in the United States and as many other countries do.

The Department of Justice has provided support and assistance to scores of Americans victimized by terrorism in Israel in cases investigated and prosecuted by Israeli authorities. OVT provides information to victims about their rights in the Israeli criminal and military justice systems and the charges, hearing dates, verdicts, and sentences in such cases. We have provided financial and logistical support for victims living in the United States to travel to Israel to attend court proceedings.

Our staff has also accompanied victims to court in Israel to assist them in their participation. We also coordinate a program that has enabled U.S. victims of attacks in Israeli to obtain reimbursement for out-of-pocket expenses associated with the attacks.

7

Now the fact that foreign governments most often prosecute terrorist activities that occur in their countries does not mean the Department of Justice does not also pursue such cases. We do and we have successfully done so many times. But there are often significant impediments to bringing prosecutions in the United States for attacks that occur overseas. These obstacles include obtaining necessary cooperation from foreign governments, gathering evidence overseas that would be admissible in U.S. court, and apprehending and extraditing defendants. I would be happy to discuss some of these challenges that we may confront in these cases today.

In closing, I can certainly understand the frustration of some of the families that the Department of Justice has not prosecuted more cases involving terrorist attacks against Americans in Israel. And we certainly share the concern about Israel's recent releases of the prisoners who harmed Americans, a step the United States urged Israel not to take. The Department is committed to making every effort to bring appropriate charges against those released prisoners who are responsible for attacks in Israel that included American victims. So I'll stop there. And I look forward to your questions.

Mr. DeSantis. I thank the gentleman.

The chair now recognizes Ms. Singer. You're up for 5 minutes.

## STATEMENT OF SARRI SINGER

Ms. Singer. Thank you. Chairman DeSantis, Ranking Member Lynch, and distinguished members of the committee, thank you for inviting me to testify today and share with you my personal story, which is a story of thousands of Americans, people living in Israel and around the globe who have felt the brutal impact of Islamic terrorism.

My name is Sarri Singer. I'm the founder and director of Strength to Strength, and I'm the daughter of New Jersey State Senator, Robert Singer. I was taught that the little things in life make the biggest difference, but I never understood the impact of the most minute details; a missed bus, seconds shaved off a marathon, a seat change, even a blink of an eye.

I sit before you today as a survivor of a terrorist attack because of a series of split-second decisions that left 16 people dead and many others injured, including myself. When a terrorist attack occurs, the smallest details determine the outcome of everyone within range, and it's those stated moments that haunt victims for the rest of their lives.

September 11, 2001 was a turning point for me. I worked near the World Trade Center, but overslept that morning. While my colleagues are running for their lives, I was uptown watching the Towers burn and the murder of thousands of Americans on television. Within 3 months, I quit my job and moved to Israel and volunteered with organizations assisting victims of terrorism.

My personal 9/11 came on June 11, 2003, the day I boarded bus number 14 in Jerusalem, and barely escaped with my life. It is now 12-1/2 years since that horrific attack, and the memories are still fresh in my mind. When I close my eyes, I am brought back to that day and shudder as my mind wanders into the alternate endings, each scenario increasingly terrifying. I was meeting a friend for

8

dinner and boarded the bus. I chose an empty seat by the window. I always preferred the aisle seat, but that day I didn't and I lived. The woman in the aisle seat next to me did not.

I remember the sounds of crushing metals and the shock waves as the explosion tore through the bus. I remember shutting my eyes, an instinct which saved my sight. I remember the moment of silence that followed the blast, a silence so frightening, the silence of those who were dead in every seat around me. I screamed. I screamed so loud that a stranger who had heard the blast from three blocks away ran toward the mangled burning bus and pulled me out.

I will never forget the old woman who held me as I was burned, bleeding, and frightened. I will never forget the kindness and love that was shown to me by those I had known my entire life and by those whom I had never met.

My injuries were extensive, shrapnel went through my left shoulder, breaking my clavicle bone. Both my eardrums were blown from the impact of the blast. My hair was burned, my face was bruised, my legs badly cut, and I have shrapnel in my mouth that is inoperable that will remain with me the rest of my life. Days after the attack, I was told that the terrorist was two people away from me, and all those seated and standing around me were killed on impact. A busload of innocent civilians boarded the bus that day, and a suicide bomber injured over 100 of us and murdered 16 innocent people, including American citizen Alan Beer, originally from Cleveland, Ohio.

An attack happens in an instant, but the impact lasts a lifetime. I established the organization Strength to Strength to create a support environment for victims, both survivors and bereaved family members. We are part of a global network bringing victims of terrorism together, working with organizations in various countries coming from different backgrounds and religions.

It's difficult to find anything positive or any semblance of meaning in an act of terror. The act of maiming or murdering another person to support a political or religious agenda is not one that I will ever understand. We must do everything to make sure no more lives are ruined by terror, and we must remember that victims need support from their family, friends, community, and especially their government.

While the physical injures I endured were difficult, nothing compares to long-term psychological impact. Finding justice is something that is vital in dealing with the long-term impact of what I and others have been through. In 2004, Congress passed the Koby Mandell Act, which funded a special office within the U.S. Department of Justice to advocate on behalf of American victims of terrorism and tasked them with not only helping families with various expenses resulting from terrorist attacks, but to actively investigate those crimes and help bring the perpetrators to justice.

While the office has been responsive in helping families with the former, and the civil servants who work at the Office of Justice for Victims of Overseas Terrorism undoubtedly have good intentions, Congress' hope that the Department of Justice would take an active role in investigating, extraditing, and prosecuting terrorists who kill Americans overseas has come up against a harsh reality.

Since Congress passed the Koby Mandell Act, the only serious counterterrorism effort I see relating to my terrorist attack and dozens like it has come from two private civil suits I joined against Arab Bank of Jordan, and National Westminster Bank in Britain. The case brought against Arab Bank led directly to a regulatory investigation by the U.S. Treasury Department of Arab Bank's New York branch, and culminated in a jury verdict in 2014, finding the bank liable for 24 Hamas terrorist attacks, including the terrorist attack that injured me.

The case against Nat West Bank is still pending, but it already has resulted in the bank closing the accounts of a U.S. specially designated global terrorist, Interpal, whose accounts remain active for years, despite U.S. diplomatic efforts.

I don't expect perfect justice, and I fully realize that the Federal Government cannot bring every terrorist to justice, but the government's track records in extraditing or even seeking extradition of Palestinian terrorists who have murdered American citizens is nonexistent.

One example is Ahmed Mustafa Saleh Hamed, part of a Hamas cell that murdered American Howard Goldstein in June 2003, who was sentenced to seven life sentences by Israel. He was released from the prisoner—from prison as part of the Gilad Shalit prisoner exchange. He has since been linked by Israeli authorities to a fatal June 29, 2015, attack in Israel.

I love my country. America has always been a great country that has created a safe haven for citizens and refugees. I grew up believing that my country would be there for me and protect me no matter where I was in the world. These last years have left me feeling let down, and I want to believe, again, the way I always did that my country is protecting me and not the people who sent a teenager, strapped up with a bomb to blow me up.

Please, for all of us who have had our lives disrupted, restore our faith that our government is on our side. In closing, thank you, Chairman DeSantis, for making this hearing a priority and being a voice for so many American victims of Palestinian terrorism. Thank you for standing up for us and making sure that we know we're not alone and that we're not forgotten. Thank you.

[Prepared statement of Ms. Singer follows:]

10

Written Testimony for Sarri Singer, Director of "Strength to Strength" a 501(c)(3) non-profit organization

Chairman Desantis, Ranking Member Lynch, and distinguished members of the Subcommittee, thank you for inviting me to testify today and share with you my personal story, which is unfortunately the story of thousands of Americans, people living in Israel and around the globe who have felt the brutal impact of Islamic terrorism.

My name is Sarri Singer. I am the founder and director of Strength to Strength and I am the daughter of New Jersey State Senator, Robert Singer. I always was taught that it's the little things in life that make a difference. But I never understood the impact of the most minute details, a missed bus, a few seconds shaved off a marathon, a seat change, even just the blink of an eye. I sit before you today as a survivor of a violent terror attack because of series of split second decisions that left 16 people dead and many others injured, including myself. When a terror attack oceurs the smallest details determine the outcome of everyone within range and it's those fated moments that haunt victims for the rest of their lives.

September 11, 2001 was a turning point for me. I worked near the World Trade Center, but somehow that morning my alarm didn't go off and I overslept. While my colleagues were running for their lives, I was safely uptown watching the towers burn and the murder of thousands of Americans on television. Helplessly watching this unfold, while knowing that if not for a small twist of fate I would have been there, changed me. I felt an urge to make a difference and within three months I had quit my job and moved to Israel to volunteer with organizations that assisted victims of terror and their families.

My personal 9/11 came on June 11, 2003, the day I boarded bus #14 in Jerusalem and barely escaped with my life.

It is now twelve and a half years since that horrific attack and the memories are still fresh in my mind.  When I close my eyes I am brought back to that day and remember everything, I relive every moment and shudder as my mind wanders into the alternate endings, each scenario increasingly terrifying. I was heading to meet a friend for dinner and boarded the bus. At the second stop I spotted two empty seats and sat by the window.  Strange, I always preferred sitting in the aisle seat, but that day I didn't and I lived, but the woman in the aisle seat next to me died instantly.

I remember the sounds of crushing metal and feeling the shockwave as the explosion tore through the bus. I remember immediately shutting my eyes, an instinct which saved my sight. And I remember the moment of total silence that followed the blast - a silence so frightening, the silence of those who were dead in every seat around me.

I screamed.

I screamed so loud that a stranger, who had heard the blast from three blocks away, heard my cries and ran toward the mangled, burning bus and pulled me out. I will never forget the old woman who stood by my side holding me as I was burned, bleeding and frightened. I will never forget the kindness and love that was shown to me by those I had known my entire life and by those whom I had never met.

My injuries were extensive.

11

Shrapnel went through my left shoulder breaking my clavicle bone, both my eardrums were blown from the impact of the blast, my hair was burned, my face burned and bruised, my legs badly cut, and I have shrapnel in my mouth that is inoperable. One of the most memorable days of my childhood was the day my orthodontist removed my metal braces. I felt pure freedom as he removed the assorted metal pieces and wires. Today I sit before you with shrapnel imbedded in my mouth. They will remain a part of me for the rest of my life.

A few days after the attack I was told that approximately two people had stood between me and the terrorist and every person seated and standing around me was killed on impact. A busload of innocent civilians boarded the bus that day, and a suicide bomber, wearing a vest loaded with shrapnel, injured over 100 innocent civilians and murdered 16 people including an American citizen, 46 year-old Alan Beer, originally from Cleveland, Ohio.

I suffer pain and anguish on a daily basis from the trauma of being in the eye of one of the most extensive bus bombings targeting Israeli citizens. The Hamas terrorist who strapped himself with explosives and shrapnel, who boarded that bus in order to hurt and murder innocent people, was just 18 years old. This teenager was the 8th homicide bomber to be recruited by Hamas from a children's Palestinian soccer team for the sole purpose of carrying out terrorist attacks in Israel on innocent civilians. In America our soccer teams play soccer. In Israel their soccer teams play soccer. Using an organized sport to recruit Jihadists from impressionable children should be unacceptable in every culture & every part of the world.

Survivors of terror are often asked if they are filled with hate or a desire for revenge. I can only speak for myself, but I refuse to give in to those emotions, because I will not let this tragic experience destroy my humanity, not after the destruction I witnessed. I had no control over what happened to me that day but I do have control over how I live my life going forward and I intend to live my life showing kindness to others as others have shown kindness to me.

An attack happens in an instant but the impact lasts a lifetime for survivors and their families. I established Strength to Strength to create a support environment for victims, both survivors and bereaved family members, essentially survivors healing survivors. Strength to Strength is part of a global network bringing victims of terrorism from all ends of the world together, all in agreement that terrorism is not one country's problem, but a major issue in the world today. Strength to Strength is a grassroots organization, where we work with existing organizations in various countries who assist civilian victims from a variety of backgrounds and religions. We work with victims from attacks in Algeria, Argentina, Colombia, England, France, Israel, Kenya, Mumbai, Northern Ireland, Spain, Uganda, and those in the United States.

We are headquartered in New York City where we hold monthly Survivors Circle meetings, where we foster an atmosphere of mutual understanding and healing. These meetings are attended by victims and family members and are both therapeutic and recreational.

We run Victim Weekend Retreats for victims and bereaved family members where they have the opportunity to share their stories and be a voice for those who did not survive. These weekends provide support and create long lasting bonds between survivors and bereaved.

Our Young Ambassadors Program brings together participants ages 14-20 who have either lost a parent or family member to terrorism, a family member injured or were injured themselves. Many of the teens travel overseas to attend, some flying for the first time. Past participants have joined from Algeria, Argentina, Colombia, England, Ireland, Israel, Kenya, Spain, France and the United States. The teens spend a week in New York City sight-seeing, attending therapeutic programs and sharing their personal stories with political leaders, community leaders and each other. The program empowers these teens to move forward as life must go on even after the most unimaginable sorrow. Connecting to a global peer group with very diverse backgrounds

12

and advocating on behalf of others is very healing. The teens head home looking towards their future and wanting to make a difference in their community and in the world.

Most recently, on December 9, 2015, we launched our Boston Division. Forty victims of the Boston Marathon bombings attended and enjoyed an inaugural dinner and connecting with other survivors in a warm and safe environment.

It's difficult to find anything positive or any semblance of meaning in an act of terror, the act of maiming or murdering another person to support a political or religious agenda is not one that I will ever understand. There is nothing positive about experiencing a bombing or a shooting, but sometimes the most horrific events are the motivation for action and the best action we can take is to make sure that there are no more victims to a violent, agenda driven tantrum. We must do everything in our power to make sure no more lives are ruined by terror and we must remember that victims need support from their family, friends, community and especially their government.

While the physical injuries I endured were very difficult, nothing compares to the long term psychological impact that surviving something so horrific, something that was planned and calculated in order to try to murder me and others that were on that bus that day. Finding validation and justice is something that is vital in dealing with the long term impact of what I, and others, have been through. We need your help.

