**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| FRIMET ROTH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-3838 (ABJ) |
| | ) | |
| DEPARTMENT OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Frimet and Arnold Roth ("plaintiffs") brought this action against the Department of State under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking records related to the 1995 bilateral extradition treaty between Jordan and the United States and the ongoing efforts by the United States to extradite Ahlam Al-Tamimi ("Tamimi").  Compl. [Dkt. # 1] ¶ 1. The State Department identified 62 records, withheld 30 of them in part pursuant to Exemptions 1, 5, and 7(A), and withheld 4 in full pursuant to Exemptions 5 and 7(A).  Plaintiffs challenge those withholdings.

Pending before the Court are the parties' cross-motions for summary judgment on the question of whether the State Department properly applied Exemptions 1, 5 and 7(A).  For the reasons set forth below, defendant's motion will be **GRANTED** in part as to documents 1–16, 19, and 21–34, and plaintiffs' motion will be **DENIED** in part as to those records.  The Court will reserve its ruling with respect to documents 17, 18, and 20 pending the receipt of additional information.

1

**BACKGROUND**

Plaintiffs' 15-year-old daughter Malka Chana Roth was killed on August 9, 2001, in a suicide bombing of a Sbarro Pizzeria in central Jerusalem. Compl. ¶¶ 1, 4. Tamimi, the individual behind the attack, was arrested by Israeli authorities shortly after the attack. Compl. ¶¶ 8, 11–12. She pled guilty and was sentenced by an Israeli court to sixteen consecutive life terms. Compl. ¶ 11. In 2011, Tamimi was released from prison as part of a prisoner exchange with Hamas, and she has since resided in the Hashemite Kingdom of Jordan ("Jordan"). Compl. ¶¶ 13–14.

On July 15, 2013, the Department of Justice ("DOJ") filed a criminal complaint under seal against Tamimi alleging that in 2001, she conspired to use and used a weapon of mass destruction against a United States national outside of the country in violation of 18 U.S.C. § 2332a(a)(1). Compl. ¶ 15. The DOJ requested that Jordan extradite Tamimi to the United States to stand trial pursuant to the 1995 bilateral extradition treaty between Jordan and the United States. Compl. ¶ 15. Jordan refused to comply and on March 21, 2017, Jordan's Court of Cassation ruled that the 1995 bilateral extradition treaty was unenforceable. Compl. ¶¶ 15–16. The United States rejects Jordan's position and maintains that the treaty is valid and in force. Compl. ¶ 17.

On August 7, 2020, plaintiffs made a FOIA request to the State Department seeking records regarding the 1995 bilateral extradition treaty and the government's ongoing efforts to extradite Tamimi. Compl. ¶¶ 1, 21, 23. After conducting a search, the State Department located 62 responsive records. The State Department withheld 25 records in part and 4 records in full pursuant to Exemptions 1, 5, and 7(A). It provided the non-exempt materials to plaintiffs as well as a *Vaughn* index identifying records that were withheld. Plaintiffs informed the agency on April 2, 2024 that it found the *Vaughn* index insufficient to explain the exemptions.

On October 28, 2024, the State Department moved for summary judgment and attached a *Vaughn* index as an exhibit.  Mem. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 50-1] ("Def.'s Mot."); Ex. B to Mem. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 50-4] ("*Vaughn* index"). Plaintiffs opposed the motion and filed a cross-motion on November 26, 2024.  Mem. of Law in Opp. to Def.'s Mot. & in Supp. of Pls.' Cross–Mot. for Summ. J. [Dkt. ## 53–54]  ("Pls.' Cross–Mot.").  Both motions are fully briefed.

On January 24, 2025, defendant filed a combined opposition to plaintiffs' cross-motion and reply in support of its motion for summary judgment, attaching a supplemental *Vaughn* index which identified 5 records being withheld that were not included the first time.  Def.'s Opp. to Pls.' Cross–Mot. & Reply in Further Supp. of Def.'s Mot. [Dkt. ## 56–57] ("Def.'s Cross–Opp."); Ex. C to Def.'s Opp. to Pls.' Cross–Mot. & Reply in Further Supp. of Def.'s Mot. [Dkt. # 57-4] ("Suppl. *Vaughn* index").   The State Department withheld the 5 records in part pursuant to Exemptions 1, 5, and 7(A).  On March 10, 2025, plaintiffs filed a reply in support of their cross-motion.  Pls.' Reply Mem. in Supp. of Cross–Mot. [Dkt. # 60] ("Pl.'s Cross–Reply").  On March 19, 2026, the Court called for the submission of three disputed records in camera.  Minute Order (Mar. 19, 2026).