In 2004, Congress passed the Koby Mandell Act which funded a special office within the U.S. Department of Justice to advocate on behalf of American victims of terrorism and tasked the Department of Justice not only to help families with various expenses resulting from terror attacks but to actively investigate those crimes and help bring the perpetrators to justice. While the Office of Justice for Victims of Overseas Terrorism has been responsive in helping families with the former and the civil servants who work at the Office of Justice for Overseas Terrorism undoubtedly have good intentions, Congress's hope that the Department of Justice would take an active role in investigating, extraditing and prosecuting terrorists who kill Americans overseas has come up against a harsh reality. As far as I know, since 2004, the U.S. Department of Justice has not sought the extradition of even a single terrorist responsible for the murder or injuring of an American citizen in Israel. During that same time period, I've spoken to a number of families in my position and while their interactions with the FBI and Department of Justice have generally been professional and polite, without exception, they have received no meaningful, substantive information about the investigations of the attacks at issue and no concrete evidence that any serious investigation has even been attempted. Then there are other victims who I am in touch with who do not even know that the Office of Justice for Victims of Overseas Terrorism exists.

In fact, since Congress passed the Koby Mandell Act in 2004, the only serious counter-terrorism effort I've seen relating to my terror attack and dozens like it, has come from two private civil suits I joined ten years ago against Arab Bank of Jordan and National Westminster Bank in Britain. The case brought against Arab Bank led directly to a regulatory investigation by the U.S. Treasury Department of Arab Bank's New York branch and culminated in a jury verdict in 2014 finding the bank liable for 24 Hamas terrorist attacks, including the terror attack that injured me. The case against National Westminster Bank is still pending but it has already resulted in the Bank closing the accounts of a U.S. Specially Designated Global Terrorist – Interpal – whose accounts remained active for years, despite U.S. diplomatic efforts.

Chairman Desantis, Ranking Member Lynch, and distinguished members of the Subcommittee, I don't expect perfect justice and I fully realize that the federal government cannot bring every terrorist to justice, but the government's track record in extraditing - or even seeking extradition

13

– of Palestinian terrorists who have murdered American citizens is non-existent. To take just one example, Ahmed Mustafa Saleh Hamed who was sentenced to 7 life sentences by Israel. He was released from prison as part of the Gilad Schalit Prisoner Exchange. Hamed was part of a Hamas cell that killed American Howard Goldstein in June 2003. He has since been linked by Israeli authorities to a fatal June 29, 2015 attack in Israel.

I have highlighted this case involving the Gilad Schalit Prisoner Exchange, of which there are a number of those released with American blood on their hands, because in this instance, we know who the specific perpetrator is, but there are many other terrorist attacks that remain far less well known and understood and the families of the dead and injured Americans in these cases have heard nothing from the government to make them believe that these kinds of terrorist attacks are being seriously and vigorously investigated.

I love my country, America has always been a great country that has created a safe haven for citizens and refugees. I grew up believing that my country would be there for me and protect me, no matter where I was in the world. These last years have left me feeling let down. I want to believe again, the way I always did that my country is protecting me and not the people who sent a teenage soccer player, strapped up in a bomb to blow me up. Please, for me, for all the American victims of Islamic terrorism, whether they were attacked at work, on vacation, enjoying an evening out, please for all of us who had our lives disrupted, please restore our faith that our government is on our side.

In closing, I would just like to say thank you Chairman Desantis for making this hearing a priority and being a voice for so many American victims of Palestinian terrorism. It always amazes me to see those like yourself, who have no direct connection to terrorism, standing up for us and making sure that we know we are not alone and that we are not forgotten.

Thank you.

14

Mr. DeSANTIS. Thank you.
Mr. Schwartz, you are now recognized for 5 minutes.

## STATEMENT OF PETER SCHWARTZ

Mr. SCHWARTZ. Thank you, Chairman DeSantis, Ranking Member Lynch, and members of the subcommittee, for holding this hearing and for allowing me to testify.

My name is Peter Schwartz, and I am the proud uncle of Ezra Schwartz of Sharon, Massachusetts. Ezra was a sweet and fun-loving kid. He was a great skier and baseball player and an avid football fan. He had a sharp mind, was a strong chess player and enjoyed reading. He had a special talent for engaging those on the margins or in need. The nervous young camper, the mediocre athlete at the baseball tryout, the elderly woman carrying groceries. Ezra graduated high school and had been accepted to the business program at Rutgers, which he was excited to attend this fall. But he decided to take a gap year in Israel in a program that mixed learning with community service.

He was popular and happy, enjoying his year, doing good work, and looking forward to college. On November 19, 2015, just over 2 months ago, Ezra and some friends went to do some volunteer work on a memorial park that ironically honored the memories of three boys who were kidnapped and killed by a Palestinian terrorist the year before. One of whom, Naftali Frankel, was an American citizen. The van that Ezra and his friends were in was caught in rush-hour traffic at the Gush Etzion Junction just south of Jerusalem. And at some point, Ezra put his head down against the window and went to sleep.

Muhammed Abd Al-Basset Kharoub, a 21-year-old Palestinian from a small West Bank village, spent at least two years planning and preparing to kill as many Jews as possible. With the assistance of his brothers, and at least one friend, Kharoub purchased two guns and many rounds of ammunition for over $10,000. Kharoub chose his own birthday, November 19th, to go searching for a place with enough Jews to kill.

When he arrived at the Gush Etzion traffic jam in which Ezra and his friends were stuck, he took out his gun and started spraying the waiting cars with bullets, killing three people, including Ezra, before being apprehended. Ezra was shot in the head, and in an instant, all of the beautiful things that he was and everything that he would ever become was gone forever. It is simply not possible to describe the magnitude of this loss and the impact it has had on our family without sounding cliche, but it is excruciating and profound and overwhelming and visceral. His absence assaults you from every direction: From his sweet face staring at you from the family photos on the wall, from his name on the label of the skiing and sporting equipment sitting unused in the closet, from his adorable first grade artwork, from the empty seat at the table, from the birthday text that never arrives, and even from the happy milestones of his friends and peers, whose future graduations and weddings will be tinged with a little bit of sadness knowing that Ezra won't be there to share them, and won't have similar milestones of his own, but will be forever frozen at 18 years old. All of

15

us in the family now have an awful highlight reel playing over and over in our heads.

For me, it includes getting the news from my brother, telling my son that his cousin is dead, telling my parents that their grandson is dead, seeing Ezra's siblings and parents around his coffin, and seeing my brother, who I love so dearly and unconditionally, in unimaginable pain that I can never comfort. And then you remember that all this terrible pain and loss is not the result of some tragic accident or unfortunate illness, but rather, it was a deliberate and premeditated act by someone who dreamed of causing this suffering.

Our family has tried to focus on Ezra's wonderful but all-too brief life, and has a void awaiting the surrounding politics, but there's nothing political or controversial about saying that the deliberate killing of innocent civilians for ideological, political, or religious reason is abhorrent and inhuman, and it is just as wrong in Israel or in Gush Etzion, as it is in Paris or Mali or London or lower Manhattan. There is no context or explanation that makes Ezra's murder or Palestine terrorism any bit less repugnant than any other terrorism in any other place, and there is no reason that it should warrant any less condemnation or reaction from every civilized citizen or country on earth. In fact, the need for a strong U.S. response to terrorism in Israel is even greater, considering how many Americans live, study, and travel there, that it is such a frequent, and now literally daily target of terrorists, and that it is our strongest ally in the Middle East, and the only one with which we share fundamental values like religious tolerance and democracy.

Since Ezra's death, the U.S. Government has been extremely supportive of our family. Condolence calls from President Obama and Secretary of State Kerry were deeply meaningful and appreciated and representatives of OVT, ITVERP, and the FBI have been in touch and sympathetic.

That said, we are not aware of what, if any, U.S. actions have been undertaken to investigate this case, and we still have many unanswered questions about the attack that claimed Ezra's life and what role our government can play in answering them. For example, how did a 21-year-old Palestinian from a small West Bank village obtain more than $10,000 to purchase firearms and ammunition? Did Kharoub receive funding from outside groups, such as Hamas or Islamic jihad? Will others, including Kharoub'sbrothers, one of whom supplied him with the car he used in the attack, be charged as accomplices in the case?

It is our hope that FBI and the legal team at OVT will take an active interest in this case and work with their Israeli counterparts to answer these questions and ensure that Mr. Kharoub, his accomplices, and other terrorists who harm Americans abroad face justice, and when convicted, remain behind bars.

Thank you for this opportunity and for all that you do to support and protect U.S. citizens and their families in Israel and around the world.

[Prepared statement of Mr. Schwartz follows:]

16

**Testimony of Peter Schwartz for the Subcommittee on National Security**

Thank you Chairman DeSantis, Ranking Member Lynch and Members of the Subcommittee for holding this hearing on such an important topic and for allowing me to testify. My name is Peter Schwartz and I am the proud uncle of Ezra Schwartz of Sharon, Massachusetts. Ezra was a sweet and fun-loving kid. He was a great skier and baseball player and an avid football fan. He had a sharp mind, was a strong chess player and enjoyed reading. He would sometimes read Harry Potter aloud to his transfixed younger brothers. He had a special talent for engaging those on the margins or in need; the nervous young camper, the mediocre athlete at the baseball tryouts, the elderly woman carrying groceries. A companion and confidante to his slightly older sister Mollie, a coach and mentor to his younger brothers Hillel, Elon and Avi with whom he'd play whiffle ball until it was so dark that you couldn't see the ball, a patient and inclusive organizer of football games among his younger cousins, including my children, a popular and award-winning counselor, a beloved friend, boyfriend, nephew, grandson and adored child to his parents Ari and Ruth.

Ezra graduated high school and had been accepted to the business program at Rutgers, which he was excited to attend this fall, but he decided to take a gap year in Israel on a program that mixed learning with community service, which appealed to him. He was popular and happy, enjoying his year, doing good works and looking forward to college. He was truly coming into his own at the fulcrum between boyhood and manhood. On November 19, 2015, just over two months ago, Ezra and several of his friends from his school went to do some volunteer work on a memorial park that, ironically, honored the memories of three boys who were kidnapped and killed by a Palestinian terrorist the year before, one of whom, Naftali Frankel, was an American citizen. The van that Ezra and his friends were in was caught in rush hour traffic at the Gush Etzion Junction, just South of Jerusalem, and at some point, Ezra put his head down against the window and went to sleep.

Muhammed Abd Al-Basset Kharoub, a 21 year old Palestinian from a small West Bank village, had dreams of his own. According to the Israeli indictment recently issued, Kharoub aspired to kill Jews for at least two years prior to the day he finally took action. He began at the age of 19 by purchasing a 9 mm pistol for approximately $5,000 with an idea to commit a terror attack in Beer Sheva, but his dream of mass murder was deferred due to a family dispute. In February 2015, he somehow purchased an Uzi with 3 magazines and 3 boxes of 9 mm bullets for another $5,000 from an individual named Khader Al-Atzlah. Thereafter, he periodically purchased additional ammunition so he could keep up his target practice with live ammunition. According to the indictment, Kharoub also received assistance from a man named Odeh Mahmud Odeh Kharoub who helped him clean his weapon and from his brothers, one of whom provided Kharoub with the Toyota Corolla he would use during the terrorist attack.

Kharoub chose his own birthday, November 19th, to go out looking for innocent Jews that he could target and kill. After some time searching for a place with enough people to target, he arrived at the Gush Etzion traffic jam in which Ezra and his friends were stuck, took out his gun and started spraying the waiting cars with bullets, killing 3 people including Ezra, before being apprehended. Ezra was shot in the head and in an instant, all of the beautiful things that he was and everything that he would ever become, was gone forever.

17

It is simply not possible to describe the magnitude of this loss and the impact it has had on our family without sounding cliché, but it is excruciating and profound and overwhelming and visceral and it has soaked through the tightly knit fabric of our family and our community.  His absence assaults you from every direction; from his sweet face staring at you from the family photos on the wall, from his name on the label of the skiing and sporting equipment sitting unused in the closet, from his adorable first grade artwork, from the empty seat at the table, from the birthday text that never arrives, and even from the happy milestones of his friends and peers whose future graduations and weddings will be tinged with a little bit of sadness knowing that Ezra won't be there to share them and won't have similar milestones of his own, but will be forever frozen at 18 years old.  Even innocuous everyday moments can be challenging, like when someone innocently asks "how are you?"  Do you answer truthfully and say "I'm heartbroken, devastated, longing for an alternate reality that will never be" or do you simply lie and say "I'm fine" and avert your gaze before they realize the predicament presented by their question and feel awkward?  All of us in the family now have an awful highlight reel playing over and over in our heads.  For me, it includes getting the news from my brother, telling my son that his cousin is dead, telling my parents that their grandson is dead, seeing Ezra's siblings and parents around his coffin, and seeing my brother, who I love so dearly and unconditionally, in unimaginable pain that I can never comfort.

And then you remember that all of this terrible pain and loss is not the result of some tragic accident or unfortunate illness, but rather, it was a deliberate and premeditated act by someone who dreamed of murder, spent years preparing for the day he could cause such suffering and chose to celebrate his own birthday by taking the lives of people he did not know and never met. Our family has tried to focus on Ezra's wonderful but all too brief life and has avoided wading into the surrounding politics, but there is nothing political or controversial about saying that the deliberate killing of innocent civilians for ideological or political or religious reasons is abhorrent and inhuman, and it is just as wrong in Israel or in Gush Etzion as it is in Paris or Mali or London or Lower Manhattan.  There is no context or explanation that makes Ezra's murder or Palestinian terrorism any bit less repugnant than any other terrorism in any other place and there is no reason that it should warrant any less condemnation or reaction from every civilized citizen or country on Earth.  I hope that history will fairly judge the people who commit such acts and those who support them, but we cannot wait for that.

The United States is in a unique position to combat terrorism, to disrupt terror financing and to degrade and diminish terrorist organizations if it is determined to do so.  And the need for a strong U.S. response to terrorism in Israel is even greater considering how many Americans live, study and travel there, that it is such a frequent – now literally daily – target of terrorists, and that it is our strongest ally in the Middle East and the only one with which we share fundamental values like democracy.