## STANDARD OF REVIEW

The "vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When a federal agency moves for summary judgment in a FOIA case, all facts and inferences must be viewed in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA.

3

*Chambers v. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).  If the agency has invoked any of FOIA's exemptions, the "burden is on the agency to justify withholding the requested documents, and the FOIA directs district courts to determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015) (emphasis in original).  "[S]ummary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).  To prevail, the agency must describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

## ANALYSIS

### I.      Sufficiency of the *Vaughn* Indices

Plaintiffs first challenge the sufficiency of the State Department's *Vaughn* indices.  Pls.' Cross–Mot. at 5–11; Pls.' Cross–Reply at 1–7.  They maintain that the list of documents in defendant's first index was incomplete, and that both versions failed to provide them and the Court with "a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure."  Pls.' Cross–Mot. at 5, quoting *Davin v. U.S. Dep't of Just.*, 60 F.3d 1043, 1050 (3d. Cir 1995).

In analyzing a *Vaughn* index, the Court's "focus is on the functions served by the *Vaughn* index: to organize the withheld documents in a way that facilitates litigant challenges and court

4

review of the agency's withholdings." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006). Thus, the index must "adequately describe each withheld document or deletion from a released document" and must "state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 294 (D.D.C. 2007) (citation omitted). An agency is permitted to use a *Vaughn* index in conjunction with a declaration that more fully details the basis for the FOIA exemptions. *Jud. Watch*, 449 F.3d at 148.

Here, in addition to the initial and supplemental *Vaughn* indices, the State Department provided two declarations from Deputy Assistant Secretary, Timothy Kootz. Ex. A to Mem. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 50-3] ("Kootz Decl."); Ex. A to Def.'s Opp. to Pls.' Cross–Mot. & Reply in Further Supp. of Def.'s Mot [Dkt. # 57-2] ("Second Kootz Decl."). The supplemental *Vaughn* index includes an entry for every withheld or redacted document, and each entry identifies the nature of the document (e.g., "analyses and recommendations prepared by lower-level State Department officials" or "memorandum regarding a January 6, 2020, meeting between State Department officials and the Jordanian Government regarding Tamimi"); the exemption(s) claimed; and a description of the type of information redacted, either by listing the specific information withheld or referencing a category of information described in the Kootz declarations. Suppl. *Vaughn* index at 3. The Kootz declarations, in turn, explain why these specific categories of information meet the requirements of the claimed exemptions. *See* Kootz Decl. ¶ 4; Second Kootz Decl. ¶ 4. Upon consideration of the defendant's submissions together, the Court finds that the State Department's *Vaughn* indices are sufficient to fulfill their purposes. They are more thorough and detailed than many the Court has received in other cases and rejected.

It is true that the first *Vaughn* index was incomplete – it was missing documents 30, 31, 32, 33, and 34.  But the Department provided a supplemental index with those documents, and that index provided the grounds for withholding the records in part under Exemptions 1, 5, and 7(A). *See* Suppl. *Vaughn* index at 15–20.  Plaintiffs also argue that defendant should be ordered to produce documents 17, 18, 27, and 29 because even though they conducted a thorough search of the State Department's productions, they were unable to locate the records despite their being referenced in the initial *Vaughn* index.  Pls.' Cross–Mot. at 21.  However, that initial index explains the Department's decision to withhold three of the four records in full under Exemptions 1, 5, and 7(A). *See Vaughn* index at 7, 13–14.  As to the fourth document – document 27 – the Department made a supplemental release on December 13, 2024, because it "identified one responsive record subject to the FOIA that was not previously produced[,]" and it "determined the one record may be released in part."  Def.'s Cross–Opp. at 19.  Thus, there is nothing missing, and taken together, the Court is satisfied that the indices are sufficient.