Since Ezra's death, the government has been extremely supportive of our family.  Condolence calls from President Obama and Secretary of State Kerry were deeply meaningful and appreciated as were the calls, visits and assistance of Governor Charlie Baker, Senators Elizabeth Warren and Ed Markey, and various other officials at the state and local level.  I have been in email touch with Heather Cartwright and one of her attorneys at the Office of Justice for Victims of Overseas Terrorism, or OVT, and with a case manager at the International Terrorism Victim Expense Reimbursement Program, or ITVERP.  Also,

2

18

a Victim Services Coordinator from the FBI's Office for Victim Assistance briefly connected with my brother.

While we feel supported by our government, there remain many unanswered questions about the attack that claimed Ezra's life. We recognize that terrorism investigations can involve sensitive intelligence-gathering and that not all of the facts are necessarily known at this time, but ultimately, we are hopeful that the FBI and the legal team at OVT will help clarify certain questions. For example, how did a 21 year old Palestinian from a small West Bank village obtain more than $10,000 to purchase firearms and ammunition? That's a significant sum for any person Kharoub's age, but in the West Bank, that sum of money begs the question: Did Kharoub receive funding from outside groups such as Hamas or Islamic Jihad? The Israeli indictment is silent on this issue. Why did one of Kharoub's brothers provide him with a car to use in the attack and which, if any, of Kharoub's brothers and friends will be charged as accomplices? There may be a variety of legitimate reasons why these questions have not yet been answered, but it's our hope that the FBI and the legal team at OVT will take an active interest in this case and work with their Israeli counterparts to answer these questions. We feel that this is particularly important because the United States has, far and away, the greatest ability of any nation to disrupt terror financing. Should the evidence ultimately lead to the conclusion that Ezra's murderer was financed by a terrorist organization, there may be concrete steps that our government can take to further disrupt these organizations which reject peaceful co-existence between Israel and its neighbors. At this stage, we don't profess to know whether Ezra's murderer or his accomplices are candidates for extradition to the U.S., but we want to better understand what role the DOJ, FBI and OVT can play in ensuring that Mr. Kharoub, his accomplices and other terrorists who harm Americans abroad face justice and, when convicted, remain behind bars.

Thank you for this opportunity and for all that you do to support and protect U.S. citizens and their families in Israel and around the world.

3

19

Mr. DeSANTIS. Thank you, Mr. Schwartz.
Mr. Roth, you are now recognized for 5 minutes.

### STATEMENT OF ARNOLD ROTH

Mr. ROTH. Chairman DeSantis, Ranking Member Lynch, distinguished members of the committee, and staff of the committee, I admire the ability you have to call an event like this and to project the message that things can be done. It is the antithesis of the feelings that people like me, people who are the parents of a child who has been murdered, or the partner of a loved one whose life has been stolen from us filled, because nothing is more disempowering and shattering and silencing than being the survivor of an act of terrorism directed at people who you love. I was reminded at just how that power works driving here. I am not a frequent visitor to Washington, but I was in a cab that went through the Mall, and we passed a memorial. It's a memorial, as it happens, to World War II, but it makes material and concrete the reality that behind all of those numbers and those ciphers and those tombstones, they were lives and people. It's a sense that has been cheated from us.

If terrorism has any overriding goal, it is to depersonalize and to anonymize, and to turn into statistics both the victims and the people who lived with and loved those victims.

And I appreciate the opportunity that this hearing presents to push back and to say what is on the minds of victims like me. There are thousands of us. We seek, by every possible means, to do something that is so difficult to explain that I can only throw the words at you, to reassert the humanity of the people whose lives have been stolen by the cruel terrorists. In this case, my daughter, Malki. I'm not going to spend any time here telling you what a wonderful life she lived, and what a beautiful person she was, and how much good she brought into the world and how empty and silent is the void that she left behind her.

But I am going to say that having stolen that life, the terrorists have left us, the families and the loved ones, no choice but to do everything we possibly can to associate the memory of that wonderful life with things that are good. And I'm struck by the reality, as I look around the other victims, other victims' families in Israel where I live, how energetically they pursue the doing of good things, perhaps the erection of a shelf for books, perhaps a shelter at a bus stop, perhaps a foundation like the one that my wife and I set up that helps people who have a disabled child.

You see actions like this are going on all the time. They are not intended to draw attention to the people that are living them; they are intended to draw attention to the lives that are being so unfairly stolen. And with the image of Malki, my daughter, who was fifteen, right before my eyes, as I say these words to you, I realize that I want you to know that I am never going to be, again, able to talk about terrorism in the way perhaps that others can. I see things; my wife sees things; my children see things that somehow the people who report about terrorism and the people who prosecute the terrorists probably never see. There are resonances and absences and failures to do things that choke us.

20

I don't remember thinking those thoughts until I had to wake up one morning and see my daughter's slippers next to the bed that she was never going to be sleeping in again.

When I put together my written submission, which I hope will be read, I felt that I needed to speak about practical things that this committee could do. And they came down to wanting you to be aware of the incitement and the enablement, two key words which may be not self-evident, the incitement that goes on day after day to anyone who has eyes and ears, by the Palestine Arab society with which we are striving to live in peace, and which, to a great extent, is folded into the society in which I and my family live.

The incitement that comes from the very highest levels of that society, right down to ordinary Tweets emanating from people who live in that society. Their hatred, the urging on to more and bigger and better acts of terrorism, is simply unbearable. And as long as it goes on, and it does go on, we're wasting our time and our prayers in hoping that these problems will go away, they will not go away.

Likewise, the enablement. Enablement has to do with money, and money is where Washington comes into the picture. When a person is sentenced to prison, and then comes out after, perhaps, many years, life is pretty difficult. You have problems re-emerging into society and you probably don't have any money. It's hard for me to convey to you how untrue that is in the case of thousands of Palestinian Arab-convicted terrorists. Of course, I'm thinking about the people, the gang who were involved in the murder of my daughter.

And I'm also thinking, in particular, of the engineer of the massacre, who was a young woman, who has been mentioned here in the chairman's thoughtful introductory words.

These people have come out with more money than they have ever had in their lives. They have come out with a more exalted position in society than they ever dreamed of. If any of us imagine that the process that produces those results is conducive to bringing an end to this death cult, this engagement with murder has a redemptive act, then think more carefully.

In relation to the work that's been done by the DOJ, I've made the point several times in my written remarks that there has been unfailing courtesy, responsiveness, and attention, but very little in the way of results. I could make the statement stronger, but I choose not to.

This is not a human material problem; this is not a goodwill problem, but there is a problem. It's clear that there's a problem. It's not clear where the problem is coming from. If this committee does anything, and I know that there is a desire to do something, let it be to focus on where the problem is.

Should the OVT or the DOJ address these issues of incitement and enablement and the particularly bizarre way in which the word "terrorism" has been removed from the lexicon of many of the people engaged in looking at terrorism, trying to stop terrorism. Euphemisms are being used as if they were machine guns, but they are not machine guns, but they do make people lose focus. In some ways, they are the real enemy here.

21

Terror is now a legitimate career option for hundreds of thousands of people living on the other side of the boundary from where I live. Unless we engage with that issue and recognize where it's brought us, not much is going to happen. I don't know why the kingdom of Jordan continues to appear at the very top of the State Department's survey on terrorism as America's close ally. I don't know why that is. I don't know why people who haven't lost a child don't see how far away, which is not very far away, everybody here, in my country, in Australia, in New Zealand, wherever, are from experiencing the kind of unthinkable loss that has turned my family's life upside down.

I am sorry that I have gone on beyond the time. I want to mention very briefly something that President Obama said last week on the day that this meeting was supposed to take place, on the 27th of January. He did something that was startling to me. He quoted a Hebrew expression, which is, of course, is taken from the Bible. In the course of speaking at the Israeli Embassy on Holocaust Memorial Day, he used the expression, Tzedek, Tzedek, Tirdorf. Three words, Tzedek, Tzedek, Tirdorf. "Tzedek" is the Hebrew word for justice. It's also the Hebrew word for righteousness. And it's repeated twice in that sentence in Deuteronomy 16.

Tzedek, justice, cannot be done in a vacuum. Justice requires it to be done in a righteous fashion, doing it right is how we ensure that all of us, not just the victims, but all of us can continue to live and exist as coherent and constructive communities and societies. I can't explain why the OVT's record is what it is, but I do urge everyone, including the key people inside the OVT, to look carefully, look carefully into their hearts to see whether justice is being done and whether it's justice, justice, as the biblical phrase says, justice, justice, thou shall pursue. Thank you very much.

[Prepared statement of Mr. Roth follows:]

22



Arnold Roth and his daughter Malki some months before she was
murdered in the Hamas bombing of Jerusalem's Sbarro pizzeria

## Seeking Justice for Victims of Palestinian Terrorism in Israel

**Hearing before the House Oversight and Government Reform Committee,
Subcommittee on National Security**

Arnold Roth

Washington DC
February 2, 2016

Page 1 of 11

23

Chairman DeSantis, Ranking Member Lynch, distinguished members of the Subcommittee.

My name is Arnold Roth. I live in Jerusalem. My daughter Malki was murdered there in a Hamas bombing attack on August 9, 2001. She was 15.

I appreciate very much the invitation to testify from the very specific vantage point of a close-knit family devastated by an act of murder driven by terrorism. The death of a young child is generally regarded as one of the most challenging traumatic experiences life can serve up. Check with Amazon; there is a wide literature that guides parents who find themselves in that awful position. A smaller number of books exists that seek to comfort the parents of a child killed by a *criminal* act. But the death of a child by terrorists has sharp, painful angles to it that defy book-laden advice. If there is a literature of help for parents like my wife and me, it's a tiny bookshelf. And being able to read Hebrew is an advantage.

Practically everything I know about *terrorism and its victims* I learned through the prism of Malki's murder. Thank you for the opportunity you have afforded me to share some of the things I have learned, and the facts that underpin them.

I want to relate to four matters that I believe ought to affect the decisions you as legislators will consider in evaluating the subject matter of this hearing:

- **Incitement**: The ongoing encouragement to do more acts of terror that is rampant throughout Palestinian Arab society, starting at its politically-highest levels and extending out through the conventional media, and the social media.
- **Enablement**: Money, where it comes from, how it's spent, and the maneuvers of those who want to conceal its role.
- The troublesome matter of **defining terrorism**, calling it by its name and why this is so hard for important parts of Western societies to do.
- Practical matters that may lead to a better **return on effort** invested by the Congress, by the Department of Justice and by the Administration in aid of the needs of victims of overseas terror.

## Justice

But for the winter storm and heavy snows that paralyzed the area, this hearing would have taken place a week earlier, on Wednesday January 27, which is Holocaust Memorial Day. President Obama honored that day by taking part in the "Righteous Among the Nations Award Ceremony" at Israel's Washington embassy.

Because I was in Jerusalem that day, and not already here in Washington, I caught a sound bite via an Israeli news program radio:

> [W]e're called to live in a way that shows that we've actually learned from our past.  And that means rejecting indifference.  It means cultivating a habit of empathy, and recognizing ourselves in one another...  It means taking a stand against bigotry in all its forms, and rejecting our darkest impulses and guarding against tribalism as the only value in our communities and in our politics...  That's how we never forget - not simply by keeping the lessons of the Shoah in our memories, but by living them in our actions.  As the book of Deuteronomy teaches us, *"Tzedek, tzedek tirdof"* - "Justice, Justice you shall pursue."   ...May the memory of the lost be a blessing.

24

And as nations and individuals, may we always strive to be among the Righteous.  [Transcript of Pres Obama's January 27, 2016 speech]

"*Tzedek, Tzedek tirdof*". The quotation is of course Biblical. But almost any Hebrew speaking child in a Jerusalem elementary school today will understand the words with no problem. Our language, along with the values it embodies, has deep roots.

But even for those with no Hebrew language skills, it's striking that one word is said twice in the three word phrase: it's the word for "justice", *tzedek*. What's more, Hebrew uses the same word, *tzedek*, for both *justice* and *righteousness*.

Jewish tradition, noticing the evident redundancy of that verse from Deuteronomy, extracts a simple message of timeless inspiration: ***When you do justice, do it in a just and righteous way***.

The phrase quoted by the President from Deuteronomy 16 calling on society to appoint judges who will carry out righteous judgment is followed by a simple statement of *why*: *"…That you may live"*.

Justice is not meant to be only for the victims of injustice. It is for the larger society in which they and we engage and interact. Doing justice right, doing it justly, doing it with righteousness, is the way we ensure that all of us - individuals and communities - can live.

Justice is not vengeance. It's about putting things right in the name of society's shared values and hopes.

## OVT

It's a universal reality that terror victims, no matter where, go through an intensely personal , often lonely and isolating, process of dealing with the loss and pain and insult and sense of violation. They need support. Often they need advocates.

Created by the Koby Mandell Act of 2005, OVT is exemplary in the way it addresses the core needs the primary parts of which its website describes this way:
- To work to ensure that where Americans are injured or killed in terrorist attacks overseas, investigation and prosecution remain a high priority within the Department of Justice
- To monitor the investigation and prosecution of terrorist attacks against Americans abroad in both foreign and the United States criminal justice systems.
- To work to ensure that the rights of victims and their families are honored and respected throughout the criminal justice system.

In formally announcing its establishment back in May 2005, Attorney General Alberto R. Gonzales captured well the optimism that many of us felt:
- "This new office guarantees a voice for victims and their families in the investigation and prosecution of terrorists who prey on Americans overseas," said Attorney General Gonzales. "Our commitment to these victims is as strong as our dedication to bringing their terrorist attackers to justice."