## II.    Plaintiffs' Request for *In Camera* Review Is Denied

Plaintiffs ask the Court to conduct an *in camera* review of the 34 documents listed in defendant's supplemental *Vaughn* index to determine if they were properly withheld pursuant to Exemptions 1, 5, and 7(A).  Pls.' Cross–Reply at 1–7.  But they raise no specific objections to the withholding of documents 30 through 34.

District courts possess the authority to conduct *in camera* reviews of agency records to determine the applicability of the claimed exemptions. *Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996).  An *in camera* review may be appropriate in the court's discretion "when agency affidavits in support of a claim of exemption are insufficiently detailed or there is evidence of bad faith on the part of the agency." *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).  But it tends to be reserved for exceptional cases. *See NLRB v. Robbins Tire & Rubber*

*Co.*, 437 U.S. 214, 224 (1978) (explaining that FOIA's *in camera* review provision "is designed to be invoked when the issue before the District Court could not otherwise be resolved"); *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ("In camera inspection requires effort and resources and therefore a court should not resort to it routinely on the theory that 'it can't hurt.' When an agency affidavit or other showing is specific, there may be no need for In camera inspection.").

After reviewing the initial and supplemental *Vaughn* indices as well as Kootz's declarations, the Court finds that there is "specific information sufficient to place the documents within the exemption categor[ies]." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). Plaintiffs do not point to any facts that would give rise to concerns about bad faith on the part of the agency, and the Court has reviewed the few documents for which defendant's explanations – or the plaintiffs' interpretation of those explanations – raised questions that could be more efficiently resolved by laying eyes on the records. With that, the Court declines to call for any additional records *in camera*.

### III.   FOIA Exemption 1

The State Department contends that it has properly withheld 14 of the disputed records pursuant to FOIA Exemption 1.

Exemption 1 allows the government to withhold matters "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). An agency "may establish the applicability of Exemption 1 by affidavit (or declaration)," provided that the affidavit establishes that the withheld information meets the classification requirements of Executive Order 13526. *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 940–41 (D.C. Cir. 2013). Courts grant an especially high degree of deference to the government's judgment in the national security context because they "lack the expertise to second-

guess such agency opinions in the typical national security FOIA case." *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *see Ctr. for Nat. Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 926–27 (D.C. Cir. 2003) (stating that executive departments responsible for national defense and foreign policy matters have unique insights as to potential harms).  And courts routinely defer to an agency's justification for invoking a FOIA exemption if it is both "plausible" or "logical." *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011), citing *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007).  However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) (finding the CIA's affidavit sufficient because it detailed the classified information, why that information was classified, and why it logically must remain classified in the interest of national security).

The State Department asserts that all 14 of the documents at issue were withheld under two independent provisions of Executive Order 13526.  Def.'s Cross–Opp. at 2, citing Second Kootz Decl. ¶ 5.  The first provision, § 1.4(d), permits the classification of information pertaining to "foreign relations or foreign activities of the United States, including confidential sources."  Exec. Order No. 13526, 75 Fed. Reg. 1013 (Dec. 29, 2009) ("Exec. Order").  The second, § 1.4(b), permits the classification of "foreign government information," which is defined as "information provided to the United States Government by a foreign government or governments . . . with the expectation that the information, the source of the information, or both, are to be held in confidence."  Exec. Order § 6.1(s)(1).

The Court finds that the State Department has offered plausible and logical explanations as to why each document is entitled to protection under section 1.4(b) or (d).  According to the Department's declarant, "foreign government information" in the documents was properly

classified and withheld under section 1.4(b) because it related to "confidential discussions about Tamimi between the United States and the Government of Jordan," including the "pending request for her extradition." Kootz Decl. ¶ 18. Its release could cause damage to national security because if "foreign officials believe that U.S. officials are not able or willing to observe the confidentiality in such interchanges," that would "impact the Department's ability to convince governments to share similar information with the United States in the future." Kootz Decl. ¶ 18.