Page 3 of 11

25

And in the Implementation Memo, issued by the Attorney General in May 2005, specific guidelines were issued that spoke of a significant commitment of resources and effort. Here are some extracts I noted in reviewing the memo:

- The Congressional mandate can best be satisfied through appropriate oversight of operational components by high ranking officials with expertise in criminal investigation and prosecution. The Office shall therefore be established within the Office of the Assistant Attorney General for the Criminal Division [*later changed to National Security division* – AR]. The Assistant Attorney General for the Criminal Division shall appoint a senior official with the requisite expertise as Director of the Office. The Director shall be accountable for the performance of the Office and shall report directly to the Assistant Attorney General for the Criminal Division.
- Because of the importance of the Office and its mission, and as part of his oversight responsibilities, the Deputy Attorney General shall identify an official within the Office of the Deputy Attorney General (ODAG) to serve as a point of contact on issues relating to terrorist incidents against American citizens overseas. The point of contact in ODAG shall receive regular updates on the activities of the Office.
- The FBI, the Criminal Division's Counterterrorism Section, and the Criminal Division's Office of International Affairs shall also designate one or more liaisons to assist the Office in the fulfillment of its responsibilities. In addition, the Criminal Division's Office of Enforcement Operations (OEO) shall designate one of more liaisons, including OEO's Victim-Witness Coordinator, to assist the Office in the fulfillment of its responsibilities.
- ...The Office shall be responsible for the following:
  - monitoring the investigation and prosecution of terrorist attacks against Americans abroad;
  - working with the Criminal Division's Victim-Witness Coordinator, the FBI, the United States Attorneys' Offices, and other pertinent components to ensure that the rights of victims and their families are honored and respected;
  - establishing a Joint Task Force with the Department of State, as described below;
  - compiling pertinent data and statistics;
  - responding to Congressional and citizen inquiries on the Department's response to such attacks; and
  - filing any necessary reports with Congress.

These pieces collectively form the components of a valuable mission that brings tremendous credit on its authors and does substantial good.

In reaching out to the OVT and in our dealings with its officers and with the DOJ at large, there is no doubt we encountered unfailing courtesy and got respectful hearings. But it has to be said that tangible results have been in short supply. We have learned far more, for instance, over the past decade about our daughter's killers from YouTube and Twitter than from updates received from the OVT. To say it bluntly, I am sorry to report that there have been no updates.

I imagine providing people like us with updates from time to time on the things being done by the DOJ and various operational agencies imposes a heavy load on the OVT. But if this is not what the OVT exists to do, then in light of what we know of its *raison d'etre*, what are we entitled to expect from it?

Last week, in advance of coming here, I looked carefully at the ***Rewards for Justice*** website, which is listed and linked to under "Resources" on OVT's website. I remember that in the past it had a full page devoted to my daughter's murder but I found that that is now gone. Malki is not mentioned anywhere.

26

While I can think of reasons why, even while being surprised about it, I was astonished to see that across the entire web site, the word *Israel* now appears exactly three times. (One of those is when a Palestinian Arab terrorist, born in "Jaffa, Israel". 1936, is described as being born in "Jaffa, Israel". 1936, of course, is a dozen years before the state of Israel was established.) Why the change? I do not know.

I was puzzled by another observation: an OVT brochure (see left) providing basic information about OVT's work was sent to us some years ago. (I am unsure about the exact dates.) Then a fresher version came into my possession. The two look almost identical, except that the later version omits the section entitled **"What are the rights of victims of overseas terrorism?"**, which describes several of those rights. While the mandate of the OVT did not change in the intervening years, the message to terror victims evidently did. I can offer no explanation for this.

If the explanation for the scaling-down of a focus on terror attacks in Israel is that matters of state and diplomacy trump the rights of parents of an American citizen to be kept informed, then it would help us manage our own expectations, and reduce the emotional wear-and-tear of a very challenging situation, if someone in authority would speak up and tell us that.

In the particular circumstances of the terrorism that turned my family's life upside down, we are left with a sense that things could have been managed differently and with greater and better effect.

## A massacre by terrorists

The circumstances of the massacre in the heart of Israel's national capital on August 9, 2001 that eventually brought me here today are well enough documented that they can be summarized in just a few points [background here].

- A cluster of jihadists dispatched by Hamas attacked the local branch of the Sbarro pizzeria chain on a hot Thursday afternoon during the school summer vacation. A human bomb was brought there from Ramallah by the chief planner of the operation. She had tried, and failed, to carry out another lethal explosion just days earlier inside a downtown supermarket by means of an explosive-filled beer can. This time, her bomb, prepared by an expert in such matters, was carefully concealed within a guitar case. And her target was thoughtfully selected, after several site visits she made to central Jerusalem, for the maximum number of Jewish children who could be killed in a single blow.
- She planted the bomb – a human bomb – and instructed him to wait until she was safely out of range and able to flee back to Ramallah. She described to a clearly delighted Arabic television interviewer in July 2012 [video] how the initial results of the explosion reached her inside an Arab taxi making its way out of Jerusalem, how the details of the steadily mounting death toll coming in over the radio filled her with joy and how the strangers traveling in the vehicle with her began smiling and cheering as the scale of the carnage became known.
- The death toll grew to fifteen people by that evening with tens of dozens of people injured, mostly women and children - which was always the plan. Two Americans were among the dead, one of them my Malki, the other Judith Hayman Greenbaum and the unborn first baby she was

27

carrying. A third American woman, Joanne Finer Nachenberg, remains unconscious in a vegetative state more than 14 years later. The two-year old daughter she brought into Sbarro that day has been raised without a mother.

- That chief planner, the woman I have been mentioning, was 21 years old. Besides studying journalism, she had an evening job reading the news for a Palestinian Arab TV station. That day, she impassively reported the killings on camera that evening, giving no outward sign of the excitement she felt. It's possible she was the first news presenter in history to have been the central figure in the day's major story about which she was reading aloud the details.
- She was subsequently arrested, indicted, tried, imprisoned (for no fewer than 16 terms of life imprisonment), freed – but never pardoned - as part of a massive deal with Hamas to secure the life of an Israeli hostage, and sent back to Jordan, the land of her birth and of her parents and siblings and where she had lived almost all her life.
- There, after barely eight years in an Israeli prison, she has been transformed into a uniquely bizarre form of public figure – a mass murderer who regrets no aspect except that she wished the death toll were higher; whose success has made her a figure of adulation across the Middle East and beyond; who today skillfully leverages television and the social media – Twitter and Facebook, in particular – to proselytize for more killings and for greater support for those caught trying to do them. I think the public platform at her disposal and the extraordinary megaphone it gives her are literally unique in the annals of sociopathy.

## Malki

Nothing is more about business and less about feelings and sentiment than a legislative chamber. But the people who make laws are people, and people are the sum total of the humanity inside them.

I therefore permit myself, as a witness testifying before this Committee, to describe Malki briefly. She is the reason I am here – my exuberant, ever-smiley daughter, bursting with the love of life and who is eternally going to be three months short of the sixteenth birthday we never celebrated.

But since addressing the beauty of her life is hard to do on paper or briefly, I want to mention just two particular aspects of it.

First, her *song*. In her tenth grade class at school, the girls were invited to take part in a contest. Those who could compose music, should do that. Those who could write accompanying words were advised to try. Those who could sing should sing. Malki never mentioned this competition to us, or the fact that she had embarked on composing a melody, and wrote the words, and sang it to her friends. But she didn't complete this in time. She missed the contest deadline because when you're fifteen, you are entitled to believe you have all the time in the world.

Her devastated friends from school visited us in our home during the seven days of mourning. We learned about the song from them. It's uplifting, optimistic, warm - exactly as Malki was. Different versions of it have been sung at concerts around the world and downloaded and streamed and shared in the years since her life's music was stolen from us. Today, it accompanies the lives of uplifting, optimistic, warm, smiley youngsters – a wonderful heritage to share, even if hearing it remains impossibly painful for my wife and me.

28

Then there was her **cell phone**. The police phoned me some weeks after the massacre that destroyed the pizzeria in the center of Jerusalem. They asked me to come downtown to collect a bag of personal effects they had identified as Malki's. Inside, we found the mangled red phone that was always with her, and on whose screen she had been happily tapping to friends at the moment when the human bomb pressed the button on the deceptive guitar case on his back. That case, engineered by one of Hamas' most accomplished engineers, was filled not with music but with explosives.

Malki had written these words on the mouthpiece of the cell phone: *Don't speak ill of other people*.

## The mastermind

That cursed guitar case, along with the human bomb who carried it, and the woman who masterminded the Sbarro massacre, are at the heart of a grotesque celebration of hateful bigotry that goes on and continues to destroy lives. It's a process that anyone willing to look for it will see it at work daily on the streets of Jerusalem and in many other places in Israel and well beyond Israel's borders.

I will confine myself to testifying about those aspects of that young Jordanian woman's story that are connected with *justice*.

She confessed to the 15 Sbarro pizzeria murders at her trial including the murder of my Malki though she had no knowledge or interest in the identity of her victims once she satisfied herself that they were all Jewish. Her confession in front of the panel of three Israeli judges was proud, triumphant, accompanied by smiles. No, not the warm smiles of young women bursting to help other people and rushing to celebrate life and do good, but a different kind of smile that all of us have seen at dark moments in our lives.

She has repeated her confession over and again since that time. She has done it in front of large crowds of college students, of ordinary folk, of religious functionaries and of politicians. And most of all, she has done it via the mass media, and the social media and via her weekly television program. The signs are that what she wants people to know, the people in her vast audience want to hear.

Intelligent discussions of terrorism and what makes people do it tend to focus on the need to identify 'root causes' and programs that will address long-standing grievances, deprivation, poverty, oppression, frustration. The instance of my daughter's killer offers what I believe is a very different view:
- Terrorism as an act of redemption and triumph.
- Self-destruction as a macabre celebration of life.
- Murder as an expression of solidarity and identification with a cause.
- And the urge that most of us have to be a hero in the society that raised us.

If I am right, this has practical implications wherever her message reaches – and that reach certainly includes the United States. In this country, as in many other countries, her jihad-promoting weekly television program is beamed every Friday from a studio in the Hashemite Kingdom of Jordan to hundreds of thousands of households. Because the audience is Arabic-speaking, this phenomenon is largely unnoticed, slipping beneath the radar screen of mainstream observers. Nonetheless, the dissemination of the woman's message of hateful triumph, extreme bigotry, the redemptive power of murder – all the points I mentioned a moment ago - is a reality that exacts a desperately high price in every society in which it happens.

Page 7 of 11

29

What makes this especially serious is that her platform is *global* even while its message remains mostly unknown to the people who – whether they know it or not – may be in her cross-hairs today or in the future.

Should the OVT address any of this? Within the terms of the mandate given to it by Congress, should it be taking this challenge on board? If it did, would this contribute to preventing further deaths of American citizens at the hands of Palestinian Arab terrorists?

## A "cash for terror" reward scheme

Any rational person will ask, on hearing the trajectory of this mass-murdering woman's life, why she ought to be helped to get her lethal brand of Islamist hatred out into the public sphere. She is obviously helped by the fact that she has been completely free and out of prison since October 2011 [Background: Shalit Deal]. But she is helped in less obvious ways as well. We ought to be asking how that help arrives and who sends it.

In the world that most of us know, a felon who does some unspeakable act of violence causing the severe injury or death of a victim can expect to spend years in prison. The upside: he or she might tap into the educational opportunities that come with the sentence and emerge with a degree or other trade qualification. Some pocket money would be available, but it would mostly go on candies, personal hygiene consumables, the small expenses of living in conditions of incarceration.

The downside: After serving all or most of the full sentence and/or being paroled - depending on the usual factors – the time comes to walk free. Emerging back into the real world, it's likely to be hard to get back on a reasonable track, to re-establish connections, to find a place in society and so on.

The fate of my daughter's murderer is different. She has never had to confront social stigma or a shortage of money. She never will.

I was given some calculations last week done for me by an Israeli group, *Palestinian Media Watch* (Palwatch.org), that has devoted years to understanding the fine details of the dangerous and disgraceful program run by the Palestinian Authority (PA) for funding its convicted terrorists and encouraging more acts of terror.

On the assumption that she spent a total of 10 years one month and 4 days in Israeli prison for the fifteen acts of murder for which she was convicted and to which she confessed, the woman who masterminded the Sbarro massacre received hundreds of thousands of shekels in monthly salary, a one-time release grant and a post-prison stipend. She is not alone in this. Every single one of the several thousand Palestinian Arab murderers imprisoned in Israel as a consequence of terror receives similar fat payments, well above those available to ordinary civil servants and many professionals. At a time of huge economic uncertainty inside the Palestinian Authority and Hamas, the reliability of the cash-flow emanating from the PA's coffers (and benefitting its own terrorists as well as those of its mortal rival Hamas) means **terror is now a legitimate career option** in their society. Terror pays.

Plainly, terror is not going to end so long as the scheme remains viable and funded.

30

The Palestinian Authority receives on the order of a billion dollars in international aid each year. Starting in 2011, there has been an awareness on the part of some of the fund providers that the payment of out-of-proportion salaries and cash payments to people we would call terrorists – whether in prison or released – and who are called "heroic" and "exemplary" within their own society, poses a problem. As political liabilities go, this one can be especially irksome at a time when the PA refers to itself as almost insolvent and when the United Nations Relief and Works Agency for Palestine Refugees (UNRWA), the agency that provides much of the schooling and welfare for millions of Palestinian Arabs, is forced to resort to a succession of emergency appeals to foreign donors.

In the most recent reporting period, that PA scheme for rewarding terror made payments of more than US $150 million. Under a certain amount of pressure from some of its donor countries (The Netherlands is a good example), and in order to safeguard continuing foreign aid funding, the PA in August 2014 engaged in what I would call a shell game trick and shut down its Ministry of Prisoners' Affairs. The argument was that, having done this, donors could be assured that foreign aid could no longer be said to have flowed into the cash-for-terror reward scheme.

I have taken a close look at the August 2014 changes because of the way they impact on killers who have affected my family's life. What I have found leads to such obvious conclusions (namely that a fraud is being perpetrated on the donor countries, including the United States) that I am forced to the view that everyone in those countries who needs to know it's a fraud knows it, but for political reasons chooses to pretend to believe it.

To state the argument simply, there is a new Commission of Prisoners' Affairs which makes these payments. This is not part of the PA but of the Palestine Liberation Organization (PLO). But the head of the PLO is also the head of the PA. (His name is Mahmoud Abbas, and his day job is president of Palestine.) The head of the Commission is a man called Qaraqe who, by no coincidence, was also the head of the PA ministry that shut down a day before the new commission started. The web address of the new commission is identical to the web address of the now-shuttered ministry. The money which the PLO spends on its prisoner payments scheme is exactly the same as the sum spent by the closed-down ministry. There are more details but to recount them here would be to take seriously the assertion that something changed.