Also, information in the documents was properly classified and withheld under section 1.4(d) because it "concerns both confidential sources and sensitive aspects of U.S. foreign relations, including, in particular, diplomatic exchanges . . . ." and "information that implicates aspects of U.S. relationships with allies and adversaries . . . ." Kootz Decl. ¶¶ 20–21. The State Department also detailed the harm that could flow from disclosing this type of material:

> Release of this classified information has the potential to inject friction into, or cause damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. national security, including some in which public opinion might not currently favor close cooperation with the United States.
>
> Diplomatic exchanges are premised and depend upon an expectation of confidentiality. Mutual trust between governments is vital to U.S. foreign relations. The inability of the United States to maintain confidentiality in its diplomatic exchanges would inevitably chill relations with other governments and could reasonably be expected to damage U.S. national security by diminishing our access to vital sources of information.

Kootz Decl. ¶¶ 22–23.

According the government the deference to which it is entitled in the national security sphere, the Court finds the withholdings to be justified.

Plaintiffs argue that that the State Department's affidavits are legally insufficient to support its withholdings because they provided a single "prepackaged" explanation for why each document is entitled to protection under both § 1.4(b) and § 1.4(d). Pls.' Cross–Mot. at 8. They cite an

9

opinion from another district court, *Hiken v. Dep't of Def.*, 2012 WL 13118568 (N.D. Cal. Feb. 3, 2012). Pls.' Cross–Mot. at 8–9. But this Court is not bound by that authority and the facts in that case are distinguishable. In *Hiken*, the government claimed that disclosure of the withheld documents would reveal "current operating procedures and methods of self-defense and target identification" relating to the war in Iraq. 2012 WL 13118568, at *6. It held that the boilerplate explanations were insufficient to demonstrate potential harm because the United States had ceased its operations in Iraq in 2010. *Hiken*, 2012 WL 13118568, at *5–8. But here, the foreign policy considerations raised by confidential information and sensitive negotiations have not abated: both the negotiations and diplomatic relations are ongoing.[1]

Other courts in this district have previously found similar explanations to be sufficient to support the withholding of documents under Exemption 1. *See Am. C.L. Union v. Dep't of State*, 878 F. Supp. 2d 215, 223 (D.D.C. 2012) (granting summary judgment where the State Department witness averred that the material withheld under sections 1.4(b) and (d) "ha[d] the potential to, among other things, degrade the confidence in the United States' ability to maintain the confidentiality of information; inhibit the United States' ability to access sources of information essential to the conduct of foreign affairs; and damage the United States' relationship with foreign governments, agencies, and officials" if disclosed); *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 102 (D.D.C. 2010) (finding that the State Department demonstrated that

---

1    Plaintiffs complain that defendant failed to clarify, from the outset of the litigation, its position that every redaction labeled "(b)(1)" is based on Executive Order 13526 § 1.4(b) and § 1.4(d), and only did so in the second declaration from Mr. Kootz. Pls.' Cross–Reply at 3–4. While defendant should have made its position more clear from the start, the matter was addressed in full during the regular course of the summary judgment briefing, and at this point, the Court is ruling based on the entire record.

disclosure of telegrams from various U.S. embassies conveying the views of foreign government officials were exempt for national security purposes).

Therefore, the Court finds that documents 1 through 14 were properly withheld under Exemption 1.  Having found that Exemption 1 applies, the Court need not address the applicability of Exemption 5 or Exemption 7(A) to documents 1–5.  *See* Pls.' Cross–Mot. at 9–11.

## IV.    FOIA Exemption 5

Plaintiffs challenge the State Department's withholding of other documents – 15, 16, 19, and 21–29 – under FOIA Exemption 5.  Pls.' Cross–Mot. at 9, 15–18.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  A document properly withheld under Exemption 5 "must satisfy two conditions: (1) its source must be a [g]overnment agency, and (2) it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  This Circuit has interpreted Exemption 5 "to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege."  *Formaldehyde Inst. v. Dep't of Health & Hum. Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989), quoting *Tax'n With Rep. v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981) (internal quotations omitted).

The State Department asserts that documents 15–16, 19, and 21–29 are all "inter-agency" or "intra-agency" communications and protected by certain privileges.  It withheld document 15 in its entirety under both the deliberative process privilege and attorney-client privilege; portions

of documents 16, 19, and 21–26 under both the deliberative process privilege and the attorney work-product doctrine; and portions of documents 27–28 and document 29 in full under the deliberative process privilege alone. *See* Suppl. *Vaughn* index at 5–15.