Nothing changed. The PA, funded by the US and the EU and others, is rewarding terrorists like Malki's killers using cash provided by taxpayers in Western countries. This reality is being deliberately obfuscated by all concerned. [Background: "Is the PA lying to Western donors?", Palestinian Media Watch, May 18, 2015]

This vexed issue of foreign taxpayers delivering up unspeakably large amounts of money to politicians prepared to lie right into the faces of the donors is a key factor in the enduring nature of terrorist savagery, Palestinian Arab-style.

The US provides a substantial part of the money that makes this possible.

Should the OVT address any of this? Within the terms of the mandate given to it by Congress, should it be taking this challenge on board? If it did, would this contribute to preventing further deaths of American citizens at the hands of Palestinian Arab terrorists?

31

## Incitement

Whether or not the president of the PA, Mahmoud Abbas, is good for peace or bad for peace is probably seen by most as a political question calling for political judgement.

But public statements by the head of state of the Palestinian Authority urging greater recognition of the alleged heroism of Palestinian Arabs who engage in terror against Israelis do not call for political judgement. No matter what his views, or ours, of a one-state solution versus a two-state solution, or an immediate end to occupation as a precondition to peace negotiations, it means something very concrete when he appears in public holding aloft the hands of convicted terrorist prisoners and declares them to be "political prisoners", "freedom fighters" and his nation's heroes.

Even if Mr Abbas had ever publicly condemned a specific Palestinian Arab for engaging in a terrorist act, we would still think that the preponderance of his messages encouraging such acts amounts to clear encouragement of terror from his people's most influential single voice.

But we have checked carefully, and we believe he has **_never once issued such a condemnation_**. Moreover, while she was still in an Israeli prison cell serving her sixteen life terms (prior to being released in 2011), Mr Abbas awarded the murderer of our daughter the Palestinian Authority's highest medal, the Al Quds Mark of Honor.

Should the OVT address any of this? Within the terms of the mandate given to it by Congress, should it be taking this challenge on board? If it did, would this contribute to preventing further deaths of American citizens at the hands of Palestinian Arab terrorists?

## Conclusion

I have already mentioned here that the criticism we feel is not directed at the people of the DOJ with whom we have had dealings. My wife and I have been treated by them respectfully and courteously. Everything we have seen tells us the DOJ people are committed to doing their jobs professionally and have sought to do so.

Why has so little of a practical nature come from those interactions? We do not know. We do not know what efforts have been made by them. To the extent those efforts are being, or were, undertaken within the confines of the legal system, we know that confidentiality can play a major role.

But since **_justice_** is the heart of our concerns, and years have gone by without update or result, it has to be said that justice has not been achieved here. At the same time, it should also be acknowledged that the responsibility of the US government is to administer justice for its citizens, including for my murdered daughter Malki and for her family.

If some larger truth lies behind the lack of momentum, that truth ought to be disclosed. If diplomatic considerations override the law enforcement imperatives, we wish that were made known too. If foreign governments are thwarting US government efforts to enforce its laws, that too should be known.

32

Washington is not just about laws and values. It's about politics – both domestic and global. If for instance this great nation's relations with the Hashemite Kingdom of Jordan and the Palestinian Authority take precedence over the pursuit of justice and the protection of innocent civilians and their lives, then as painful, as distasteful, as that would be, it's the kind of thing that societies do. We don't know that that is what has happened. We don't say it has, even if others say it is perfectly obvious to them that it has.

But if – and I am just speculating – the inaction were the deliberate outcome of political thinking, then we could call it a terrible mistake, we could try to persuade the appropriate decision makers to see it differently, we could appeal to public sentiment that might agree with us. And we could hope for a new and different strategy.

But we do not know, and our efforts to help ourselves and to be helped by others whose role is to help, have been unhelpful.

I consulted Sherry Mandell just before flying to Washington this week. I told her I would convey the sense of her feelings to this hearing. Sherry is the mother of the American child whose cruel murder ultimately led to the enabling law that created the OVT being named for him: *Koby Mandell*. Sherry asked me to say this:

> *It hurts, saddens and enrages me that the OVT, which was once created by a law named after my 13 year old son who was beaten to death by terrorists--is not being used to help families such as ours. Koby Mandell's name was expunged from the OVT website with no sign that it was ever there. I did get a phone call telling me that the US government was closing the case--even though the killers were never found. They closed the case, burying Koby again. Causing us another round of pain. The office that was created in my son's name to protect us, instead damages us.*
> *There has been no communication since. No sign that the OVT could care less about an innocent 13 year old American boy named Koby--or others like him.*

Thank you.

33

Mr. DeSantis. Well, I thank the gentleman and I think the witness statements were excellent. I really appreciate you guys coming here, and I think that anybody watching this, you know, I think it was very, very powerful, and we appreciate it.

Mr. Wiegmann, the committee has counted that since '93, at least 64 Americans have been killed, as well as two unborn children, and 91 have been wounded by terrorists in Israel in disputed territories.

How many terrorists who have killed or wounded Americans in Israel or disputed territories has the United States indicted, extradited, or prosecuted during this time period?

Mr. WIEGMANN. I think the answer is—is none.

Mr. DeSantis. Okay. How many terrorists who have killed or wounded Americans anywhere else overseas has the United States indicted, extradited, or prosecuted?

Mr. WIEGMANN. I don't have an exact figure for you.

Mr. DeSantis. But it would be a decent size number, though, correct?

Mr. WIEGMANN. It would be a significant number, yes.

Mr. DeSantis. Okay. Does the DOJ plan to prosecute any of the terrorism cases committed by Palestinian terrorism and Israel in the disputed territories?

Mr. WIEGMANN. So we have a number of open investigations. I can't comment further on the status of the investigations.

Mr. DeSantis. Do you know how many, though?

Mr. WIEGMANN. I can't give you that number.

Mr. DeSantis. Why not?

Mr. WIEGMANN. I don't have the number, and I don't think we want to comment exactly, because the more we say about the number of investigations we have, the more we tell the bad guys who we are trying to get.

Mr. DeSantis. I get the ongoing investigation. I think we would like a sense of whether this is a substantial effort or not. And so, you know, maybe you don't give us an exact number, but we want to know that progress is being made.

In your opening statement, you said that these prosecutions, when Americans are killed by terrorists overseas, including in Israel, that that was the highest priority, and that there should be no stone left unturned. And I understand when you're talking about foreign jurisdictions, and you alluded to some of the issues that arise, and I think that point is well taken. But when it's zero for 64, I think you see some people, who have been affected negatively, wonder, you know, what exactly is the Department doing within this particular aspect of terrorism that occurs in Israel?

And let me ask you, particularly: Mr. Roth alluded to engineer of the terrorist attack that killed his daughter. This is an individual who really is, since being released in a prisoner exchange, has been open and notorious, is on TV with Hamas. Is that something that the Department is monitoring? And is there any plans to try to seek justice in that case?

Mr. WIEGMANN. So let me address that. I think the Tamimi case is the case you're referring to. And she, along with two others, I think, were prosecuted originally by the Israelis. As I said in my opening statement, most of the cases that occur in Israel are pros-

34

ecuted in the Israeli system. And so she was sentenced to a long prison term. She was then released in 2011 in conjunction with the Gilad Shalit prisoner exchange. This is something that we opposed. We advised the Israeli Government that we opposed this release, but they did that anyway. They are a sovereign government. We couldn't block that.

Since that time, we have made clear that we intend to pursue any available charge that we can, either in this case and all the other cases involving released prisoners. That was really a kind of game changer for us, the prisoner release, and we are really concerned about all of those folks that have American victims on their hands——

Mr. DeSantis. I think so.

Mr. Wiegmann. —so absolutely we are pursuing all those cases, including that one.

Mr. DeSantis. And I appreciate that. Senator Inhofe, in 2012, wrote and requested the status, and basically, we were in the same holding pattern. So I appreciate those words. But I think, as Mr. Roth said, when OVT was created, the idea was you're going to help the victims and then hopefully, facilitate within the DOJ that these prosecutions are happening, and they are not.

Now, it's- been alleged that the reason that DOJ does not prosecute the Palestinian terrorists who harm Americans in Israel, the disputed territories, is that the Department of Justice is concerned that such prosecutions will harm efforts to promote the Israeli-Palestinian peace process, or that it will actually harm the Palestinian Authority.

So let me ask you straight up, is that a consideration the Department of Justice?

Mr. Wiegmann. I can assure that is obsoletely not the case.

Mr. DeSantis. And has the State Department ever made arguments to the Department of Justice to handle some of the Palestinian terrorism cases differently than you may normally handle, say, a terrorism case in Asia?

Mr. Wiegmann. Absolutely not. The State Department has nothing to say about cases that we bring, whether in Palestinian territories related to these cases or not. So it absolutely makes zero difference to us whether the terrorist attack occurred in Israel, whether it's a Palestinian terrorist group, whether it's ISIL, Al Qaeda, they are all the same to us. We want to protect Americans regardless of who they are victimized by.

Mr. DeSantis. So you mentioned the 2011 prisoner releases that included terrorists who harmed Americans. Now, when that was undertaken, you said the administration opposed it. Did the State Department work with Israel to maybe seek extradition of any of the people would were being released against our wishes?

Mr. Wiegmann. So, again, I can't comment on any particular investigation. But what I can say is that since that prisoner release, we have kind of redoubled our efforts on those investigations. We are working really hard with the Israelis. We have gotten increased cooperation from the Israeli Government since those releases. And to the extent that we can bring charges in any of those cases, we intend to do so.

35

Again, I would caution the committee not to assume that because, as I said in my opening statement, that we don't have any public charges doesn't necessarily——

Mr. DESANTIS. No, I don't think we do assume that. I just think it has been a long—you know, this has been something that's been going on for a long time. And I think there's a lot of concern, understandable concern, about the lack of results. And so that is really what we are focused on is the results.

Now, some have said that if you have a situation where a terrorist who kills Americans in Israel is prosecuted by the Israelis, then they are later released in a prisoner exchange or release, that somehow if we were to prosecute them here, that would trigger double jeopardy. Is that the Department's position?

Mr. WIEGMANN. Absolutely not. We have prosecuted people who have been released from prison before. Sometimes it takes us a while. One prominent case is an older case, actually a case involving a Palestinian terrorist who hijacked an airliner in Pakistan. He spent, I think, 8 to 10 years in a Pakistani prison. Then he was released, made his way to another country, and was, I think, more, 10, 12, 15 years later that we were able finally to apprehend the person, prosecuted him in 2004, and he's got a 60-year sentence today.

So we have prosecuted people who have been released from prison before, and certainly, nothing in the Israeli prison release would be any different. We fully intend to pursue charges in any of those cases if we can.

Mr. DESANTIS. Let me just conclude by asking, and I realize, I mean, you are here representing the Department, the Koby Mandell and the OVT. This was all over 10 years ago. We've had different administrations, different parties, we've had Congress, different parties, and so it's been a— it's not that there's one person to blame, but when you see that zero cases have been brought, and you see the victims of terrorism, their families seeking justice, do you understand the frustration without seeing any tangible results, even understanding that some of these cases are very difficult?

Mr. WIEGMANN. I certainly understand the impatience and frustrations. The only thing I can say are the reasons are, in some of those 64 cases they talked about, there were Israeli prosecutions, and Israel is a very capable and effective and aggressive prosecution regime, so a lot of those cases, prosecutions were brought by the Israelis, and that's the same as we would do here. I mean, we have had foreign nationals injured in terrorist attacks here, whether it's 9/11 attacks, or the Boston Marathon bombing. There were foreign nationals in both of those attacks who were killed and injured. Those attacks are going to be prosecuted in the United States.

The foreign governments, we try to work with them, give them information and so forth about the case, but the same is true in Israel. The Paris bombing was prosecuted, or will be pursued, investigated by the French, because it is on their territory. There was an American killed in that attack. So I totally get it. I understand the frustration and impatience of the victims, but, in general, those terrorism cases around the world are prosecuted where they occur.

36

That doesn't mean that we don't try to bring extraterritorial cases when we can, but there are some really tough issues in bringing these cases. As I mentioned in my opening, we have to have the cooperation——

Mr. DESANTIS. I appreciate all that, but, you know, the tough issues, you have to confront this. When you say leave no stone unturned, that means you have to deal with them head on. So I appreciate you being here. I've gone over, and so let me recognize the ranking member, Mr. Lynch.

Mr. LYNCH. I want to thank the witnesses for your testimony. Indeed, heartbreaking and very, very powerful. I want to go through, Mr. Wiegmann, the procedure that has to be followed. I also serve as the top Democrat on the Task Force on Terrorism Financing, so I spent a lot of time in the Middle East, in Pakistan, a lot of time in Israel, a fair amount of time. I just came back last week from Lebanon, the Syrian border, Turkey, Jordan. And part of our efforts there are to, on the terrorist financing pieces, to take the power away from these terrorist groups to try to deny them the resources that they use to perpetrate these terrorist acts, and to deny them access to the legitimate financial system.

I'm also very familiar with the previous terrorist attacks, Khobar Towers, Nairobi, Dara Salaam, the multiple attacks in Karachi, Pakistan, and Islamabad, obviously several attacks in Beirut.

Mr. Wiegmann, if there is an attack in a foreign country on U.S. citizens—I think you've said this before—in the first instance, the prosecution is solely—let's back up a little bit. In all of those cases that I just mentioned, to my knowledge, it was the FBI that goes in first. Is that correct? Are they the lead agency for the United States?

Mr. WIEGMANN. For the United States they are, but obviously if it's an attack overseas, the real leader is the government of the place——

Mr. LYNCH. No, no, I realize that.

Mr. WIEGMANN. The FBI, yes.

Mr. LYNCH. The lead agency for us?

Mr. WIEGMANN. Yes, absolutely.

Mr. LYNCH. And in the first instance, our role in terms of assisting any prosecution by the host country, and as you said, the Israelis handle it. The Lebanese handle it. The Kenyans handle it. It is an investigation that is by the host country, and we're allowed to assist. Is that how it normally goes?

Mr. WIEGMANN. Yes. In many cases, we do provide assistance if we have information that is relevant to the attack or we can provide, we sometimes are helping with the victims actually provide information what they have on the attacks.

So, yes, there's ways that we can assist, and we do. Sometimes it's just helping them in their own investigative techniques, so there's a lot of cases in which we provide support. The other more capable governments, it's less likely that we would provide assistance, because they're already quite capable on their own. So it really depends on the country.