### A. Inter-Agency or Intra-Agency Communications

A document may not be withheld under Exemption 5 unless it is an "inter-agency or intra-agency" record whether it is pre-decisional or deliberative. *See* 5 U.S.C. § 552(b)(5); *Klamath Water Users*, 532 U.S. at 9. FOIA defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(f)(1). Generally, this means that communications between agencies and outside parties are not protected under Exemption 5. *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 257–58 (D.C. Cir. 1977) (holding that policy objectives of Exemption 5 are not applicable to negotiations between agency and outside party).

The Court finds that documents 15–16, 19, and 21–29 fall squarely within the definitions of "inter-agency" or "intra-agency" communications for purposes of Exemption 5. Taken together, the *Vaughn* indices and declarations provide sufficient detailed information to enable the Court to find that the records relate to, and were prepared in anticipation of and during, bilateral U.S.-Jordan negotiations regarding Tamimi's extradition, and that they include exchanges among a number of U.S. government stakeholders. *See* Kootz Decl. ¶¶ 28–32; *see also* Suppl. *Vaughn* index at 5–15.

The description of document 29 as a "a draft letter prepared by the DOJ for the Jordanian Ministry of Justice regarding the Tamimi case and the potential extradition of Tamimi from Jordan

to the United States" engendered some confusion on the part of the plaintiffs.  Suppl. *Vaughn* index at 14.  But the Court's *in camera* review has confirmed what the Court understood the index to mean: that the document found in the State Department's files, during a search for records responsive to a FOIA request to the State Department, is a draft of a letter addressed to the Jordanian Minister of Justice, at that country's Ministry of Justice, from the then-Attorney General of the United States.  And it was withheld because, as document 19 reveals, it was transmitted as an attachment to an email from a DOJ lawyer to the State Department recipient.  In other words, it is part and parcel of an inter-agency communication that reflects the "distillation of the two agencies' views and are predecisional as they predated a final agency ruling on policy."  Kootz Decl. ¶ 30.

Plaintiffs seize upon that language and object to the withholding of document 29 in its entirety on the grounds that a communication with a foreign entity does not qualify as an "inter-agency" or "intra-agency" communication.  Pls.' Cross–Reply at 9.  But they did not read the declaration closely enough and misperceive the nature of the State Department's determination that the record was exempt.  First of all, when Kootz refers to "the two agencies" in paragraph 30 of his declaration, it is apparent from a review of the preceding paragraphs that he is talking about the State Department and the Department of Justice.  *See, e.g.*, Kootz Decl. ¶ 27 ("These documents fall under the deliberative process privilege because they are predecisional and deliberative communications concerning State and DOJ officials' views on policy decisions related to the pending extradition request for Tamimi."), and ¶ 29 ("[T]he Department withheld portions of email communications between Department and other officials at the Department of Justice and the Federal Bureau of Investigation . . . .").  The defendant's concern is that the letter is a draft; it reflects DOJ's unfinished process of considering what should be said *to* the Jordanian Ministry of

13

Justice, and its appearance in the State Department's files is an aspect of the inter-agency dialogue on that question. It is not being withheld as an inter-agency deliberative exchange *with* a Jordanian governmental agency.

The question that remains, then, is whether the inter-agency or intra-agency communications withheld in full or in part are covered by the privileges identified.

## B. Deliberative Process Privilege

"The deliberative process privilege protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.'" *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008), quoting *Klamath*, 532 U.S. at 8. "To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented judgment." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis omitted). A record qualifies for withholding only if it is both "predecisional" and "deliberative." *Access Reports v. U.S. Dep't of Just.*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). "Documents are predecisional if they are generated before the adoption of an agency policy, and deliberative if they reflect[] the give-and-take of the consultative process." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (internal quotation marks and citation omitted). To meet its burden, an "agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of the Commonwealth of P.R. v. U.S. Dep't of Just.*, 823 F.2d 574, 585–86 (D.C. Cir. 1987), quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).