Mr. LYNCH. Okay. Are there any opportunities for us to have shared prosecution agreements or something like that, or a treaty in place where we can actually, you know, get in initially with the

37

investigation and sort of expedite and enhance the prosecutions in foreign countries? Do we have anything like that?

Mr. WIEGMANN. It really depends on the country and the facts of the case. There's some cases, let's say an African country. You mentioned Kenya and Uganda, I know. There are cases where they really need our help. They're not used to doing complex counterterrorism classifications. We send FBI teams in very early, and prosecutors as well, to help investigate the case, and we're there at a very early stage. In contrast in another case, let's say it's an attack in France, they already have a very sophisticated cadre of investigators and prosecutors. We typically would provide information, but, say, electronic information on accounts that terrorists may have been using or things like that, and we provide assistance, but it's not the same level of support that we provide in a less developed country.

Mr. LYNCH. How—and I know this is probably country-specific, but what is the experience that you've had in terms of getting cooperation from some of the host countries where an attack has occurred involving a U.S. citizen?

Mr. WIEGMANN. So, again, it's really all over the map. Some countries really welcome our cooperation and ask for it. Other countries are not as cooperative and won't give us information, won't allow us in on the ground, won't allow us to go in and interview witnesses or do anything like that, so it really runs the gamut.

Mr. LYNCH. Mr. Schwartz' testimony highlights the balance of understanding the sensitive nature of investigations and intelligence gathering on the one hand, but also on the other, the victims and families deserve answers to the questions, so you can see how this is tremendously frustrating to families in this case, and also all those who are similarly situated, and there are hundreds. I'd like to get your comment on it, particularly given that your division, the National Security Division, not only oversees OVT, but also is more generally responsible for enhancing law enforcement and intelligence efforts to combat international terrorism. How do we divide those priorities in terms of trying to inform the families, but also dealing with maybe sensitive issues with the host countries?

Mr. WIEGMANN. So we have an obligation, and it's our mission anyway to give the families as much information as possible about the status of the investigations to the extent we can do so without interfering with or impeding those investigations. So that's one of the main functions of our office for victims, is to keep the victims apprised of the status of investigations. We have lots of meetings with victims, their families, to tell them what's going on. There are limits sometimes as to how much we can say, but we say a lot more than we can say publicly. We can develop confidential relationships with the victims and can share quite a bit of information with them.

We try to obtain information if it's a case that's being prosecuted overseas from the foreign government in a way the victim might not be able to, and share that information to the extent that we can as well. The victims actually have statutory rights to be informed to the extent possible, and we try to maximize that to the

38

extent that we can. There are some limits to what we can say, because we don't want to jeopardize the case in any particular case, but we do try to share as much as we can.

Mr. LYNCH. Is there anything that Congress can do? Do you feel that you're inhibited, in any way, by statutory provisions that we have put in place that could be mitigated in order to help you be more cooperative with victims' families?

Mr. WIEGMANN. I don't think so. I feel like our office does, we can always use more resources. We have a small office, so there's always more that could be done in theory, but I don't think there are any legal prohibitions on our relationship with the victims.

Mr. LYNCH. My time is expired, and I yield back.

Mr. DESANTIS. The gentleman yields back. The chair notes the presence of the gentleman from North Carolina, Mr. Meadows, a member of the full committee, and without objection, Mr. Meadows is welcome to fully participate in today's hearing. Without objection, it's so ordered. And that being done, the chair now recognizes the gentleman from North Carolina for 5 minutes.

Mr. MEADOWS. Mr. Chairman, I want to say thank you for holding this hearing, and, obviously, it is critical, and it's the reason why I made it a priority to be here, not only to support your efforts, but I know that you have followed very closely not only the conflict that is going on in the Middle East and the terrorism threat, but fully bringing justice to the victims. And so I want to just say thank you.

Mr. Wiegmann, my concern, Winston Churchill has one of my favorite quotes, and it is, "No matter how beautiful the strategy, we must occasionally look at the results." And the results are not encouraging. In fact, when you were talking about how your office helps the victims, I watched people, and many of the people at your table were rolling their eyes and not agreeing with your premise on helping and keeping them informed.

So I guess one of the questions I have for you is I know there are a number of services that are out there in terms of helping victims' families, whether it's travel or counseling or any of those things. Are those all available to victims' families?

Mr. WIEGMANN. I know one program that we operate is called the International Terrorism Victims Expense Reimbursement Program, so that's a program to reimburse families for——

Mr. MEADOWS. But there's multiple agencies. You kind of become the point of contact for these families. So, Mr. Schwartz, have they reached out to you to let you know all of those?

Mr. SCHWARTZ. I have been in contact, and we have been contacted. Who made the initial contacts and sort of who reached out to who, we were fortunate to have sources of information from many different directions. But, you know, I would echo Mr. Roth that there's been no shortage of sympathy and accessibility of resources for us.

Mr. MEADOWS. But not a whole lot in terms of results from a prosecution standpoint?

Mr. SCHWARTZ. Certainly not results, but it has been very early, and there's been some effort to keep us apprised. But if there is any American involvement with the investigation, we're, as yet, unaware of that.

39

Mr. MEADOWS. So, Mr. Wiegmann, let's talk to that because my wife and I just recently got back from Israel. One of the most chilling things that I think I sat in a courtroom in Israel where six terrorists were being tried. They had a Hamas-paid attorney, had six of them in leg irons. Several were committed to ISIS. Several were committed to Hamas. And with pride, almost like they were turning in a paper on a job well done, they were smiling and joking with their family in the courtroom. I made a commitment at that particular time to say that not only do we have to bring justice, but we have to bring it quickly.

And so, I guess the question I have is, knowing that there's the pride of these terrorists and many of them feel like that they get off so easily, why are the Israelis better at bringing them to court than we are here in the United States? Is it a lack of resources? Because if it is, you need to speak up now.

Mr. WIEGMANN. I wouldn't say it's a lack of resources. It's just they're the ones on the ground who are, let's say an attack occurs in Jerusalem; they're the ones going to the scene. They're collecting the forensic information in a way that they would do that in Israel, but may not be the way we would have to do it in the United States to ensure that they're admitted in a U.S. court.

Mr. MEADOWS. So they're not coordinating with you properly. Is that—because, I mean, I'll reach out to the Israeli Government if that's the——

Mr. WIEGMANN. So the typical case that might be five or six Israelis are killed, and then one American is killed, and perhaps a Palestinian or someone from a third country, the Israelis are going to take the lead in that country. They're not going to, in general, have multiple, multi-country investigations. Right at the very initial stage, they probably haven't even identified the nationalities of the victims at stake, much less have a chance to contact the foreign governments and get them involved.

So they're going to, just as we would do here in the United States in investigating a case, the FBI is going to do the investigation. It's not going to be promptly inviting in—for example, in the Boston Marathon bombing, there was a Chinese national that was killed. We're not going to be inviting the Chinese Government in to help us conduct that investigation.

So I think the Israelis do it the way that most other countries would do it, but they're doing it under Israeli priorities and under Israeli laws that are not going to necessarily lead to us being able to introduce the evidence that they collect in a U.S. court. The way they get statements from witnesses and so forth can also be in a manner that we can't use them in a U.S. court.

So don't get me wrong. We can overcome some of these obstacles. I wanted you to be aware there are particular challenges in these overseas cases.

Mr. MEADOWS. So when are you going to overcome these obstacles? Because the chairman pointed out from a standpoint of the results, as Winston Churchill would say, is we haven't seen a whole lot of them, so the point of your office is what?

Mr. WIEGMANN. Well, our office, again, to be clear, it's to ensure that justice is done, whether it's done——

Mr. MEADOWS. So as long as the Israelis do it, you're fine?

40

Mr. WIEGMANN. We support all tools. We have whole programs at the Department of Justice that is our design to build the capacity of foreign countries to prosecute terrorists. We work with——

Mr. MEADOWS. So Mr. Roth shouldn't expect any further action from DOJ?

Mr. WIEGMANN. I wouldn't say that in his particular case. I'm just saying that if the Israelis were to sentence the attackers in that case to life sentences or adequate terms of imprisonment, that's a way to protect our national security and ensures accountability.

Mr. MEADOWS. Who determines what's adequate?

Mr. WIEGMANN. Well, I don't know. We would have to evaluate that, and when they get out of prison——

Mr. MEADOWS. Who determines it? Is it Mr. Roth or is it you? Who determines what's adequate?

Mr. WIEGMANN. If they get out of prison, and we think it's not enough, then we can pursue charges at that time. We have done so in many cases. That's one of the things that happened in these release cases in 2011, which is they were released prematurely as part of a prisoner swap. We were not happy with that at all, and we are actively pursuing those cases, I can assure you.

Mr. MEADOWS. So, Mr. Chairman, you know that you have my full support, and I will continue to work with you as you continue to illuminate this particular situation. I thank you for your leadership, and I yield back.

Mr. DESANTIS. The gentleman yields back. Mr. Wiegmann, one of the purported rationales for the Koby Mandell Act was for OVT to, "determine the reasons for the absence of indictments of terrorists in some regions," and obviously Israel was one of those. Has the DOJ actually done that and determined specific reasons why Israel would not be getting prosecutions while other overseas victims in other areas of the world do? Is there a memo, or does it outline the reasons for that?

Mr. WIEGMANN. I'm not familiar with that. You said the reasons why there are no charges?

Mr. DESANTIS. Yeah. Determine the reasons for the absence of indictments of terrorists in some regions, and I think this would be obviously one of those regions where the indictments would be lacking.

Mr. WIEGMANN. Of U.S. charges, you mean?

Mr. DESANTIS. Yes.

Mr. WIEGMANN. Yes. I think the reasons would be along the lines that we've talked about, although those aren't unique to Israel. The challenges that we have would be in any country, the ones I identified. It's just that in some cases, we're able to overcome those, and others not.

Mr. DESANTIS. Ms. Singer, do you believe that OVT is doing what it was set out to do?

Ms. SINGER. So I definitely have a relationship that started off very strong with the office. I was in touch with them very much. But with all due respect to Mr. Wiegmann, I never was even told any information about my attackers, about those that planned and carried out the attack. I know that the terrorist, you know, died in the attack, but I wasn't told any other information until I signed

41

on to the lawsuits that I was on, the Arab Bank lawsuit and National Westminster Bank, and once I signed there, the lawyers were then able to tell me that the terrorists that were the masterminds of my attack were currently in jail.

But any information that I tried to seek further from that, from the office, was really, there was none for me. And my biggest concern and fear is what happens when those that have carried out my attack are released in a swap, in a prisoner exchange, and then they're just going to be left free to go to other countries. And even countries that we have extradition treaties with, they won't be extradited and brought here and be put on trial for the murder of Americans and injured Americans, which are many, many more than the number 64.

And I don't want to preclude in saying that not only are those numbers, but there are families and extended families and communities that are directly impacted by those murders. Our family members are the ones that suffer long-term with us, especially the survivors, that live with those memories every day. And justice for us and accountability and validating what we went through is something that we need to see more of.

We need to make sure that those that have carried out these attacks, if they're being let out of jail because of an exchange, that their lives are not going to go back as if they're heroes, but that they're really going to be prosecuted against in this country and be made an example that no one should be carrying out attacks against Americans anywhere in the world. And I think it's really important that there is more movement, and more measures taken to, especially with the ones that we've talked about from the Schalit deal, there are a number of those with American blood on their hands that could be taken and prosecuted.

Again, for me, I've never received any significant information in this area with regard to assistance of ITVERP and other areas of psychological, physical. The immediate needs for a victim after an attack, the office is very good with, in terms of medical needs and reimbursement, but it's really the justice portion of it that I have some issues with in terms of really wanting to find out what happened and where these people are and that they're not going to be released soon.

Mr. DeSantis. Do you know, Mr. Wiegmann, the status we had the murders in Gush Etzion, I think, in November of 2015. There was an American that was killed. Are the Israelis currently prosecuting that case to your knowledge?

Mr. Wiegmann. What was the name of the case that you mentioned again?

Mr. DeSantis. There were a handful of people, probably mid-November of 2015. We can get you the information if you can let us. It was the most recent, I believe. Oh, yeah, it was Schwartz.

Mr. Wiegmann. So, yes, the Israelis have opened a prosecution in that case, and brought charges in that case. I think there are three others; there have been seven. There's been an uptick in violence in Israel recently, and there's been a number of Americans injured or killed in those attacks. I think there are seven cases, and of those seven recent cases involving Americans, there are four that the Israelis have brought charges, and we're in touch with,

42

have contacted the victims and their families in each of those cases and have offered our support and services.

Mr. DeSANTIS. Okay. Good. Mr. Roth, your testimony was great. You really did a good job with that. It was well done, so thank you for that. I think you bring up a good point. Obviously, when something like this happens, I mean, we want justice, but I think everyone would prefer that this stuff just does not happen to begin with. You talked about the incitement, and you talked about just the lucrative nature of terrorism in this society, and American funds are obviously a part of propping up the Palestinian Authority, even with the Unity Government with Hamas. What is your advice to us about how we use tax dollars with respect to the Palestinian Authority?

Mr. ROTH. Look for the return on investment, if I could just put that in the simplest of terms. But I'm not very good at giving advice, certainly not in this context. I am a little bit better at asking questions. And I have to say the one question that is rattling around in my brain after hearing some of the comments that have been made here and focusing on the work of the OVT, what it says it does, what it describes as being its goals, what its highest priorities are, I'm struck by a triviality, and I mentioned it in my written submission.

The brochure that's handed out to families who are the clientele of the OVT have gone through at least two different versions, and you have to look very carefully to see the difference because they look identical. But the difference between the two is that in one of them, the earlier one, the first one, is a section, a significant section headed, "What are the Rights of Victims?" And in a later version, that paragraph has simply been removed. The guidelines haven't changed. Nothing's changed. But somebody somewhere—and as I say, all I know is to ask questions—has made the decision that the rights of the victims perhaps isn't the same kind of priority now as it was then.

Now, I'm not establishing that as a conclusion at all. I'm only asking questions. But as a lawyer—and I've practiced law as long as most people here in this room—I know that you can't simplify the legal process without doing damage to the integrity of the process.