The State Department claims deliberative process privilege for documents 15–16, 19, and 21–29. Upon review of the *Vaughn* indices and Kootz declarations, the Court finds that the agency

14

has made the required showing to support its reliance on the deliberative process privilege with respect to documents 15–16, 19, 21–26, and 28–29.  The dispute concerning document 27 is moot.

For documents 15–16, 19, 21–26, and 29, the State Department has explained that the records consist of draft letters prepared by the Department of Justice to the Jordanian Ministry of Justice, background and talking points developed for department officials ahead of a meeting with Jordanian officials, inter- and intra-agency communication regarding the extradition request and the U.S.-Jordanian dialogues concerning that request, and agency communications regarding questions and concerns raised by plaintiffs regarding the pending extradition request.  *See* Kootz Decl. ¶¶ 26–32; *see also* Suppl. *Vaughn* index at 5–12, 14–15.  These documents are pre-decisional as they were created and exchanged while the department was in the process of developing its policy on that matter and before it was finalized, Kootz Decl. ¶¶ 24–26, and they were deliberative because they contained the exchange of viewpoints between stakeholders and the distillation of multiple agencies' considerations of the factual and legal issues posed by the Tamimi matter. Def.'s Mot. at 14–15.

Documents 27 and 28 were also withheld in part under the deliberative process privilege. In the supplemental *Vaughn* index, document 27 is labeled as "[d]raft meeting materials" which contain "background and talking points on the status of the U.S.-Jordan [e]extradition . . . for use in a meeting with Jordanian Government officials."  Suppl. *Vaughn* index at 13.  In response to plaintiffs' cross-motion for summary judgment, though, the State Department produced the document on December 13, 2024, Def.'s Cross–Opp. at 19, and this issue is now moot.

Document 28 is a 4-page document identified as "[d]raft press guidance:" it "contains information prepared for Department employees to respond to press inquiries about the criminal charges brought against Tamimi . . . ."  Suppl. *Vaughn* index at 13–14.  The portion of the first

15

page that supplies State Department officials with answers to anticipated press inquiries is entirely

unredacted, and the Department of Justice Office of Public Affairs press release announcing

Tamimi's indictment, which is pasted into page 2 of the document and takes up all of pages 3 and

4, is also reproduced intact.[2]

The redacted section of document 28 begins on the bottom of page 1 and continues on the

top of page 2, and the *Vaughn* index explains the invocation of the deliberative process privilege

as follows:

> The withheld portions of the document are predecisional because the
> content predates any final determination about the specific responses that
> would be shared by the State Department with the press. These portions of
> the document are also deliberative because they reflect State Department
> officials' views and opinions concerning relevant facts to be considered in
> preparing for responding to press inquiries about the criminal charges
> brought against Tamimi. Disclosure of the withheld information, which
> contains a selection and analysis of facts reflecting the judgment of the
> author could reasonably be expected to chill the open and frank expression
> of ideas, recommendations, and opinions that occur when Department
> officials are formulating a strategy for official action, particularly in the
> context of a sensitive issue such as extradition. Disclosure of the withheld
> information would foreseeably harm the State Department's deliberative
> process by impeding the ability of responsible State Department officials to
> formulate Department press guidance by inhibiting candid internal
> discussion and the expression of recommendations and judgments regarding
> preferred messaging or positions to be communicated to members of the
> press. This foreseeable harm is particularly heightened in the context of
> foreign affairs, where the U.S. Government's official position on a certain
> subject may implicate, or even negatively affect, its relationships with other
> countries. If non-final recommendations or opinions on foreign affairs
> issues are released, it may cause international confusion about the United
> States stance on these issues and harm relations with the affected countries.

Suppl. *Vaughn* index at 14. As the Court's *in camera* review confirms, since this background

information was being provided for the State Department officials' benefit in making future

---

2       This means that plaintiffs' argument that an agency may not withhold draft press guidance
under the deliberative process privilege without supplying the final version, *see* Pls.' Cross–Mot.
at 15–17, is of no moment here; the press guidance and sample Q and A was produced in full.

decisions about what to say publicly and what not to say, it falls within Exemption (b)(5) as deliberative and predecisional.  Moreover, the harm that could flow from disclosure was sufficiently articulated.  Therefore, the Court will grant summary judgment in defendant's favor as to document 28 as well.