The fact is, things can take time. But speaking as a client of the lawyers now, my family and I haven't heard a thing for 4 years. I've learned a lot about the perpetrators of the murder of my daughter, but it's come through the legal offices of Twitter, and Facebook, and YouTube. That's not consistent with the self-description of the OVT. I have, and I mean this sincerely, the utmost empathy with the people doing the job, and I know how tough it is to be a lawyer with unreasonable demands of oversight committees and difficult clients, but we have seen nothing, and the nothing is rattling around in my brain as a question, not as a conclusion.

Mr. DeSANTIS. Thank you. Mr. Lynch, do you have anything further?

Mr. LYNCH. Sure.

Mr. DeSANTIS. The chair now recognizes the gentleman from Massachusetts.

43

Mr. LYNCH. Thank you, Mr. Chairman. Mr. Wiegmann, the Office of Justice For the Victims of Overseas Terrorism, OVT, that's in your department. Is that correct?

Mr. WIEGMANN. Yes, sir, that's correct.

Mr. LYNCH. Then we have the Office of Victims of Crime. Is that in your department as well?

Mr. WIEGMANN. It's in the Department of Justice, not in my division, but it's in the criminal division.

Mr. LYNCH. That's regarding victims' expenses, reimbursement programs?

Mr. WIEGMANN. That's correct.

Mr. LYNCH. Then we have—the FBI has an Office of Victims Assistance straight up, right?

Mr. WIEGMANN. Correct.

Mr. LYNCH. And that's totally different?

Mr. WIEGMANN. Yes.

Mr. LYNCH. Ms. Singer, you've worked with dozens of Americans affected by overseas terrorism, and you, yourself, obviously are a victim of bombing in Israel. In your testimony, you said that you thought that many victims that you worked with have never even heard of OVT or its services. Is that your testimony here today?

Ms. SINGER. Yes.

Mr. LYNCH. You know, it seems scattered. I know these different agencies were created in response to different issues. But you got people at State. You got people with you at DOJ. Then you've got people at FBI. And, you know, you think that with all those agencies, if they were doing what they should be doing, victims and their families, they shouldn't be waiting 4 years without information. Especially when, as you say, it's out there on Twitter and other media platforms.

I'm just wondering if there's a way to consolidate this and do it in a way that actually serves the people. I think we're running into a problem where it's everybody's job, so nobody's doing it. That's the problem. And I'm just wondering if we have accountability with one agency and it's their job and we can hold them accountable if it doesn't happen? I just think that it works in harmony with all of our incentives here, which is, you want to get as much information to the victims' families as possible. Right now it seems like it's three or four different agencies have this responsibility, and nobody's really doing it to the extent that it needs to be done.

Mr. WIEGMANN. So let me just comment first that you're absolutely right that in keeping the victims informed, and serving as that liaison function is job one. If we're not doing that, we're not doing our jobs, in other words, being a liaison with the victims, keeping them informed of the developments in their case, telling them as much as we can about the scope of the investigation, if charges are brought, keeping them apprised of the progress of the prosecution, telling them their rights, as Mr. Roth said. These are statutory mandates that Congress has created, and we have an obligation to fulfill. We needed to try to do that in every single case, and we work hard to do that to reach out to the victims; but if there's a case where that's not happening, then we need to correct that.

44

In terms of having the different offices, they really do perform different functions. OVT was actually the latecomer that Congress created in 2005. The Office of Victims' Assistance at FBI is the kind of what I would analogize as the first responder. They're the ones who are often the first ones to contact victims. They're providing some of those immediate social services and things like that to victims to assist them. They also have a much broader mandate.

It's not just terrorism, so it's any crime. They're protecting all crime victims, so they have a much broader and different mandate.

Then you have victim-witness coordinators at U.S. attorneys' offices. I know this can be confusing, but just bear with me just a minute. Those folks are helping when there's a U.S. prosecution. So if it's brought in Illinois or Georgia or California, the U.S. Attorney's office will have someone assigned to work with the victims in conjunction with those cases.

So the gap that OVT fills is for these overseas cases. So how do we help people know their rights in Israeli or France or Brazil, or wherever the case may be, understand what their rights are under foreign law and how they can interface and help them participate in those proceedings and provide victim impact statements and do the other things that we do?

So that's why we have different offices, and we try to have all these offices work together as appropriate.

Mr. LYNCH. Okay. I've exhausted my time. I yield back.

Mr. DeSANTIS. The gentleman yields back. The chair now recognizes the gentleman from North Carolina.

Mr. MEADOWS. Mr. Chairman, I'll be very brief. Mr. Wiegmann, I asked earlier if it was lack of funding, how can we help? So here is my request of you and my challenge to you. It seems curious that I would have two people at a particular witness table that would indicate that there is a failure to communicate on not only a regular basis, but they're finding out more information, whether it's a lawsuit or Twitter or Facebook, than they are from the appropriate agency.

You just described the agencies and what they did, and I'm confused. I mean, it's like spaghetti, and you don't know where to start and where to stop, and so here's what my request of you, is, can you put together a task force within DOJ that makes a commitment to all victims, not just the three that we have here today, to provide regular updates, to let them know what their rights are, to put it back in a brochure to make sure that every victim's family gets something as a disclosure that says you can count on this, you can count on this, and you can count on this.

And if you're not getting that, then let your Member of Congress know, or let us know, or the appropriate person know. Are you willing to commit today to get that available to the hundreds of victims that are out there and victims' families and make a commitment to this committee and the chairman and the ranking member today?

Mr. WIEGMANN. That's our mission. That's what we should be doing. As I said——

Mr. MEADOWS. I understand that's your mission, but let me just tell you, you're failing at part of your mission, Mr. Wiegmann. And

45

so I'm asking you, are you willing to make a commitment, and if so, by what date can this committee count on that?

Mr. WIEGMANN. So you're saying to create a task force to——

Mr. MEADOWS. It doesn't even have to be a task force. Just get it done where victims can understand what their rights are and what's available to them where they can count on it so they don't have to have an attorney figure out the legalese that you just went through.

Mr. WIEGMANN. That's absolutely our commitment to the victims, and so I can make that commitment today. We owe that to the victims, and I'm certainly happy right after this hearing, we can chat if you feel like you're not getting what you need from our office. We can meet. We can arrange meetings for you, whatever you guys want because we do owe that to the victims.

Mr. MEADOWS. I do appreciate that. But here's what I don't want to happen, is one conversation that happens because you're feeling the heat today because the chairman called this particular hearing. What I want it to be is a report back to the chairman and say this is the process of how we're going to keep all victims and their families informed and of their rights from here on out. Can you do that within the next 120 days?

Mr. WIEGMANN. We can absolutely get you something on that.

Mr. MEADOWS. Thank you. Mr. Chairman, I yield back.

Mr. DESANTIS. The gentleman yields back. I want to thank the witnesses for coming. I think the testimony from our victims and family members was phenomenal. I think it was very, very powerful. I think it was necessary, and I think it's going to help the Department of Justice perform better at this function.

We face, as Americans, a global jihad, and Israel is ground zero for that fight. And when we have Americans visiting, studying, living in Israel, and they're killed, they're wounded by terrorists, we're not going to forget that. We can't forget that. And we will get justice. And we'll be patient if we need to be, but we are not going to let justice be denied. So thank you guys for attending, and this hearing is now adjourned.

[Whereupon, at 3:51 p.m., the subcommittee was adjourned.]

# APPENDIX

———

MATERIAL SUBMITTED FOR THE HEARING RECORD

48

**Submission to House Oversight Subcommittee on National Security from <u>Sherri Mandel</u>**

After my 13 year old son Koby, an American citizen, was killed by terrorists in 2001, a law was introduced in Congress called the Koby Mandell Act. The office's mandate was to actively pursue terrorists who murdered Americans abroad.

At about the same time, the government initiated a Rewards for Justice Program to pay for information leading to the arrest of overseas terrorists. Yet, no terrorist killers of Americans in Israel have ever been apprehended under that program. In fact, today when I checked the Rewards for Justice website, there was not even a listing for my son's name. His murderers have not been found, yet the Justice Department has seemingly deleted him from their consciousness. They are not looking for his killers. In fact, according to their list of atrocities, no Koby Mandell was ever killed in Israel by terrorists. They have closed his case, if it was ever opened.

Yet the Koby Mandell Act promised that the US government would vigorously pursue the killers of American citizens, including those killed in Israel. So far, not one of them has been brought to justice with the help of the American government.

The OVT's primary responsibilities are to work to ensure that when Americans are injured or killed in terrorist attacks overseas, investigations and prosecution remain a high priority. Another responsibility is to honor and respect the rights of victims and their families. The office is also meant to monitor the investigation and prosecution of terrorist attacks against Americans aboard.

Yet this is the way terror in Israel is reported on the site--in this case the murder of the Henkin's, a beautiful young mother and a father killed in cold blood while driving with their little kids in the back of the car:

October 1, 2015

The United States strongly condemns the terrorist attack that took place late Thursday evening in the West Bank. **The shooting resulted in the death of an Israeli couple** who were driving with their young children. We extend our condolences to the victims' family. We urge all sides to maintain calm, avoid escalating tensions in the wake of this tragedy, and work together to bring the perpetrators to justice.

The shooting resulted? What feeble morally dubious language.Obfuscation. Who were the shooters? How is the OVT going to protect the victims when they are too morally confused to name the murderers? Hamas murderers from Nablus.

49

Honorable Ron DeSantis
6th District, Florida
United States House of Representatives
Chairman, Subcommittee on National Security, Committee for Oversight and
Reform, US Congress
3 January '16                Sent by Email

Congressman DeSantis:

I am writing for your consideration.  My name is Alan Bauer, and this letter is
in regards to the proposed 2 February '16 Subcommittee meeting concerning
Americans harmed by Palestinian terrorists in and around Israel.  I am one of
several dozen American terror victims who have been directly harmed by
Palestinian terrorists.  I wish to thank you for holding the planned hearings,
the first of its kind to my knowledge.  I wished to take the liberty of providing
some background on the subject. I am sure that much of the recent history is
well-known to you, so I apologize for providing any information you may
already possess.

Between the signing of the Oslo Accords in 1993 and 2006, there were
approximately 72 terror attacks with American casualties:  54 killed and 85
injured, including my son (screw passed through right brain) and myself (two
screws in left art).  Appendix 1 has a near complete list of known attacks
through 2003 as compiled by Dr. Paul Teller of the Republican Study
Committee.  Of the dozens—if not hundreds—of Palestinian terrorists directly
involved in planning, funding, and carrying out said attacks, not a single one
has faced American justice.  The Office for Justice for Victims of Overseas
Terrorism (OJVOT), specifically set up in 2005 to give DoJ a focus on these
cases, has accomplished nothing. Ditto for the FBI, which has the operational
responsibility for these files; same for DoJ who has prosecutorial obligations
in these cases, and of course the State Department, who has done nothing to
advance criminal prosecutions of Palestinian terrorists. To date, there has not
been a single indictment, extradition, prosecution, or arrest of a Palestinian
terrorist in any of the relevant cases.   This state of affairs is an
embarrassment for all involved.

1

50

As shown in the Berman-Walsh Congressional letter to AG Holder (Appendix 2) and DoJ's response to it (Appendix 3), the Department of Justice has answers for all questions or issues raised by its complete failure in prosecuting Palestinians who killed and maimed American citizens. A parallel "Parents Letter" (Appendix 4) and a personal response from AG Holder (Appendix 5) have similar themes: these cases are really important but we can't do any prosecutions. The situation has reached the absurd with the planner of the "Sbarro bombing", where several American citizens were killed, frequently and unrepentantly describing her role in planning and executing the attack in numerous YouTube videos (for example, http://www.youtube.com/watch?v=_-WTx7k4baw). This woman lives in Amman, Jordan, free from any fear of US officials knocking on her door or interrupting her radio talk-show. If US law enforcement does not have the tools to catch terrorists, then it is the task of the AG to come to Congress and ask for additional powers. If Israel is not playing ball on evidence and/or terrorist access, then it is the job of the Secretary of State to put the subject before the Israeli leadership. Over two presidents, five attorney generals and four secretaries of state, no such thing has ever been done. For all of the lip-service, trips to the region, and Federal tools in play, our cases are simply irrelevant in the eyes of DoJ, State, and the White House. It has only been Congress that has consistently gone to bat for US terror victims.

Besides the complete failure of US law enforcement in prosecuting Palestinian terrorists, the US has actively attempted to harm American citizens' interests in civil cases brought in US federal courts. In 2008, a group of approximately 20 terror victims held a very contentious three-hour meeting with Mr. John Bellinger of the State Department, after the latter planned to file a Statement of Interest in favor of the PLO and against an American woman whose husband had been gunned down by a PLO terrorist. Only through our remonstrations and supportive letters from your colleagues in the House and Senate did State back down from its plan, and the plaintiff in question was able to successfully settle her case. In another, pending, case, critical evidence unintentionally provided by the Palestinian Authority (PA) lawyers to plaintiffs was never picked up by any US governmental body, though the

51

material in question described the individuals involved in the death and injury of several US teens in a pizzeria bombing in the Israeli town of Karnei Shomron. The US, as a major funding body for the Palestinian Authority, is perfectly positioned to ask for the information prepared by the PA. No such request was ever put forth by any relevant office.

One additional subject which I wish to bring to your attention is the complete failure of the "Rewards for Justice" program run by State. Immediately after the attack in which my son and I were injured, we were listed on the "Rewards" site. I later provided information on the individuals involved in our attack (Appendix 6). As State and the FBI did nothing with the information, we were never considered for a reward. I know of a similar case where accurate information was given regarding the location of a Palestinian terrorist who had knifed and murdered an American citizen. As the US did nothing on the information, this same "tipster" was told that his information had not been "actionable" and he also received nothing. The terrorist in the latter case was allowed to move from the Church of Nativity to Europe, where he is today.

You may note from the material in Appendix 6 that those involved in our injuries were active members of the PA intelligence services. The bomb, the bomber, the dispatcher, Marwan Barghouti, and others all have direct links to the PA, the same PA that the US is funding to the tune of several hundred million dollars per year. The head of the cell gave an interview with the NY Times; he did not deny his role in our attack (Appendix 7).