Plaintiffs observe that the redactions that appear on the documents simply identify Exemption (b)(5) without identifying the particular privilege being invoked to support any individual withholding, and they maintain that is improper.  Pls.' Cross–Mot at 9.  But the *Vaughn* indices make it clear whether and when the agency was relying on one or more privileges, *compare* Suppl. *Vaughn* index at 9–10 (invoking both deliberative process privilege and attorney work product over the withheld information in documents 21–24), with *id.* at 13 (invoking only the deliberative process with respect to the redaction of document 27), and the Department was permitted to proceed in this fashion.  *See, e.g.*, *Jud. Watch*, 449 F.3d at 150–51 (noting that the agency had asserted both deliberative process privilege and attorney-client privilege over documents in question).[3]

Having found that the deliberative process privilege was properly invoked, the Court need not evaluate if the attorney-client privilege also covers document 15 or if the work product doctrine also applies to documents 16, 19, and 21–26.

---

3       Plaintiffs also complain that defendant improperly withheld a portion of a May 28, 2019 email that appears in document 21, noting that the same email appears in their Exhibit 34, which was released in August 2022 in unredacted form. Pls.' Cross–Mot at 18.  But a comparison of the two records reveals that in both productions, identical language was left unredacted, albeit in a different format, and there is no discrepancy of concern.  *See* Def.'s Cross–Opp. at 11–12, and Exhibit B to Cross–Opp.

## IV.    FOIA Exemption 7(A)

Finally, plaintiffs challenge the State Department's withholding of documents 17, 18, and 20, *see* Suppl. *Vaughn* index at 7–9, pursuant to Exemption 7(A). Pls.' Cross–Mot. at 10–15; Pls' Cross–Reply at 7.

Exemption 7(A) permits agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To justify the withholding of records under Exemption 7(A), an agency must show that the records were compiled for law enforcement purposes and that their disclosure "(1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Mapother v. U.S. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (emphasis omitted); *Juarez v. Dep't of Just.*, 518 F.3d 54, 58 (D.C. Cir. 2008) (noting a law enforcement agency cannot justify withholding under Exemption 7(A) unless the material withheld relates to a "concrete prospective law enforcement proceeding"). "The proceeding must remain pending at the time of [the court's] decision, not only at the time of the initial FOIA request." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 746 F.3d 1082, 1097 (D.C. Cir. 2014) ("*CREW*"). "Thus, reliance on Exemption 7(A) may become outdated when the proceeding at issue" ends. *Id.*, citing *Coastal States*, 617 F.2d at 870 ("There is no reason to protect yellowing documents contained in long-closed files.").

Documents 17 and 18 are listed together in the *Vaughn* index, and identified as an April 10, 2017 letter from the Ministry of Foreign and Expatriate Affairs of Jordan to the U.S. Embassy in Amman, Jordan, written in Arabic, and an April 21, 2017 translation of the letter in English. The withholding of the record under that exemption is justified as follows:

18

The Department withheld these documents in full because they were compiled as a direct result of the United States request for Tamimi's extradition from Jordan to the United States. These documents were generated as a result of the criminal case brought by DOJ against Tamimi related to her alleged participation in a 2001 suicide bomb attack in Israel that resulted in the death of U.S. nationals, and subsequent extradition request. The premature release of that information could reasonably be expected to interfere with DOJ's ongoing criminal investigation and efforts to obtain custody of Tamimi. The disclosure of the information could also reasonably be expected to compromise the United States ability to work cooperatively with the Jordanian Government to obtain custody of Tamimi.