Congressman DeSantis, the laws regarding terror attacks against American citizens were enacted when the US found that it did not have the legal tools to deal with the murder of Leon Klinghoffer aboard *Achille Lauro*. Yet, the results today are the same as in the late 1980's: no prosecutorial success. I know that much of the material that I sent to the FBI (at the suggestion of then ambassador to Israel Jones) was thrown out; as of 2010, our file was empty, though I had sent tens of pages of indictments, newspaper articles and relevant information. I also know that the FBI was caught flat-footed by the 2011 release of terrorists for the soldier Schalit: they could not figure out the names of those released or did not have complete identify numbers. It was

3

52

only a letter from one of our lawyers (Appendix 8) that clarified to the FBI who had been released. From July 2008, 3.5 years before the release, I lobbied to have the US put a veto on terrorists who had been shown to be connected to the death and injury of US citizens. Heather Cartwright, the director of USOJVOT, wrote me in July 2008 that the subject was relayed to the highest levels of government (Appendix 9) and I know that a list of such terrorists was prepared. It was never given to Israel, and the US made no real protest that people who harmed Americans—including several from our attack alone—went free. None of the terrorists released for Schalit has ever been prosecuted by the US government, though I have sent the FBI video of one of the women escorts describing in detail how she brought the bomber to King George Street, where my son and I were injured. Even my request to Ms. Cartwright that the US demand that Palestinian terrorists with American blood on their hands not receive salaries which include US monies fell on deaf ears.

It is my hope that that your Subcommittee meeting this week will be the first step in righting a serious wrong, that we may look forward to the US prosecuting Palestinian terrorists as well as standing by the side of US terror victims. Aggressive prosecution of Palestinian terrorists will send the Palestinian Authority an important message: if you wish to become a state, you will have to work to uproot terror completely from your ranks. Additionally, Mr. Kennedy, your family knows the importance of not letting a terrorist out of jail; I wish that the DoJ would learn from the consistent and responsible approach of your family with respect to another Palestinian who killed an American Citizen.

I thank you for your consideration.

Most sincerely,

/Alan J. Bauer/

Alan J. Bauer, Ph.D.

alan@sci.co.il

53

February 2, 2016

House Committee on Oversight and Government Reform
National Security Subcommittee
2471 Rayburn House Office Building
Washington, D.C. 2051

To Whom It May Concern:

My name is Mark Sokolow, and my family and I are United States citizens. My wife and I live in
Cedarhurst, New York.

In January 2002, my wife and I took our two daughters - ages 12 and 16 - on a family trip to
Israel to visit our oldest daughter who was studying in Jerusalem for the year.

On what was supposed to be the last day of our trip, the four of us went for some last minute
shopping in central Jerusalem. We bought shoes, and right after we left the store, Wafa Idris, the
first female suicide bomber, blew herself up right in front of us. She was a member of the Al-
Aqsa Martyrs' Brigade, the military wing of Fatah, which is a part of the Palestinian Liberation
Organization.

We were all thrown to the ground and sustained significant burns and shrapnel injuries. We were
taken to three different hospitals, and for several hours I didn't know what had become of my
family.

My wife - Rena - suffered a severe leg injury that required immediate surgery to save her leg,
and she had to stay in Israel for another 10 days. Rena was not able to walk for six months
following the attack and has permanent damage to her leg. She will never forget the sight of the
severed head of the suicide bomber lying next to her on the ground.

Our youngest daughter - Jamie, just 12 years old - suffered a severe eye injury that required her
to remain in the hospital for a week and to have follow-up surgery just a few years ago.

Our daughter Lauren and I also suffered burst eardrums that needed follow-up surgery following
the attack.

We all suffer from Post Traumatic Stress Disorder and not a day goes by when we don't think
about the traumatic events of that day.

Throughout the days, months and years of our recovery from this horrific ordeal, we were
contacted only once or twice by the Office of Justice for Victims of Overseas Terrorism (the
"Office"), by what seemed to be a generic form letter. We did not receive any assistance with our
medical needs from the Office nor, to our knowledge, did the Office seek to monitor, investigate,
extradite and prosecute those that were responsible for carrying out the attack against me and my
family.

54

I sincerely hope that this Subommittee can investigate the Office and its affairs to ensure that the Office exercises its authority and mandate and provides the much-needed assistance to the countless number of victims of Palestinian terror.

Very truly yours,
/s/ Mark I. Sokolow
Mark I. Sokolow

55

**Statement of**
**Farley Weiss, President**
**National Council of Young Israel**
**Hearing**
**"Seeking Justice for Victims of Palestinian Terrorism in Israel"**
**House Oversight and Government Reform Subcommittee on National Security**
**February 2, 2016**

Chairman DeSantis, Ranking Member Lynch, and members of the committee, thank you for providing the National Council of Young Israel with the opportunity to share its views regarding the security of American citizens who have been victimized by and are constantly threatened by Palestinian terrorism. I am Farley Weiss and I serve as President of the National Council of Young Israel, one of the 52 members of the Conference of Presidents of Major Jewish Organizations. The National Council of Young Israel was founded 104 years ago and represents approximately 130 orthodox synagogues in America, comprising about 100,000 members.

The issue of this hearing is of major concern to our organization and to me personally. Many of our members visit Israel and very recently the son of one of our members, Ezra Schwartz, was murdered by a Palestinian Arab terrorist. His life was cut short in the midst of doing a charitable act, while using his "gap year" to continue his studies in Israel. His death was noted by the New England Patriots before an ESPN-televised football game. Moreover, the Schwartz Family accepted calls of condolence from President Obama and Secretary of State Kerry. No matter how heartfelt the conveyed sympathies, action speaks louder than words. For years, and not just limited to this Administration, American policy has failed to employ all its legal tools, including seeking extradition, to bring to justice Palestinian terrorists who have wounded or murdered Americans. In my view, such actions would prove to be a strong deterrent to terrorism. The National Council of Young Israel hopes that this hearing will be a catalyst to implement a change in policy.

The issue of pursuing justice for victims and families victimized by Palestinian terrorism is not new for me; it dates back to December of 1997. At that time, during a conference

56

call with Secretary of State Madeleine Albright, I raised the issue. Subsequently, I worked with Congressman Matt Salmon on a letter sent to Secretary Albright, relating to the murder of nine Americans citizens by Palestinian Arab terrorists. The communication called on our country to bring terrorists, like known murder Mohammed Deif, to justice. Deif organized the kidnapping and murder of Nachshon Wachsman. At a subsequent Conference of Presidents call with the Secretary of State, I reminded Ms. Albright of my previous comments and she indicated that she would pursue the Dief matter. Subsequently, the Palestinian Authority briefly detained Dief when they controlled Gaza, but released him. Regrettably, Dief remains free and he was never faced trial.  In fact, Dief is the current military head of Hamas, and is responsible for the death and wounding of over one hundred Israelis, including Americans.

Two other terrorists, Nabil Sharihi and Adnan al-Ghoul, were known to have been involved in the 1995 murder of American Alisa Flatow; they were similarly arrested and then released by the Palestinian Authority.  Furthermore, other Palestinian Arab terrorists who murdered Americans were arrested and released by the Palestinian Authority without, to our knowledge, objection by any Administration, Democrat or Republican. Hence, these terrorists could not face American justice. In our view, this failure promotes terrorism.

In 1998, the House of Representatives overwhelmingly passed, with strong bipartisan support, House Concurrent Resolution 220.  In part, the resolution stated:

> "That it is the sense of the Congress that-- (1) the United States should demand the prosecution of all suspected perpetrators of these attacks against United States citizens; (2) the United States should seek the cooperation of the Palestinian Authority and all other appropriate authorities in the prosecution of these cases; and (3) the suspects should be tried in the United States unless it is determined that such action is contrary to effective prosecution."

57

In 2004, the Koby Mandell Act was enacted (Public Law 108-447), which required the Attorney General to establish an office in the Office of Justice for Victims of Overseas Terrorism (OJVOT) to monitor acts of terrorism against Americans outside the United States and attempt to bring to justice those terrorists who have harmed Americans. In part, the office was tasked to ensure that the investigation and prosecution of terrorist attacks against American citizens overseas remains a high priority within the Department of Justice, and to guarantee that the rights of victims and their families are honored and respected. To our dismay, the enactment of the Kobe Mandel Act did not result in a single Palestinian Arab terrorists brought to these shores to stand trial for the murder of an American. The number of Americans murdered by Palestinian terrorists has climbed to over 60 and approximately 100 of our fellow citizens have been wounded.

In October 2015, Mrs. Naama Henkin was murdered, with her husband Eitam, an American citizen, in front of their children. Israel captured the murderers and they are currently in jail in Israel. In my view, the United States should indict these terrorists and ask for their extradition to face American justice. It is noteworthy that PA President Abbas never condemned the murder of the Henkins. Moreover, the Palestinian Authority continues to praise murderers of American and Israeli citizens as heroes, naming streets after them, and rewarding the terrorists' families with financial assistance – "blood money." This is blatant incitement which encourages terrorist acts.

The United States must articulate with unqualified clarity that there is no double-standard in our desire to pursue justice. If an American is murdered by a Palestinian terrorist, we will hunt that murderer just as we do for other global murderers of Americans. Shortly after 9/11 President Bush gave a moral justification for the U.S. to go to war in Afghanistan by stating succinctly that those who give safe havens to terrorists are equally morally culpable to the terrorists. The Palestinian Authority goes further than giving safe havens to terrorists; they reward their families for murders and treat the terrorist murderers as heroes. America cannot turn a blind eye to the providing of safe havens and the praising of these murderers of Americans.

58

There is strong bipartisan congressional support for American justice for acts terrorist acts committed against our fellow citizens. American justice would send an unambiguous message to prospective terrorists that they will not be a component of some prisoner exchange.  American justice will lead to a more peaceful Middle East because deterring terrorism is in our national security interest. It is within America's interest to bring terrorists to justice.

Mr. Chairman, once again, thank you for conducting this hearing and pursuing this essential issue of bringing terrorists who murder Americans to justice.

Æ

# Exhibit 41

**Jordanian Cassation Court**

**Capacity: Penal**

**Case Number: 757/2017**

<div align="center">

**The Hashemite Kingdom of Jordan**

**Ministry of Justice**

**The Decision**

</div>

Issued by the Court of Cassation authorized to carry out the trial and issue a verdict on behalf of the King of the Hashemite Kingdom of Jordan, **His Majesty Abdallah Bin-al-Husayn II**

**The ruling body headed by Judge Mr. Muhammad Ibrahim and the member judges, sirs**

**Naji al-Zu'bi, Yasin al-'Abd-al-Lat, Dr. Muhammad al-Tarawnah, Basim al-Mabyadayn**

**Appellant:**

**Assistant Public Prosecutor / Amman**

**Appellee:**

**Ahlam 'Arif Ahmad al-Tamimi**

On the date of 15 February 2017, the appellant presented this cassation to contest the decision issued by Amman Court of Appeal in the case numbered 48587/2016 and dated 4 December 2016 consisting of: (overturning the appeal and supporting the appealed decision).

**Requesting the acceptance of the cassation in form and in substance and the revocation of the contested decision for the following reason:-**

**((The decision was issued in violation of the law and due process given that the extradition request is in accordance with the extradition law and the agreement is applicable)).**

**The assistant of the public prosecution presented a written notice in which he requested the acceptance of the cassation in form and in substance and the revocation of the contested decision.**

A.S.G 17-757

Continued

- 2 -

## The Decision

**After examination and deliberation**, we find that the fact of the request is summarized in the fact that the magistrate of Amman Penal Mediation Court was handed a document number 6736/3297/94 issued by the Arab and International Criminal Police Department on the date of 6 September 2016, requesting the extradition of the Jordanian citizen Ahlam 'Arif Ahmad al-Tamimi to the United States authorities on the charges of using weapons of mass destruction against an American citizen and that an international red notice was issued against her.

Amman Penal Mediation Court has determined in its decision number (16685/2016) regarding a fugitive offender on the date of 23 October 2016 considering that the conditions of extradition relating to the recipient of the request of extradition, Ahlam 'Arif Ahmad, are not available.

The Assistant Public Prosecutor did not accept this decision and contested it through an appeal. Hence, Amman Court of Appeal issued its decision number (48587/2016) dated 4 December 2016, dismissed the appeal, and supported the appealed decision.

The decision referred to has not been accepted by the Assistant Public Prosecutor, who contested it for the two reasons on the list of cassation submitted on the date of 12 February 2017 within the legal period.

On the date of 15 March 2017, the Assistant Public Prosecutor presented a written notice in which he made a request to accept the cassation in form and in substance, revoke the appealed decision, and apply the legal requirement.

## And about the two reasons for cassation: -

They seek to raise that the Court of Appeal has made a mistake in the conclusion it had reached and to investigate whether the conditions of extradition are available against the appellee or not.

And in this, we find that the recipient of the extradition-the appellee- is a Jordanian citizen, that the party requesting the extradition is the United States of America, and that the two countries, the Hashemite Kingdom of Jordan and the United States, have signed a mutual treaty on 28 March 1995 regarding the extradition of fugitive offenders. In addition, despite the fact that this treaty has been signed, it has not been approved by the Jordanian Parliament as mandated by the constitution.

A.S.G 17-757

Continued

- 3 -

Hence, the treaty is not enforceable and its application is not authorized. As a result, extradition requests are not accepted because extradition requests sent to the designated authorities in the Hashemite Kingdom of Jordan from foreign countries are not accepted if they are not the result of a treaty or an agreement entered into regarding the extradition of offenders. And this is the conclusion of the judicial interpretation (cassation decisions numbers 961/2004 and 202/99 and number 424/97 and number 282/98). And where the Court of Appeal has reached the same result, hence its cassation decision is to remain unchanged and is in conformity with the law. And for this reason, it is irreversible.

**Therefore, and on the basis of the above, we decide to revoke the cassation, support the appealed judgment, and return the papers to their source.**

**Decision issued on the date of 22 Jumaddah al-Akhira of the year 1438 [Hijri] corresponding to 21 March 2017.**

**Member: Deputy President**

**[*Signature*]**

**Member: Deputy President**

**[*Signature*]**

**Headed by the Magistrate: Deputy President**

**[*Signature*]**

**Member: [Blank]**

**[*Signature*]**

**Member: Deputy President**

**[*Signature*]**

**Chief of Cabinet**

**Verified**

S.A

A.S.G 17-757