Suppl. *Vaughn* Index at 7–8. The agency's declarant elaborates with the assertion that "[t]he Department of Justice, a federal law enforcement agency, has an ongoing criminal case and investigation against Tamimi related to her alleged participation in a 2001 suicide bomb attack in Israel that resulted in the death of U.S. nationals." Kootz Decl. ¶ 35. He states without equivocation that "[t]he request for the extradition of Tamimi to the United States is still pending, and the ongoing criminal complaint and investigation into Tamami's alleged offenses remains an active law enforcement proceeding." Kootz Decl. ¶ 36. He adds that the "premature disclosure" of the information being withheld under Exemption 7(A) could both harm the investigation and interfere with efforts to extradite Tamimi. Kootz Decl. ¶ 36. "Specifically, disclosure of this information could interfere with the United States['] ability to work cooperatively with the Jordanian government to extradite Tamimi." Kootz Decl. ¶ 36.[4]

Document 20 is a March 15, 2017 email chain among State Department and Jordanian government officials "regarding the United States['] engagement with the Jordanian Government concerning the criminal case against Tamimi and the request for her extradition from Jordan to the

---

4    This reference to a "pending" request for extradition echoes the representations made in connection with the withholdings under section 1.4(b) of the classified information exemption. *See* Kootz Decl. ¶ 18 (stating the Department withheld "information regarding the pending request for [Tamimi's] extradition to the United States").

19

United States.  Suppl. *Vaughn* index at 9.  The index explains: "[t]he document reveals underlying details of U.S. efforts to obtain custody of Tamimi, which if released prematurely could reasonably be expected to stymie DOJ's ongoing criminal investigation and efforts to obtain custody of Tamimi[,]" and "to compromise the United States['] ability to work cooperatively with the Jordanian Government to obtain custody of Tamimi."  *Id.*

Plaintiffs are dissatisfied with these explanations and not without reason.  "Exemption 7(A) is temporal in nature," and an agency seeking to invoke the exception must "show that the material withheld relates to a concrete prospective law enforcement proceeding."  *CREW*, 746 F.3d at 1097, quoting *Juarez v. Dep't of Just.*, 518 F.3d 54, 58 (D.C. Cir. 2008) (internal quotation marks omitted).  Plaintiffs point out that as of March 21, 2017, the extradition treaty between the United States and Jordan has been deemed unenforceable by the Jordanian government.  Plaintiffs' Statement of Undisputed Material Facts In Supp. of Cross–Mot. for Summ. J. [Dkt. # 53-2] ("Pls.' SUF") ¶ 5.  And the Jordanian government continues to be hostile to the idea of extraditing Tamami: it has been almost 13 years since the Department of Justice's investigation into Tamami was initiated, and almost 9 years since the indictment was unsealed.  Plaintiffs' SUF ¶¶ 1–2, 5.  In short, the plaintiffs have been waiting a very long time for more information, and they question whether there is anything "ongoing," much less, ongoing "cooperation" that could be adversely affected.

Given the deference owed to the government's declarations, though, and the lack of any indication that it is acting in bad faith here, it appears that the agency has laid the groundwork for the applicability of the exemption given its repeated representations that both the investigation and the efforts to extradite Tamimi are in fact "ongoing."  But the descriptions of the harm that could flow from releasing Jordan's initial reactions to the request for extradition now are too general and

too conclusory to support an award of summary judgment in the agency's favor on this record. *See CREW*, 746 F.3d at 1098 ("[A]lthough [courts] give deference to an agency's predictive judgment of the harm that will result from disclosure of information, it is not sufficient for the agency to simply assert that disclosure will interfere with enforcement proceedings; it must rather demonstrate *how* disclosure will do so.") (emphasis in original) (internal citations and quotation marks omitted).

The Court encourages the agency to reconsider its decision to withhold these records given those circumstances. If upon review of this record, the State Department remains persuaded that disclosing the nine-year-old letter and/or the email chain could harm real, ongoing efforts to extradite Tamimi, it must supplement its showing that disclosure could reasonably be expected to interfere with that aspect of the law enforcement proceeding, and that the agency reasonably foresees that disclosure would harm an interest protected by the exemption, by April 21, 2026. The Court will reserve ruling on plaintiffs' motion for summary judgment with respect to documents 17, 18, and 20 in the meantime.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is **GRANTED** in part: the Court finds that documents 1–16, 19, and 21–34 were properly withheld under the claimed exemptions. Therefore, plaintiffs' cross-motion for summary judgment is **DENIED** in part as to those documents. Finally, defendant is **ORDERED** to file by April 21, 2026, a supplement showing that disclosure of documents 17, 18, and 20 could reasonably be expected to interfere with and cause harm to its ongoing efforts to extradite Tamimi.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  March 30, 2026